## PRELIMINARY STATEMENT

The defendants in this matter -- seven individuals generally alleged to have been "affiliated" with the defendant animal rights organization Stop Huntingdon Animal Cruelty USA ("SHAC") -- have been indicted on the basis of information published on the Internet.  Defendant Kjonaas now moves to dismiss the indictment because of the facial insufficiency of the indictment itself:  Each count fails to set forth the elements of the offenses with which the defendant stands charged, and the allegations of the indictment are so facially insufficient that they do not provide even a baseline of facts to support its counts.

The charges against all of the defendants include conspiracy to have violated the Animal Enterprise Protection Act, 18 U.S.C. § 43 (the "AEPA").  The indictment is fatally flawed because it misstates the elements of the AEPA, and alleges that the defendants conspired to use a facility in interstate commerce (i.e., the Internet).  But the AEPA, by its plain language, does not include such a conspiracy.  The defendants have not been charged with the actual use of such a facility, as required under the AEPA's first of two separate, requisite sections:  18 U.S.C. § 43(a)(1).  That is an incurable, fatal defect in the indictment.

Further, the facts as alleged against the individual defendants are threadbare and insufficient as a matter of law.   There is no allegation anywhere in the indictment that any of the individual defendants committed any act whatsoever to effect the publication of any information on the SHAC website in any way, other than the general statement that, at some unspecified time and in wholly unspecified ways, individual defendants collectively "chose[ ] and coordinated" the activities of SHAC and its website in cyberspace.  (Defendant McGee is not even alleged to have had that most minimum contact.)   Indeed, there is no other allegation in the indictment that any

of these individual defendants prepared or reviewed any material that was thereafter broadcast in any manner anywhere in cyberspace, or in any other medium -- electronic or not.

The indictment also charges that acts were committed against a wide variety of individuals and corporations, only one of which is alleged to be an "animal enterprise," following from the publication of that information.   Within the period of time of the conspiracy charged in Count One of the indictment, no individual defendant -- indeed no human conspirator whatsoever -- is alleged to have been involved in those acts, which the indictment attributes generally to unnamed "individuals" or "protesters," or to no one at all, through the liberal use of verbs of passive mood, with no subject specified.

The factual deficiencies of the allegations infect each of the other counts of the indictment, wherein defendant Kjonaas has been charged with conspiracy to commit interstate stalking through alleged use of the Internet, three substantive counts of interstate stalking (again, arising out of alleged use of the Internet), and conspiracy to commit interstate transmission of anonymous faxes.  The indictment does not allege that defendant Kjonaas reached any agreement at all with any of the conspirators.  Again, there is no fact alleged to link defendant Kjonaas (or any other individual defendant) with the use of the Internet or any electronic or telecommunications medium for any purpose within the scope of any criminal conspiracy.

Defendant Kjonaas moves for dismissal for a separate set of reasons, grounded in the Constitution:  The statutes underlying the charges are vague and overbroad, and violate his rights of freedom of speech under the First Amendment, and of due process and grand jury procedure under the Fifth Amendment.

Accordingly, defendant Kjonaas asks the Court, following its review of the facts and charges confined within the four corners of the indictment itself, to dismiss the indictment in its entirety.

## PROCEDURAL HISTORY

On May 20, 2004, the Clerk of this Court filed a five-count indictment against seven individual defendants (Kevin Kjonaas, Lauren Gazzola, Jacob Conroy, Joshua Harper, Andrew Stepanian, Darius Fullmer, and John McGee), and one corporate defendant (Stop Huntingdon Animal Cruelty USA, Inc., also known as SHAC USA, or SHAC). (See Ex. A at p. 1).[1]

In Count One of the indictment, all defendants have been charged with conspiracy in violation of the Animal Enterprise Protection Act (the "AEPA"), 18 U.S.C. § 43(a)(1).[2]

Count Two charges that SHAC, Kjonaas, Gazzola and Conroy conspired to use a facility in interstate commerce to violate the interstate stalking statute, contrary to 18 U.S.C. § 2261A(2) and in violation of 18 U.S.C. § 371. (See Ex. A at pp. 23 to 24.) In Counts Three through Five, the same four defendants have been charged individually with violations of the interstate stalking statute, contrary to 18 U.S.C. § 2261A and 2. (See Ex. A at pp. 25 to 28.)

The individual defendants were arraigned on the indictment on June 15, 2004. The arraignment of the corporate defendant SHAC took place on July 20, 2004.

On September 16, 2004, the Superseding Indictment (attached as Ex. A, and referred to herein as the "indictment") was filed with the Court, by which defendants SHAC, Kjonaas, Gazzola, Conroy, and Harper have been charged in the add-on Count Six with having "knowingly and wilfully combine[d], conspire[d] and agree[d] with one another and with others to utilize a telecommunications device to abuse, threaten and harass persons at the called number and who received the communication without disclosing the identity of the person utilizing the

---

[1]   The exhibits cited in this Memorandum as Ex. A and Ex. B are attached to the Certification of Isabel McGinty, dated January 28, 2005, which is filed with the Court along with the Notice of Motion to Dismiss the Indictment.

telecommunications device, contrary to" 47 U.S.C. § 223(a)(1)(C), in violation of 18 U.S.C. § 371.

The individual defendants named in the added count thereafter entered their pleas of not guilty, pursuant to Fed. R. Crim. P. 10(b).

Defendant Kjonaas, through his counsel, now moves the Court for dismissal of the indictment as to all counts.

---

[2] The relevant portions of the statutes at issue in this matter are annexed to this brief in the Appendix, at pages 68-70.

# STATEMENT OF FACTS

For purposes of this motion to dismiss, to highlight for the Court the facial insufficiency of the allegations of the indictment, this Statement of Facts adheres wholly to the facts as set forth in the indictment, and does not include any facts outside the indictment.

The indictment, in turn, sets forth allegations imputed to the defendants of a conspiracy against Huntingdon Life Sciences ("HLS"), a pharmaceutical company engaged in animal experimentation. (Ex. A at pp. 1-2). The indictment identifies, in its opening paragraphs, HLS as a Delaware corporation with its principal place of business in New Jersey. (Ex. A at p. 1). "HLS was started and maintains facilities in the United Kingdom. It is one of the leading pharmaceutical testing companies" which engages in experiments and tests on animals. (See Ex. A at pp. 1 to 2).

The indictment states conclusively that "HLS is an 'animal enterprise' as that term is defined" in 18 U.S.C. § 43(d)(1), "in that it is a commercial enterprise that uses animals for research and testing." (Ex. A at p. 2). Although a number of other corporate entities are characterized as victims in the indictment, no other such entity is identified as an "animal enterprise," and none is alleged to have engaged in business as "a commercial enterprise that uses animals for research and testing." (See Ex. A at p. 2; see generally 18 U.S.C. § 43(b)(1)-(2), (d)(2)-(3) [there is no allegation in the indictment that these other companies could have suffered, or did suffer, any "physical disruption," or resultant "economic damage," from the actions alleged against the defendants]).

The indictment describes defendant SHAC as a vehicle for the dissemination of information within the specific category of animal rights. (See Ex. A at pp. 2-3). The indictment identifies SHAC as an organization that (without any time specification) was "first started in the

United Kingdom and then incorporated in the United States." (Ex. A at p. 2). The indictment

identifies SHAC as "a not-for-profit corporation" with "its principal place of business located in

New Jersey." (See Ex. A at p. 2). The indictment identifies no "business" activities conducted by

SHAC other than the dissemination of information unfavorable to HLS. The indictment states

that SHAC was "formed to interrupt the business of HLS and ultimately to force it to cease

operations altogether due to its use of animals for research and testing." (See Ex. A at p. 2). The

indictment further specifies that "SHAC distributed a newsletter and operated a series of websites

that disseminated its animal rights ideology and furthered its mission by, among other things,

posting information relating to individuals and organizations that SHAC targeted for action."

(Ex. A at p. 2).

The indictment states that "[t]his information included the names, addresses and other

personal information about individuals who where employed by HLS and other targeted

companies." (Ex. A at p. 2). Without any time specifications, the indictment states that the

websites operated by SHAC "included www.shacusa.net; www.shacamerica.com;

www.shacamerica.net; www.shacamerica.org; www.stephenskills.com; www.october29.org; and

www.december1.com (hereinafter sometimes collectively referred to as the "SHAC Website")."

(Ex. A at pp. 2-3).

The indictment, without otherwise defining the relevant timeframe, states that "[t]he

activities of SHAC and the SHAC Website were chosen and coordinated *at various times* by" all

of the individual defendants, except John McGee. (Ex. A at p. 3). That is the only allegation in

the indictment linking any of the defendants with the SHAC Website. This is the only allegation

in the indictment which directly links any of the defendants with electronic transmissions (e.g., e-

mail or fax activity) attributed to SHAC in the indictment. (See generally Ex. A at p. 10, ¶ 18 [the

only other paragraph relating to computers attributes a series of very general and not criminal actions -- some of which are also unrelated to computer technology -- to "defendants and others," without any further clarification]; see also Ex. A at p. 6, ¶¶ 4, 6; p. 9, ¶ 13; p. 10, ¶ 16 [the only remaining references to the collective group of individual defendants do not relate to electronic media]).  Arguably, the broad and general statement that "[t]he activities of SHAC and the SHAC Website were chosen and coordinated *at various times* by" individual defendants does not link any of the defendants at all to the specific actions alleged by the Government to have involved a criminal act arising out of use of the Internet, e-mail, or faxes.  As for defendant John McGee -- the Government has not alleged in the indictment that Mr. McGee was linked to these activities in any way whatsoever.

Further, while the indictment identifies SHAC as the vehicle for the dissemination of information, the indictment gives no information to support any inference that any of the individual defendants, in their "cho[o]s[ing] and coordinat[ing]" of information to be broadcast on the SHAC Websites, exercised that role within the relevant time frame of the alleged conspiracy and with regard to the information specified in the "Overt Acts" section of Count One (the "specified information").  The indictment does not state whether the persons who chose and coordinated the specified information for publication on the SHAC Websites also composed that information, or whether they republished it for informational purposes, to expand the marketplace of ideas in cyberspace, rather than as an expression of agreement without reservation as to the viewpoint expressed in the piece.   The indictment does not attribute to any human actor -- conspirator or not -- any involvement at all in the broadcast, publication, or dissemination of the specified information on the SHAC Website.  It gives no information about whether any person at

all acted with the intent to commit a criminal offense as the object of a conspiracy to achieve the illegal result.

The indictment only once attributes to the individual defendants a connection with the corporate defendant, SHAC.   That connection is set forth on page 3 of the indictment, as follows:

- Kevin Kjona[a]s is identified, without any further elaboration, as "the President of SHAC";

- Lauren Gazzola is identified, without any further elaboration, as "the campaign coordinator for SHAC";

- defendants Jacob Conroy, Joshua Harper, Andrew Stepanian, Darius Fullmer, and John McGee are identified, without any further elaboration,  as "affiliated with SHAC."   [Ex. A at p. 3]

The indictment does not specify if any others were "affiliated" with SHAC in any way at all, and it does not name any other individuals who might fit within that category.   The indictment readily states that other persons were involved in the activities it cites as overt acts in furtherance of the conspiracy attributed to SHAC and the individual defendants, but it does not identify whether those others were members (or "affiliates") of SHAC, or even members of the conspiracy charged in the indictment (or any other conspiracy).   Indeed, the indictment expressly attributes many of the acts set forth therein to such individuals.   (See, e.g., Ex. A at p. 11, ¶ 21 ["*protesters* appeared at the. . . residence of HJ"]; p. 11, ¶ 222 ["rocks *were thrown*"; a car "*was overturned*"; "a second car . . . *was also vandalized*"]; p. 12, ¶ 22  ["defendant [McGee] and *another* slashed the tires"]; p. 12, ¶ 26 ["*individuals* . . . caused HLS' server to overload"]; p. 13, ¶ 31 ["*individuals* engaged in a . . . "'Zombie Attack'"]; p. 15, ¶¶ 38, 40 ["the home[s] of SD . . . [and MR *were*] *vandalized*"]; p. 15, ¶42 ["*individuals* harassed MH"] ; p. 15, ¶ 44 [a golf "[c]lub

*was vandalized*; its putting greens *were destroyed* and . . . [the greens] *were dug* into"]; p. 16-17, ¶¶ 47, 49 ["*individuals* vandalized the home[s] of FT . . . [and] RH"]; p. 18, ¶ 52 ["*individuals* assembled outside the home . . . of ML [and] . . . *demonstrators* banged on the home and its windows, and shouted"]; p. 19, ¶ 55 ["*individuals* broke windows and splashed paint"]; p. 19, ¶ 58 ["2 million e-mails *were sent*" in a "barrage of e-mails"]; p. 20, ¶ 63 ["the home of BR . . . *was vandalized* and his boat *was damaged*"]; p. 22, ¶ 69 ["*animal rights activists* protested"]; p. 22, ¶ 71 ["*individuals* went to the home of AH"]).

In the string citation just given, the actors are wholly nameless, plural, and not labeled as members of any conspiracy at all. Indeed, the indictment does not even state that persons "affiliated" in any way with SHAC performed these acts. The express language does not attribute to any of those others any meeting of the minds with any of the individual defendants, or with the corporate defendant SHAC.

The indictment also identifies various companies, each of which "utilized a website as well as e-mail." (Ex. A at pp. 4 to 5). None of the companies is identified as an "animal enterprise" within the terms of 18 U.S.C. § 43(d)(1), and none appears to qualify as such an entity. Further, many of the acts implicitly attributed to the defendants as overt acts in furtherance of the conspiracy to violate the AEPA involve these entities, not HLS:

- S. Corp., "an investment banking firm with its principal place of business in Little Rock, Arkansas" (Ex. A, p. 4, ¶ 1(j));

- M. Corp., a company "which provided insurance brokerage services on behalf of large corporations and others" with a principal place of business in New York, New York (Ex. A, p. 4, ¶ 1(k));

- Q, a company with headquarters in New York, New York, which was "involved in investing in companies on behalf of clients" (Ex. A, p. 4, ¶ 1(l));

- W. Corp., a company with headquarters in Jersey City, New Jersey, "involved in trading the stock of publicly traded companies on behalf of clients" (Ex. A, p. 4, ¶ 1(m));

- BNY, a financial institution with "its principal place of business in New York, New York, which provided financial services to individuals and corporations" (Ex. A, p. 4, ¶ 1(n);  and

- C. Corp., "a global pharmaceutical company headquartered in Emeryville, California" (Ex. A, p. 5, ¶ 1(o)).

The indictment proceeds to lay out a series of events attributed broadly and generally to SHAC.   With rare exception (see Table A below), the indictment makes almost no further mention of the individual defendants.  The indictment generally states that the SHAC Website broadcast its messages against HLS; individuals acted; the reader is left to infer that SHAC conspired to achieve that result; the reader is left to make a further inference -- an inference not spelled out in the express language of the indictment -- that the individual defendants identified as "affiliated" with SHAC, or as its "president" or "campaign coordinator," therefore must be assumed to have conspired with SHAC to have achieved that result, as well.

The overt acts alleged against each of the individual defendants as to Count One are limited to the following dates:

**Table A.**
**References to Overt Acts in Which the**
**Individual Defendants Are Named as to Count One**

| Defendant | date of events occurring outside the time frame of Count One | date of events occurring within the time frame of Count One (10/01 - 2/04) |
|---|---|---|
| Kjonaas | 5/13/01 (Ex. A, p. 20, ¶ 61 [alleged victim:  TP, a BNY employee at home]) | none |

| Gazzola | 5/13/01 (Ex. A, p. 20, ¶ 61[same event]) | 8/10/02 (Ex. A, p. 17, ¶ 50 [alleged victim: wife of M. Corp. employee MH; at the home of RH])<br><br>9/10/02 (Ex. A, p. 19, ¶ 59 [alleged act: letter received by W Corp., signed in the name of an alias attributed to Gazzola]) |
| Conroy | none | none |
| Harper[3] | none | none |
| Stepanian | 5/13/01 (Ex. A, p. 20, ¶ 61 [alleged victim: TP, a BNY employee at home]) | none |
| Fullmer | 5/13/01 (Ex. A, p. 20, ¶ 61 [same event]) | none |
| McGee | 5/30/01 (Ex. A, p. 12, ¶ 23 [tires of DD, an HLS employee, slashed at DD's home]) | none |

The events laid out in the overall indictment occurred within the time period of October 2000 through February 2004. To make the overview of these events clearer, in Table B we have set forth chronologically all of the events for which the indictment identifies a date. These include all of the "overt acts" set forth in Count One, as well as the acts alleged in all other counts of the indictment. Table B also sets forth the dates specifically charged as to each of the separate Counts of the indictment. In the last column of the Table, we have addressed the issue of whether each paragraph, by its plain language, involves garden-variety criminal behavior (whether prosecuted ordinarily in municipal court, New Jersey Superior Court, or federal court), in contrast to speech-related events, wherein the speech or publication may have been controversial or even inflammatory, but it did not involve an identified or identifiable individual victim who was expressly and imminently threatened with harm:

---

[3] The indictment also alleges that defendant Harper, on 10/17/02, "gave a presentation" publicly on "how to send black faxes[.]" This conduct is specified as an overt act in proof of the conspiracy laid out as Count Six. See below at pp. 62-63. There is no overt act attributed to defendant Harper by name as to Count One.

**Table B.**
**Chronological Breakdown of Overt Acts and/or**
**Criminal Conduct Alleged as to All Counts**

| Date | Indictment cite | Event | About or Against Whom[4] | Garden-variety criminal act? |
|------|-----------------|-------|--------------------------|------------------------------|
| 10/00 | p. 13, ¶ 33 | "SHAC caused the website www.stephenskills.com to be launched to apply pressure on S. Inc. to cease doing business with HLS." | S. Inc. | No |
| 2/15/01 | p. 11, ¶ 19 | Announcement on SHAC website re HLS: "we'll be at their offices, at their doorsteps, on their phones or in their computers. There will be no rest for the wicked." | HLS | No |
| 2/28/01 | p. 13, ¶ 34 | SHAC website announced successful electronic attack on S. Inc. which "saw over a thousand activists activate a floodnet program from their computers" to flood S. Inc.'s website | S. Inc. | No |
| **3/01 to 12/02** | **p. 23, ¶ 2** | **COUNT 2:** **CONSPIRACY TO COMMIT INTERSTATE STALKING (against defendants SHAC, Kjonaas, Gazzola, Conroy)** with regard to actions against SD [¶¶ 36-39 of Count 1], MH [ ¶ 42], and RH [¶¶ 49-51], in Somerset, NJ, and elsewhere (also incorporating by reference allegations in ¶¶ 1, 6, 9-14, 16-18) | -- | -- |
| 3/6/01 | p. 11, ¶ 20 | "SHAC website listed the 'top 20 terror tactics' that could be used against organizations and individuals in order to harm HLS and ultimately cause it to shut down"[5] | HLS generally | No |

---

[4]    The following abbreviations are used in this column: "*ee*," for employee; "*ees*" for employees.

[5]    The image of the webpage to which this allegation refers is set forth at Ex. B (images of web pages showing broadcast dates of 3/8/01 [G12400], 3/16/01 [G12107], and 3/20/02 [G09634-35]). The allegations of this paragraph of the indictment are not disputed for purposes of this motion to dismiss.

At trial, however, the petit jury would have the evidence before it, and the exhibit of this alleged publication will speak for itself. The exhibit shows that, when this information was published on the Internet in March 2001, it bore the heading which identified its source, which was ***not*** SHAC or any animal rights group, and it carried a disclaimer. Indeed, the SHAC Website stated that it quoted text published "From the Research Defense Society of the UK," and the quoted piece was followed by this disclaimer on the SHAC Website: "Editors' Note: Now don't get any funny ideas, folks." An image from a SHAC website for 3/20/02 shows that by then the following text had been added to introduce the Research Defense Society's list, before the list (surrounded by quotes) was set forth in full immediately thereafter:
**What They Don't Want You To Read.**

| 3/31/01 | p. 11, ¶ 21 | "after the SHAC Website postings described above [see 2/15/01 and 3/6/01], protesters appeared at the [NJ] residence of HJ, an HLS employee, and banged on the windows and doors at his home" | HLS ees at home | No |
|---|---|---|---|---|
| From 4/01 | p. 20, ¶ 60 | SHAC website listed BNY as a target | BNY | No |
| 4/2/01 | p. 11, ¶ 22 | "after the SHAC Website postings described above, rocks were thrown through windows of [HLS employee] HJ's home"; car in driveway overturned and vandalized; second car in HJ's driveway vandalized | HLS ee at home | Yes |
| 5/13/01 | p. 20, ¶ 61 | KJONAAS, GAZZOLA, STEPANIAN, FULLMER "and others appeared at the doorstep of BNY employee TP's home and shouted, cursed and threatened his wife" | BNY ee at home | Yes |
| After 5/13/01 | p. 20, ¶ 62 | afterwards, the SHAC website reported the "verbal attack upon [BNY employee] TP's wife" | BNY ee at home | No |
| 5/30/01 | p. 12, ¶ 23 | McGEE "and another slashed the tires on the car of DD, an HLS employee, and spray painted on his house" | HLS ee at home | Yes |
| After 5/30/01 | p. 12, ¶ 24 | After attack on the home of HLS employee DD, SHAC Website "posted names and home addresses of HLS employees," as well as information about attack on DD, including that "[h]is wife is reportedly on the brink of a nervous breakdown and divorce." | HLS ee (home related) | No |
| 7/01 | p. 19, ¶ 57 | "SHAC Website listed W. Corp. as a Market Maker of the Week, thereby targeting W. Corp. for direct action." | W. Corp. | No |
| 7/11/01 | p. 19, ¶ 58 | "in a matter of hours over 2 million e-mails were sent through W. Corp.'s computer. This barrage of e-mails compromised the computer server and caused damage to W. Corp.'s operations." | W. Corp. | No[6] |

In February of 2001, the Research Defense Society, an UK organization "representing medical researchers in the public debate about the use of animals in medical research and testing" released a list of successful "terror tactics" used by activists against HLS.

The list caused such a stir that HLS and Stephens Inc. lawyers attempted to shut down our website due to our reprinting of a pro-animal research news update.

Go figure -- THEIR side produced the information  -- we're just helping spread THEIR propaganda!

Now don't go getting any funny ideas!

*(Ed. note -- SHAC does not organize, fund or take part in any illegal activity, however we do support any action that does not harm any animal, human, or non human, to further the campaign to shut down HLS)*

*[Ex. B]*

---

[6] In a recent vice presidential debate, Vice President Dick Cheney incorrectly mentioned the name of a website.   Instead of citing factcheck.org, he directed viewers to factcheck.com, a very small

| | | | | |
|---|---|---|---|---|
| 7/24/01 | p. 20, ¶ 63 | Home of BNY employee BR "was vandalized and his boat was damaged." SHAC press release reported that his "Amerikkkan Flag was lowered and discarded . . . and replaced with . . . a pirate flag" | BNY ee at home | Yes, as to the vandalism; No, as to the published report |
| **10/01 to 2/04** | **p. 5, ¶ 2; pp. 5-22** | **COUNT 1:**<br>**CONSPIRACY TO VIOLATE THE ANIMAL ENTERPRISE PROTECTION ACT charged against SHAC, Kjonaas, Gazzola, Conroy, Harper, Stepanian, Fullmer and McGee, at Somerset, NJ, and elsewhere**<br><br>**("did knowingly and willfully combine, conspire and agree with one another and others")** | -- | -- |
| **10/01 to 2/04** | **p. 28, ¶ 2** | **COUNT 6:**<br>**CONSPIRACY WITH ONE ANOTHER AND WITH OTHERS TO USE A TELECOMMUNICATIONS DEVICE TO MAKE ANONYMOUS CALLS charged against SHAC, Kjonaas, Gazzola, Conroy and Harper, at Somerset, NJ, and elsewhere** | -- | -- |
| 10/23/01 | p. 18, ¶ 54 | e-mail sent to animal rights activists targeting Q as an "hls: Investor of the week." The e-mail listed personal information about PQ, a principal of Q, and message that he'd been listed as an Investor of the Week before, but now "we have decided to be more stern in our tactics and strategic in our focus." | Q corp. and its ee | No |
| 11/01 | p. 29, ¶ 3 | *[as to Count 6, only:]*<br> SHAC website posted names, addresses, phone and fax numbers of various officers of S. Corp., along with "hint" that *67 will block sender information when sending black faxes | S. Corp. | No |
| 1/3/02 | p. 14, ¶ 35 | SHAC website announced that the home of WS, head of S. Corp., was vandalized in the early morning hours of 1/3: porch lights | S. Corp. ee at | |

---

website that could not accommodate heavy Internet traffic. Thereafter so many visitors attempted to reach that website that it taxed the limits of the system, and website traffic came to be redirected to a different website (where they were met with information hostile to the Bush/Cheney campaign), in part, to accommodate the staggering amount of web traffic which was paralyzing the website. See "Cheney directs surfers to anti-Bush site," Oct. 6, 2004, http://money.cnn.com/2004/10/06/technology/cheney_soros/ ("When [Vice President] Cheney mentioned the wrong site [factcheck.com] during the [vice presidential] debate, [website] officials saw nearly 50,000 visitors click on the site in the first hour, up from 200 visits a day[.]" [available Jan. 20, 2005]). It is surely an ever-present risk, and an anticipated cost of doing business for any website (rather than a compensable injury, or any kind of "damage"), that the visitors on any given day may exceed expectations, or the capacity of the website to accommodate the number of visitors at any given moment.

| | | smashed, 15 paint bombs, "puppy killer" spray painted on sidewalk | home | |
|---|---|---|---|---|
| 2/3/02 | p. 19, ¶ 55 | "individuals broke windows and splashed paint at the building where PQ [of Q corp.] resided" | Q corp. ee at home | Yes |
| 2/02 | p. 19, ¶ 56 | SHAC website "reported the vandalism that occurred at the residence of PQ" of Q corp. | Q corp. ee at home | No |
| 2/10/02 | p. 14, ¶ 36 | SHAC website listed M. Corp. as a target: "hitting their insurance company will keep HLS on the defensive." Readers advised that office addresses and internal phone numbers will follow | M. Corp. | No |
| 3/02 | p. 14, ¶ 37 | SHAC website listed information (including personal) about M. Corp. employees, including SD and MR | M. Corp. ees | No |
| 3/9/02 | p. 15, ¶¶ 38, 40 | Homes of MR and SD, employees of M. Corp., "[were] vandalized" | M. Corp. ees at home | Yes |
| **3/9/02 to 12/02** | **p. 25, ¶ 2** | **COUNT 3: INTERSTATE STALKING AS TO SD of M. Corp. against SHAC, Kjonaas, Gazzola, and Conroy, in Somerset NJ and elsewhere** | -- | -- |
| 3/10/02 | p. 15, ¶¶ 39, 41 | SHAC website reported vandalism of SD and MR (M. Corp. employees) | M. Corp. ees at home | No |
| 4/21/02 | p.18, ¶ 52 | "individuals assembled" at the home of ML, an M. Corp. employee. Banged on windows; "shouted that they knew where ML worked, . . . lived and would be back" | M. Corp. ees at home | Yes |
| **4/28/02 to 12/02** | **p. 27, ¶ 2** | **COUNT 5: INTERSTATE STALKING AS TO RH of M. Corp. against SHAC, Kjonaas, Gazzola, and Conroy, in Somerset, NJ and elsewhere** | -- | -- |
| 5/02 | p. 29, ¶ 4 | [*as to Count 6, only:*] SHAC Website posted calendar of events for "black fax Mondays . . . in May, June and July, and provided facsimile numbers of various targeted companies" | various unnamed companies | No |
| 6/02 | p. 12, ¶ 25 | "SHAC Website announced an electronic form of attack against HLS and posted a computer application designed to cause certain commands to be sent automatically to the HLS website" | HLS | Maybe[7] |

---

[7] See n. 6, above. The indictment is vague as to what conduct is alleged to have been directed at HLS. If the conduct is heavier-than-usual visitors to the HLS website, that is a cost of doing

| 6/02 | p. 12, ¶ 26 | "individuals using the above utility caused HLS' server to overload, rendering it, and hence the HLS website, inoperable" | HLS | Maybe |
|---|---|---|---|---|
| 6/15/02 | p. 17, ¶ 49 | "individuals vandalized the home of RH, an employee of M. Corp." | M. Corp. ee at home | Yes |
| 7/02 | p. 29, ¶ 5 | [*as to Count 6, only:*]<br>"SHAC website directed individuals who visited it to a section in the website where they could obtain black faxes" | -- | No |
| 7/10/02 | p. 18, ¶ 53 | "a smoke bomb was set off at the offices of a subsidiary of M. Corp. in Seattle, Washington causing the evacuation of a high-rise office tower." 2d smoke bomb at the offices of M. Corp., also in Seattle, with evacuation. Report about the events posted on the SHAC Website **after** the events. | M. Corp. | Yes, as to the smoke bomb; No, as to the published report |
| 7/12/02 | p. 12, ¶ 27 | "SHAC Website announced that its 'multi pronged attack on the workers, shareholders and clients' of HLS was being successfully carried out." | HLS | No |
| 7/29/02 | p. 15, ¶ 43 | SHAC Website announced that FT, a Director of M. Corp., would be at the Lightpath Golf Tournament at the Meadowbrook Golf Club in NY from 7/29/02 to 8/4/02, and also posted his home phone, address and fax number. | M. Corp. ee, home-related | No |
| 7/30/02 | p. 15, ¶ 44 | The Meadowbrook Golf Club "was vandalized; its putting greens were destroyed and the words 'FT pup-killer wuz hea' were dug into the grass on one of the greens." | private golf club and M. Corp. ee | Yes |
| 7/29/02 to 8/1/02 | p. 16, ¶ 45 | The SHAC Website announced that "FT Commando Division of the [ALF] claims responsibility," and stated that "[d]amages from this action may in fact exceed hundreds of thousands of dollars between the damage to the" golf course, disruption of PGA event, and to the Club itself. | private golf club and M. Corp. ee | No |
| 8/3/02 and thereafter | p. 15, ¶ 42 | "individuals harassed MH" and protested at home of MH, employee of subsidiary of M. Corp., "whose home address had been posted on the SHAC Website." | M. Corp. subsidiary's ee at home | Maybe |
| **8/3/02 to 12/02** | **p. 26, ¶ 2** | **COUNT 4:**<br>**INTERSTATE STALKING AS TO MH of M. Corp. subsidiary against SHAC, Kjonaas, Gazzola, and Conroy, in Somerset NJ and elsewhere** | -- | -- |
| 8/10/02 | p. 17, ¶ 50 | "members of the conspiracy, including . . . GAZZOLA, assembled outside the home of RH, an employee of M. Corp. and, using a | M. Corp. ee at | Maybe |

business and not any type of damage within the AEPA. The indictment gives no information as to how this could have related to criminal activity attributable to any of the defendants.

| | | | | |
|---|---|---|---|---|
| | | megaphone, threatened RH, his wife and family with burning down their home." | home | |
| 8/11/02 | p. 18, ¶ 51 | "SHAC Website posted a report of the demonstration at the home of RH." | M. Corp. ee at home | No |
| 9/10/02 | p. 19, ¶ 59 | "W. Corp. received a letter from SHAC, signed by Angela Jackson [GAZZOLA alias] . . . requesting written confirmation that W. Corp. had ceased as a Market Maker of HLS stock." Promises to follow up to bring "a prompt end to the phone calls and faxes and e-mails your company is receiving." | W. Corp. | No |
| 9/17/02 | p. 16, ¶ 46 | SHAC Website posted message that "25 activists paid a visit to the posh Plandome home of FT, director at M. Corp. . . . Chants of 'blood money! [etc.]' and bullhorn speakouts . . . drove neighbors out of their houses to see what was all the commotion." | M. Corp. ee at home | No |
| 9/19/02 | p. 16, ¶ 47 | "individuals vandalized the home of FT, spray painting the words 'murder,' 'leave town,' and 'M*** pull out of HLS' on his and his neighbor's property." | M. Corp. ee at home | Yes |
| 9/21/02 | p.17, ¶ 48 | SHAC Website posted message that ALF had paid a visit to the home of FT the previous evening. Reports of vandalism. "The posting went on to threaten this was 'only the beginning.'" | M. Corp. ee at home | No |
| 10/02 | p. 12, ¶ 28 | "SHAC Website posted an announcement listing the home address and telephone number of CA, an HLS employee" | HLS ee at home | No |
| 10/17/02 | p. 29, ¶ 6 | *[as to Count 6, only:]*<br>Joshua HARPER "gave a presentation to a group of people in Seattle, Washington wherein he explained how to send black faxes noting that 'it knocks out the entire line of communication' of the recipients of the black faxes." | -- | No |
| 10/21/02 | p. 13, ¶ 29 | SHAC Website posted announcement relating to signs posted in and around area of Princeton, NJ, "which referred to CA [HLS employee] as 'deluded and deranged' and listed her home address and telephone number" | HLS ee, home-related | No |
| 11/17/02 | p. 13, ¶ 30 | SHAC Website posted announcement stating that HJ ( see 3/31/01 and 4/2/01) and another HLS employee "resigned after months of pressure, including protests, property destruction, [and] phone blockades at home and work." | HLS ees | No |
| *12/02* | | *[time frame of stalking counts ends]* | -- | -- |
| late p.m. 5/15/03 to early a.m. 5/16/03 | p. 22, ¶ 69 | "animal rights activists protested at the home of AH [of C. Corp.] with bullhorns" | C. Corp. ee at home | No |

| | | | | |
|---|---|---|---|---|
| 5/16/03 | p. 22, ¶ 70 | SHAC Website posted report of demonstration at home of AH of C. Corp. [posting reports the events occurred in neighborhoods of C. Corp. employees and board members] | C. Corp. ee at home | No |
| 5/29/03 | p. 21, ¶ 64 | "SHAC Website announced that C. Corp., a global pharmaceutical company, was a target of the SHAC campaign. Referring to C. Corp. employees, the SHAC Website stated: ". . . best of all we know where you live!" | C. Corp., and its ees at home | No |
| 8/18/03 | p. 21, ¶ 65 | "SHAC Website announced that animal rights activists had demonstrated at the home of KS, a C. Corp. employee" | C. Corp. ee at home | No |
| 8/18/03 | p. 22, ¶ 71 | "individuals went to the home of AH [of C. Corp.; see 5/15-5/16/03] and, pounded on her front door, rang her doorbell and shouting 'open the door you fucking bitch'" | C. Corp. ee at home | Maybe |
| 8/21/03 | p. 21, ¶ 66 | "SHAC Website announced that animal rights activists had demonstrated at the home of KS" [C. Corp. employee]; bullhorn used | C. Corp. ee at home | No |
| 9/16/03 | p. 21, ¶ 67 | "SHAC Website announced that animal rights activists had demonstrated at the home of KS [of C. Corp.] and stated '. . . WE ALWAYS WIN.'" | C. Corp. ee at home | No |
| 10/15/03 | pp. 21-22, ¶ 68 | "SHAC Website posted" announcement that KS [aka "the killer"] of C. Corp.'s toxicology depart. "has been infiltrated." Announces that the e-mail list of the Cascade Orienteering Club [of which KS is the longtime treasurer] "has also been infiltrated," with members contacted and then "bombarded with e-mails" about KS, "and now nothing is secret." Web posting included names, home addresses, home phone and personal e-mail addresses of club and members. | C. Corp. ee; home-related | No |
| 12/03 | p. 13, ¶ 31 | "individuals engaged in a 'Distributed Denial of Service' against HLS known as a 'Zombie Attack,' which caused the HLS Website to be inoperable." | HLS | Maybe[8] |
| 12/03 | p. 13, ¶ 32 | "SHAC Website reported on the 'Zombie Attack' on HLS, attributing the attack to Russian computer hackers." | HLS | No |
| *2/04* | | *[end of time frame of AEPA and black fax counts -- Counts 1 & 6]* | -- | -- |

---

[8] The term "Zombie Attack" is not defined in the indictment. The bare language of this paragraph does not allege any criminal act; indeed, it may relate to wholly non-criminal behavior. See nn. 6-7, above.

The indictment alleges that SHAC "operated a series of websites that disseminated its animal rights ideology and furthered its mission by, among other things, posting information [on the Internet] relating to individuals and organizations that SHAC targeted for action." (Ex. A at p. 2). The allegations of the indictment set forth in Table B make clear that the Internet played an integral part in the acts attributed to SHAC by the Government. The material published on the SHAC Website is at the heart of the conspiracy as it is alleged by the Government to have existed.

It is critical, then, also to start with facts about the Internet and cyberspace, as such facts have been determined to apply universally by the United States Supreme Court in <u>Reno v. American Civil Liberties Union</u>, 521 U.S. 844 (1997). <u>See generally</u> A. Hugh Scott, <u>Computer and Intellectual Property Crime: Federal and State Law</u> (2001) at 10 (<u>Reno v. ACLU</u> is "[t]he seminal judicial discussion of the Internet, its history, and how it functions").

The Supreme Court in the <u>Reno</u> case made what continues to be the most comprehensive and definitive statement of the Internet, and that factual and historical overview must inform and direct the course of our assessment of the sufficiency of the allegations of the Government, as those allegations have been set forth within the four corners of the indictment itself, as to how the defendants used the Internet and cyberspace to effect the criminal acts attributed to them in the indictment.

The Supreme Court in <u>Reno</u> identified "[t]he Internet [as] an international network of interconnected computers," which is "a unique and wholly new medium of worldwide human communication." 521 U.S. at 850. The Internet has continually displayed "extraordinary growth," with the number of "host" computers (defined by the <u>Reno</u> Court as "those that store information and relay communications") already having reached 9.4 million as of 1996, with sixty percent of these hosts located in the United States. 521 U.S. at 850. The <u>Reno</u> Court found as

fact that about 40 million people used the Internet as of 1996 -- "a number . . . expected to mushroom to 200 million by 1999." Ibid. It is surely an undisputed fact that, in the five years since the publication of the Reno decision, the number of Internet users has exceeded 200 million by many additional millions worldwide.

The Reno Court found as an undisputed fact that, already by 1996, "[a]nyone with access to the Internet may take advantage of a wide variety of communication and information retrieval methods . . . [which] are constantly evolving and difficult to categorize precisely." Id. at 851. Such methods include "electronic mail (e-mail), automatic mailing list services ('mail exploders,' sometimes referred to as 'listservs'), 'newsgroups,' 'chatrooms,' and the 'World Wide Web.'" Ibid. These tools, all of which can transmit text, "constitute a unique medium -- known to its users as 'cyberspace' -- located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet." 521 U.S. at 851. It is also surely an indisputable fact that, in the five years since the publication of the Reno decision, access of the general population worldwide to cyberspace has skyrocketed; the computer literacy of the general population has also grown worldwide by huge numbers annually.

The allegations of the indictment relate in large part to information broadcast on the SHAC Website, and the acts attributed to individuals following the publication of that information. It is a key omitted fact that the indictment does not allege that any of the individual defendants played any role in the publication of the information which the Government alleges as part of the conspiracy. Indeed, it is a key omitted fact that the indictment does not attribute the publication of the information to anyone at all. The Government's theory appears to be that the conspirators published this information. But the Reno Court, in its statement of the facts about the Internet and cyberspace, found that "Web publishing is simple enough that thousands of

individual users and small community organizations are using the Web to publish their own

personal 'home pages,' the equivalent of individualized newsletters about that . . . organization,

which are available to everyone on the Web."  521 U.S. at 853.

The Reno Court addressed the feasibility -- indeed the futility -- of trying to hold those

using the Internet accountable if persons outside their intended audience should seek access to

information on a Website.  The Court held, "Access to most Web pages is freely available . . . .

The Web is thus comparable, from the readers' viewpoint, to both a vast library including

millions of readily available and indexed publications and a sprawling mall offering goods and

services."  521 U.S. at 852-53.  The Court also held that, from the publishers' perspective, the

Internet "constitutes a vast platform from which to address and hear from a worldwide audience

of millions of readers, viewers, researchers, and buyers.  Any person or organization with a

computer connected to the Internet can 'publish' information."  521 U.S. at 853.

The indictment does not identify whether the persons who committed the acts of

vandalism or harassment, as alleged in the indictment, had ever even accessed any of the

information from the SHAC Website, or considered themselves affiliated with SHAC.  Indeed,

such individuals may have acted for wholly independent reasons, following from wholly separate

information disseminated by other sources, without connection to SHAC, the SHAC Website, or

the individual defendants.  The indictment, after all, does not allege that any of these unnamed

persons was a conspirator, or had any connection at all with the conspiracy charged.  The grand

jury cannot have been given any information that the persons who committed the acts attributed

generally in the indictment to unnamed "individuals" included the defendants.  (See Transcript,

Hearing on Prelim. Motions, Nov. 19, 2004, at 55-13 to -21 [AUSA Solano:  "In every instance

. . . in which [the individual defendants] were at an actual site it's in the indictment. . . . And in many instances, who was carrying out the conspiracy, who joins it, the Government simply does not know."]).

It is significant that, in the indictment, the Government has not alleged that any of the individual defendants played any role in the actual publication on the Internet of any of the messages which the Government has set forth as an overt act. The Government has not alleged that any other conspirator (or person or individual) performed this role. Yet the Government alleges that the defendants participated in a conspiracy to achieve that result. But we then reach an additional problem with the indictment: It alleges that messages and reports were published on the SHAC Website as part of the conspiracy. The messages cited by the Government as so offensive consisted, for the most part, of reports of actions already taken, or the broadcasting of information otherwise available from other sources (as there is no allegation that any defendant, or any other entity, committed any criminal act in gaining access to non-public information).

The Reno Court identified the futility of attempting to attribute to any individual user (as opposed to any given computer) the publication of a particular message through electronic means. The Reno Court also recognized the difficulties inherent in attempting to identify the identity of an intended recipient of a specific electronic message. "There 'is no effective way to determine the identity . . . of a user who is accessing material through e-mail, mail exploders, newsgroups or chat rooms.'" 521 U.S. at 855 (internal citation, aff'g court below, omitted). An e-mail address, according to the Supreme Court, provides "no authoritative information about the addressee." 521 U.S. at 855 n.20. The Reno Court also stated that "mail exploders such as listservs . . . automatically send information to all e-mail addresses on a sender's list," which thereby poses a tremendous obstacle to establishing that the sending address (and just the address, as opposed to

the even more attenuated task of trying to identify what particular individual could have had control of that sending address at the relevant time) intended the e-mail for a particular recipient. 521 U.S. at 855 n.20.  Instead, any subscriber to the mail exploder group can send a message to a common e-mail address, which then forwards the message to the group's other subscribers.  521 U.S. at 851.

The conspiracy counts of the indictment (Counts One, Two, and Six) are founded on activities for which the Internet and cyberspace played the key role, apparently, in linking the alleged conspirators and in fusing their (putative) common plan and purpose.  As the <u>Reno</u> Court has underscored, the Court must consider the nature and scope of cyberspace as it scrutinizes the bare allegations, as they are set forth within the four corners of this indictment.

We return to the fact -- the only fact -- as alleged in the indictment, by which these individual defendants have been linked to the SHAC Website:  that "[t]he activities of SHAC and the SHAC Website were chosen and coordinated *at various times* by" all of the individual defendants, except John McGee.  (Ex. A at p. 3).  Again, this is the only allegation in the indictment which directly links any of the defendants with electronic transmissions (e.g., use of the Internet, e-mail, or fax activity) attributed to SHAC in the indictment.  (<u>See</u> above at pp. 7-8.) This bare allegation, unbounded by time and not specifically relating to any of the messages alleged by the Government as specific acts of criminal activity, is surely not sufficient to sustain any of the conspiracy charges which any of these individual defendants face.[9]

---

[9] Those bare allegations are indeed the bases for the Government's prosecution of these individual defendants.  At the hearing on the defendants' preliminary motions, conducted before the Court on November 19, 2004, the Assistant United States Attorney represented to the Court as follows:

> Beginning with Ms. Gazzola, there are two very important other paragraphs in which Ms. Gazzola is identified in.  One is 1B, in which she is identified as one of several defendants who are responsible for choosing and coordinating the activities of SHAC.  And the other would be 1D, in which she is alleged to be the campaign

The deficiencies contained within the four corners of the indictment are many. We list some of the more glaring examples, to highlight the deficiencies in the evidence before the grand jury which handed up this indictment. There is no allegation in the indictment, for example, for the relevant period (or at any other time, ever), that:

1.  any individual defendant (or any human member of the alleged conspiracy) composed any e-mail relating to SHAC;

2.  any individual defendant (or any human member of the alleged conspiracy) sent or received any electronic message relating to SHAC;

3.  any individual defendant (or any human member of the alleged conspiracy) prepared, composed, or reviewed any text for publication on the SHAC Website, or anywhere else in all of cyberspace;

4.  any individual defendant (or any human member of the alleged conspiracy) prepared, composed, or reviewed any text message for electronic transmittal to any recipient at all about SHAC;

5.  any individual defendant (or any human member of the alleged conspiracy) had or used a SHAC e-mail address;

6.  any individual defendant (or any human member of the alleged conspiracy) had or used any e-mail address or e-mail account at all, for any purpose;

7.  any individual defendant (or any human member of the alleged conspiracy) logged onto the SHAC Website, ever;

_____

coordinator for SHAC. That is the allegation of the Government that Ms. Gazzola is directly responsible for the activities of SHAC.
[Trans., 11/19/04, at 52-17 to -24].

8.   any individual defendant (or any human member of the alleged conspiracy) logged onto any website, or even touched a computer, for any purpose, anywhere in the world, ever;

9.   any individual defendant (or any human member of the alleged conspiracy) caused the specific texts cited by the Government in the indictment to be displayed on the SHAC Website;

10.   any individual defendant (or any human member of the alleged conspiracy) caused the specific texts cited by the Government in the indictment to be broadcast on the Internet;

11.   any individual defendant (or any human member of the alleged conspiracy) took any step at all to cause physical disruption to HLS;

12.   any individual defendant (or any human member of the alleged conspiracy) acted with any other person in any way to cause physical disruption to HLS;

13.   any individual defendant (or any human member of the alleged conspiracy) took any step whatsoever to damage property used by HLS;

14.   any individual defendant (or any human member of the alleged conspiracy) took any step to cause damage to HLS, within the definition limited by the AEPA;

15.   HLS sustained any damage at all within the scope of the AEPA as the result of any action of any individual defendant (or any human member of the alleged conspiracy);

16.   HLS endured anything more than high volume of visitors (albeit, even if animal rights advocates) to its website or to its e-mail addresses on any given date as the result of any activity it has attributed to SHAC;

17.  any individual defendant (or any human member of the alleged conspiracy) ever sent a "Black Fax" to HLS, or to any other entity at all;

18.  any individual defendant (or any human member of the alleged conspiracy) ever "conduct[ed any] telephone [or] e-mail blitz[], fax blitz[] [or] computer blockade[] against HLS" for any purpose at all (see Ex. A at p. 7, ¶ 7);

19.  any individual defendant (or any human member of the alleged conspiracy) caused "information [to] be disseminated through the SHAC Website to coordinate computer attacks on HLS" for any purpose at all (see Ex. A at p. 7, ¶ 8);

20.  any individual defendant (or any human member of the alleged conspiracy) did any act at all to cause the publication of any personal information on the SHAC Website about any HLS employee (see Ex. A at pp. 7-8, ¶ 9; p. 12, ¶ 28; p. 13, ¶¶ 29-30);

21.  any individual defendant (or any human member of the alleged conspiracy) served any role at all in the publication of reports on the Internet of activities directed against HLS employees (see Ex. A at p. 8, ¶¶ 10-11);

22.  any individual defendant (or any human member of the alleged conspiracy) appeared with the unnamed "protesters . . . at the New Jersey residence of HJ, an HLS employee," on or about March 31, 2001, or April 2, 2001, or ever (see Ex. A at p. 11, ¶¶ 21-22);

23.  when defendant John McGee is alleged to have appeared with "another" at the home of DD, an employee of HLS, either of them acted with the knowledge, consent, or on the advice of any individual defendant (or any human member of the alleged conspiracy) (Ex. A at p. 12, ¶ 23);

24. any individual defendant (or any human member of the alleged conspiracy) had any role in or prior knowledge of the publication on the SHAC Website of an "announce[ment of] an electronic form of attack against HLS" in or about June 2002 (Ex. A at p. 12, ¶ 25);

25. any individual defendant (or any human member of the alleged conspiracy) had any role in or prior knowledge of the publication on the SHAC Website of a "computer application designed to cause certain commands to be sent automatically to the HLS website" (Ex. A at p. 12, ¶ 25);

26. any individual defendant (or any human member of the alleged conspiracy) had any role in or prior knowledge of the use by "individuals," in or about June 2002, of a computer application that "caused HLS' server to overload, rendering it, and hence the HLS website inoperable" (Ex. A at p. 12, ¶ 26);

27. any individual defendant (or any human member of the alleged conspiracy) had any role in or prior knowledge of the use by "individuals," in or about December 2003, of a "'Zombie Attack' which caused the HLS website to be inoperable" (Ex. A at p. 13, ¶ 31).

The facts as alleged by the Government within the four corners of the indictment are not sufficient to withstand defendants' motions to dismiss, where the defendants have challenged the patent deficiency of those facts as to each of the counts of the indictment with which they have been charged. Accordingly, this Court should order the dismissal of the indictment in its entirety, on the further basis of the law set forth in the Argument section which follows.

# ARGUMENT

## POINT I

**COUNT ONE OF THE INDICTMENT (CONSPIRACY TO
VIOLATE THE ANIMAL ENTERPRISE PROTECTION
ACT [THE "AEPA"]) MUST BE DISMISSED BECAUSE
IT FAILS TO SET FORTH A CHARGE UNDER WHICH
DEFENDANT KJONAAS OR ANY OTHER DEFENDANT
COULD BE HELD CRIMINALLY ACCOUNTABLE ;
FURTHER, THE STATUTE AT ISSUE CANNOT
WITHSTAND CONSTITUTIONAL SCRUTINY**

A.     **Count One Must Be Dismissed Because It Does Not State a
Cause of Action for Which Any of the Defendants Could Be
Held Accountable Under the AEPA, Charges Conspiracy in
Violation of the Plain Language, and Misstates the Elements
of the AEPA**

Defendant Kjonaas challenges the sufficiency of Count One of the indictment because he

has been indicted for a conspiratorial act which is not included within the scope of the AEPA, 18

U.S.C. § 43(a).  That statute sets forth two separate requirements of the offense, joined by the

word "and."  18  U.S.C. § 43(a)(1) and (2).   Conspiracy is encompassed within the (a)(2) section

of the offense, but excluded from the (a)(1) section of the statute.

The relevant language of the AEPA is as follows:

> (a)  Offense. -- Whoever --
> (1) travels in interstate or foreign commerce, or uses or causes to be used the
> mail or any facility in interstate or foreign commerce for the purpose of
> causing physical disruption to the functioning of an animal enterprise; ***and***
>
> (2) intentionally damages or causes the loss of any property (including animals
> or records) used by the animal enterprise, or ***conspires*** to do so,
>
> shall be punished as provided for in subsection (b).
>
> [18  U.S.C. § 43(a)(1)-(2) (emphasis added)].

Under the (a)(1) section, a defendant must be charged with a substantive act, and the

section does not allow for conspiratorial liability.   Only the (a)(2) section includes allowance for

conspiratorial liability.  See Gozlon-Peretz v. United States, 498 U.S. 395, 404 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion and exclusion" (internal quotation marks omitted)); quoted with approval in Reno v. ACLU, 521 U.S. at 871 n.36; see also Estate of Bell v. Commissioner, 928 F.2d 901, 904 (9th Cir. 1991) (same principle); Arizona Elec. Power Co-op, Inc. v. United States, 816 F.2d 1366, 1375 (9th Cir. 1987) ("When Congress includes a specific term in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded.").[10]

But all of the defendants have been charged as conspirators in the indictment as to both the (a)(1) and the (a)(2) sections of the statute.  (Ex. A at p. 5).   This is an incurable, fatal defect in the indictment.   Because the grand jury handed up an indictment setting forth a charge in Count One which misstates the statutory language and the elements of the AEPA, that count must be dismissed.   See United States v. Cole, 784 F.2d 1225, 1227 n.1 (4th Cir. 1986) ("If the grand jury had not found all elements of the offense, the indictment is invalid"); see also Russell v. United States, 369 U.S. 749, 770 (1962) ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure.  For a defendant could then be convicted on the basis of facts not found by, or perhaps not even presented to, the grand jury which indicted him.").

----

[10]   See generally Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[I]n interpreting a statute a court should always turn to one, cardinal canon before all others. . . .[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  Indeed, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' ").

In addition, the second part of the AEPA requires a defendant to have "intentionally damaged or cause[d] the loss of any property . . . used by the animal enterprise," or to have conspired to have caused such actual damage or loss. 18 U.S.C. § 43 (a)(2). The AEPA by its language does not criminalize a conspiracy which involves the attempt to have caused such damage -- but that, at best, is all that Count One has alleged. See generally United States v. Meacham, 626 F.2d 503, 508-09 (5th Cir. 1980) (underlying statute must criminalize the attempt to commit the substantive offense before the Government may succeed in prosecuting the conspiracy to have attempted such a criminal act). The indictment should be dismissed because the defendants have all been charged merely with having "combine[d], conspire[d] and agree[d] with one another and others to . . . intentionally damage and cause the loss of property used by HLS," without mention of the essential element that the defendant so charged actually caused such a loss, rather than merely having conspired to have attempted such a result.

As set forth more fully below, defendant Kjonaas asks the Court to order Count One dismissed because of the facial insufficiency of the allegations contained in the indictment.

**(1)  The Legal Standard Governing This Motion to Dismiss**

Defendant Kjonaas moves to dismiss the indictment, pursuant to Fed. R. Crim. P. 12(b). That Rule provides that "[a]ny defense, objection or request that the court can determine without a trial of the general issue" may be raised before trial by motion. Fed. R. Crim. P. 12(b)(2). A motion alleging a defect in instituting the prosecution must be raised before trial; a motion alleging a defect in the indictment may be heard at any time while the case is pending. Fed. R. Crim. P. 12(b)(3)(A)-(B).

We recognize that, at the pretrial stage, a "motion to dismiss the indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." United States

v. DeLaurentis, 230 F.3d 659, 660-61 (3d Cir. 2000); United States v. Alsugair, 256 F. Supp. 2d 306, 311 (D.N.J. 2003).    Indeed, we are not challenging the sufficiency of any evidence that the Government would choose to present against defendant Kjonaas at trial.    For purposes of responding to this motion, it is irrelevant what the Government may now bring forward and claim it could have presented to the grand jury.  The Government is bound by the indictment handed up by the grand jury in this matter.

Instead, the present motion "challenges the facial sufficiency of the allegations contained in the indictment brought against [defendant]."    Alsugair, 256 F. Supp. 2d at 311.    "[F]or purposes of Rule 12(b)(2), a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation."  United States v. Panarella, 277 F.3d 678, 685 (3d Cir.), cert. denied, 537 U.S. 819 (2002); Alsugair, 256 F. Supp. 2d at 311; see generally Russell v. United States, 369 U.S. 749, 764 (1962) (where an indictment fails to specify allegations against a defendant within the scope of the statute charged, "our cases have uniformly held that in indictment must do more than simply repeat the language of the criminal statute").

The Court must determine whether the "facts as alleged in the indictment adequately allege the elements" of the offense as set forth in the statutes under which the defendant stands charged.  See Alsugair, 256 F. Supp. 2d at 311; see generally United States v. Welch, 327 F.3d 1081, 1090 (10th Cir. 2003) ("Where a defendant challenges the sufficiency of an indictment for failure to state an offense, a court is generally bound by the factual allegations contained within the *four corners of the indictment.*  'An indictment should be tested solely on the basis of the allegations made on its face[.]'"  [emphasis added; internal citations omitted]) .

**(2)  Count One: The Language of the Indictment**

In Count One, the indictment specifies that the defendants "did knowingly and willfully combine, conspire and agree with one another and others to use a facility in interstate and foreign commerce for the purpose of causing physical disruption to the functioning of HLS, an animal enterprise, and intentionally damage and cause loss of property used by HLS, in an amount exceeding $10,000."  (Ex. A at p. 5).

The indictment attributes conspiratorial acts to the various defendants, apparently through their mere "affiliation" with SHAC, which in turn operated a website. The linkage between all of the individual defendants (except John McGee) and the website is vaguely included in the sweeping statement that six of the individual defendants "chose[] and coordinated at various times" "[t]he activities of SHAC and the SHAC Website," without any further elaboration (Ex. A at p.3).

The indictment is fatally defective, in violation of the rights of due process of the defendants, because it charges conspiracy to violate 18 U.S.C. § 43(a)(1), which is not a crime under the statute charged.  In addition, the indictment does not allege any actual economic damage to HLS itself, but instead seeks to criminalize the attempt by the alleged conspirators to have caused such damage, which is not a criminal act within the scope of 18 U.S.C. § 43(a)(2).

Indeed, the United States Attorney's Office for the District of New Jersey, in commencing this prosecution under the AEPA, has taken a position contrary to that voiced by spokespersons of the Department of Justice ("DOJ") who appeared before Congress, on May 18, 2004 -- just two days before the grand jury handed up the original indictment in the present case -- and asked that the AEPA be amended because it does not cover the specific conduct at issue in this case.   At the hearing on that date before the Senate Judiciary Committee, United States Attorney McGregor W.

Scott,[11] from the Eastern District of California, stated categorically that the AEPA could not be used as the basis for a prosecution of SHAC for its protest activities directed at HLS and HLS-affiliates: "At present, the statute applies *only* when there is 'physical disruption' to the functioning of the enterprise that results in damage to or loss of property." (Scott Statement at 2, 6 [emphasis added]).

In his very next sentence, U.S. Attorney Scott spoke specifically about SHAC. Mr. Scott stated that the language and scope of the AEPA does not cover the activities of SHAC at issue in this indictment (the alleged use of "threats, coercion and other methods of intimidation -- often directed at employees, customers, or vendors of an animal enterprise"):

> *[F]ederal law does not currently equip the Department with the necessary tools to effectively prosecute the perpetrators of such conduct. The Department therefore supports amending the animal enterprise terrorism statute* to prohibit the use of threats, vandalism, property damage, trespass, persistent and harassing communications, intimidation, or coercion in order to cause economic disruption to an animal enterprise. This *new offense is needed* to address unambiguously harassing and threatening conduct directed at animal enterprises as well as their employees, customers, or vendors, conduct that currently causes substantial economic harm.
> [Scott Statement at 2-4, 6-7 (emphasis added)].

Deputy Assistant Director John E. Lewis[12] of the FBI Counterterrorism Division within the DOJ gave a similar statement before the same Senate Judiciary Committee on the same date

---

[11]    Statement of McGregor W. Scott, United States Attorney, Eastern District of California, to the Senate Judiciary Committee Concerning Animal Rights: Activities vs. Criminality, May 18, 2004; available Sept. 1, 2004 at http://www.animalrights.net/archives/year/2004/000194.html (previously filed with the Court as Exhibit E, annexed to the Certification of Isabel McGinty in Support of Defendant Kjonaas' Motion for Preliminary Relief, October 28, 2004), referred to herein as "**Scott Statement**."

[12]    Statement of John E. Lewis, Deputy Assistant Director, Counterterrorism Division, Federal Bureau of Investigation, to the Senate Judiciary Committee, May 18, 2004; available July 5, 2004 at http://www.judiciary.senate.gov/print_testimony.cfm?id=1196&wit_id=3640 (previously filed with the Court as Exhibit D, annexed to the Certification of Isabel McGinty in Support of Defendant Kjonaas' Motion for Preliminary Relief, October 28, 2004), referred to herein as "**Lewis Statement**."

(May 18, 2004). He expressed an opinion identical to that of U.S. Attorney Scott. The DOJ's position, expressly set forth by these two spokespersons before Congress, was that the Government was blocked from basing a prosecution of SHAC on the AEPA because of the express language of that statute. (See Lewis Statement at 2, 4, 5). That position follows from the plain language of the statute itself. As Deputy Assistant Director Lewis explained, "the activities of SHAC generally fall outside the scope of the [AEPA]." (Lewis Statement at 5).

Until now, the AEPA appears to have been a statute untested in any prosecution with any allegation of conspiratorial conduct. The AEPA was enacted into law on August 26, 1992. In the 12 years since its enactment, it appears that there has been only one other prosecution conducted by the Government under that Act.[13] In that case, out of the federal district court in Wisconsin, defendant Justin Clayton Samuel entered his guilty plea to violations of that Act, based on his having released a large number of live mink from their cages on mink farms, in the course of his participation in an animal liberation campaign in the Mid-West.[14]

---

[13] See Scott Statement at 1, 6; see also Statement of James F. Jarboe, Domestic Terrorism Sec. Chief, FBI, before the House Resources Committee, Subcommittee on Forests and Forest Health, Feb. 12, 2002, available Sept. 1, 2004 at http://www.cdfe.org/jarboe.htm (previously filed with the Court as Exhibit F, annexed to the Certification of Isabel McGinty in Opposition to the Government's Motion for an Order Revoking the Pretrial Release of Defendant Kjonaas, September 3, 2004), at pp. 5 to 6.

[14] See Press Release, United States Attorney, Western District of Wisconsin, "Guilty Pleas Entered in Nation's First Prosecution of Animal Enterprise Terrorism for Mink Farm Releases," September 1, 2000; available Aug. 31, 2004 at http://www.furcommission.com/news/news F01c.htm; see also Press Release, United States Attorney, Western District of Wisconsin, "Animal Rights Activist Sentenced to Maximum Term for Mink Releases in Nation's First Prosecution of Animal Enterprise Terrorism," Nov. 3, 2000; available Aug. 31, 2004 at http://www.furcommission.com/news/newsF01u.htm (both previously filed with the Court as Exhibits G and H, annexed to the Certification of Isabel McGinty in Support of Defendant Kjonaas' Motion for Preliminary Relief, October 28, 2004).

The charges against the SHAC defendants, in stark contrast, arise out of their alleged participation in a conspiracy to use electronic technology to disseminate information against HLS and a broad range of others -- although the indictment does not allege that any of the defendants did anything at all in connection with the incidents wherein electronic media were used, or planned to be used, to further the conspiracy during the relevant period. The Government's application of the AEPA is novel, unprecedented -- and without foundation in the statute underlying Count One of this indictment.

As a further fatal defect, Count One fails to specify any economic damage suffered by HLS as a result of the alleged criminal conduct. The indictment does not specify in what way HLS, the animal enterprise, suffered (or was intended by the conspirators to have suffered) any "physical disruption" within the scope of the AEPA. See 18 U.S.C. § 43(a)(1); see also 18 U.S.C. § 43(d)(2). Under the AEPA, the term "physical disruption" does not include lawful public reaction -- expressed, for example, by groups engaged in lawful public protests, or by individuals exercising their rights under the First Amendment of protest and dissent -- following from publicity over the business and activities of HLS. See 18 U.S.C. § 43(d)(2) ("the term 'physical disruption' does not include any lawful disruption that results from lawful public, governmental, or animal enterprise employee reaction to the disclosure of information about an animal enterprise"). The defendants could not and cannot be held criminally accountable, under the same section of the statute, for any losses attributed by HLS to employee reaction to any lawful public protest of the business activities of HLS (e.g., HLS employee resignations following lawful protest activities directed at HLS, or even when those protests take place outside the homes of those same employees).

If the indictment did set forth any cause of action against defendant Kjonaas (or any other defendant) within the scope of the AEPA, then, it would have to be set forth in the section of Count One specifying acts alleged against HLS -- the only entity alleged in the indictment to be an "animal enterprise."  But the indictment separates the "attacks" against HLS into two categories:  those events which occurred ***before*** the time frame of the alleged conspiracy to violate the AEPA, and those which occurred ***within*** the time frame of the alleged conspiracy (October 2001 - February 2004; Ex. A at p. 5, ¶ 2).

a)  *Actions Alleged to Have Been Taken Against HLS Before the Time*
    *Frame of the Conspiracy*

The indictment, as "overt acts" against HLS, the animal enterprise, alleges the following occurred ***before*** the time frame of the conspiracy:

(a)  the SHAC Website posted a general announcement against HLS, on or about February 15, 2001 [with no involvement attributed to any individual defendant or human conspirator] (Ex. A at p. 11, ¶ 19);

(b)  the SHAC Website, on or about March 6, 2001, "listed the 'top 20 terror tactics' that could be used against organizations and individuals in order to harm HLS and ultimately cause it to shut down" [with no involvement attributed to any individual defendant or human conspirator] (Ex. A  at p. 11, ¶ 20);

(c)  at least three weeks passed before unnamed protesters [not the defendants and not any alleged conspirators] appeared at the home of HJ, an HLS employee "and banged on the windows and doors at his home," on or about March 31, 2001 (Ex. A at p. 11, ¶ 21);

(d)   two days later, at the home of the same HLS employee, "rocks were thrown

through [his] windows" by unidentified individual(s); and two cars in HJ's

driveway were vandalized [with no involvement attributed either to any

individual defendant or any conspirator] (Ex. A at p. 11, ¶ 22);

(e)   nearly two months later, defendant John McGee is alleged, along with a

second person designated merely as "another" [and without any involvement

attributed to any other defendant or alleged coconspirator] to have slashed the

tires of DD, an HLS employee and "spray painted on his house" on or about

May 30, 2001 (Ex. A at p. 12, ¶ 23);

(f)   thereafter, the SHAC Website "posted names and home addresses of HLS

employees," as well as information about the actions against DD [with no

involvement attributed to any individual defendant or human conspirator] (Ex.

A at p. 12, ¶ 24).

The above sections (a) to (f) fail to state a cause of action against any of the defendants for

several reasons.  The first has to do with the dates of the alleged acts.  None of the specified acts

occurred within the time of the conspiracy charged against the named defendants in Count One.  See

Ex. A at p. 5, ¶ 2.  ***Even if*** this Count alleged acts within the time frame of the conspiracy, the

allegations in the separate paragraphs do not state a cause of action against any of the individual

defendants for which any of them could be held accountable under the AEPA.  None of the

paragraphs alleges that any one of the defendants "used or caused to be used . . . any facility in

interstate or foreign commerce" for the purpose of causing physical disruption to the functioning of

an animal enterprise, as required under 18 U.S.C. § 43(a)(1).  None of the paragraphs lists any

"economic damage" or "physical disruption" caused to HLS within the meaning of the AEPA.

None of the paragraphs just detailed from the indictment includes the names of any persons (other than defendant John McGee) alleged to have participated in or committed any of the events cited.  But none of the paragraphs alleges *any* of the other defendants (including McGee) conspired with anyone at all to commit any violation of the AEPA itself. "To establish a conspiracy, the government must show:  (1) a unity of purpose between two or more persons;  (2) an intent to achieve a common goal;  and (3) an agreement to work together."   United States v. Helbling, 209 F. 3d 226, 238 (3d Cir. 2000), cert. denied, 531 U.S. 1100 (2001); see also United States v. Carr, 25 F.3d 1194, 1201 (3d Cir. 1994), cert. denied, 513 U.S. 1086 (1995).

But Count One does not set forth any facts by which any of the defendants has been charged with the elements of any conspiracy.  The indictment does not identify the agreement alleged to have bound any conspirators in a common goal.  The indictment suggests that the agreement was a general plan to post information hostile to HLS on the Internet, or to use political protest to get the attention of HLS.  But such an agreement would not be a crime; it would relate to constitutionally protected speech activities, even if HLS found the messages offensive.  See generally United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999) ("[A] conspiracy requires an agreement to commit some other crime beyond the crime constituted by the agreement itself."  [internal quotation omitted]), cert. denied, 528 U.S. 1131 (2000).

The indictment attributes actions only to the "SHAC Website," on the apparent theory (it can only be inferred, at best) that the corporate defendant SHAC is thereby imputed to be responsible for these Internet postings.  But there would have to be at least two human conspirators identified as part of the conspiracy, if such a conspiracy were to be charged at all.  See United States v. Sain, 141 F.3d 463, 474-75 (3d Cir. 1998) ("there must be at least two natural individuals for a conspiracy involving a corporation to exist because two entities must

have the required mental state to form a conspiracy"), <u>cert. denied</u>, 525 U.S. 908 (1998). But, as set forth for Count One, the indictment does not allege that any human at all entered into any agreement to achieve any illegal object whatsoever. <u>See</u> <u>United States v. Davis</u>, 183 F.3d 231, 244 (3d Cir. 1999) ("A conspiracy requires agreement between at least two people to the illegal object of the conspiracy, though other participants need not be indicted."). This, too, is a fatal defect in Count One.

There is the additional issue of how persons merely alleged to have been "affiliated" generally with SHAC can be charged as coconspirators on account of information appearing on a website linked to SHAC. It is telling that the indictment relies on mere association, and nothing else, as the nexus between defendant Kjonaas (and all other individual defendants) and the specific overt acts alleged to have been committed against HLS. <u>See</u> <u>Healy v. James</u>, 408 U.S. 169, 186 (1972) (the First Amendment imposes on the Government "the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims"); <u>United States v. Robel</u>, 389 U.S. 258, 265 (1967) (the First Amendment absolutely prohibits the Government from basing any illegal sanction on "guilt by association alone, without any need to establish that an individual association poses the threat feared by the Government in proscribing it").

Count One imputes conspiratorial liability to the individual defendants on the apparent theory that they must have had some role in the posting of information on the SHAC Website in cyberspace. But as the Supreme Court's overview of the Internet in <u>Reno v. ACLU</u> has illustrated, the fact that these allegations relate to postings on the Internet must alert us that the base allegations of the indictment, without more, will not support any inference that any of these defendants had any role in that specific posting, given the ease with which information may be caused to exist in

cyberspace, and the access of hundreds of millions of persons to the Internet.  See 521 U.S. at 851-52.  The Reno Court emphasized that the expanding computer universe known as "cyberspace" is "located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet."  521 U.S. at 851; see id., 521 U.S. at 852 ("It is 'no exaggeration to conclude that the content of the Internet is as diverse as human thought." (citations omitted)); see generally James v. Meow Media, Inc., 300 F.3d 683, 696 (6th Cir. 2002) (Internet sites are entitled to free speech protection under the First Amendment), cert. denied, 537 U.S. 1159 (2003).

     Further, some of the allegations are not criminal conduct within the scope of any criminal statute at all, even at the municipal level.  For example, as alleged in (a), the posting of a general announcement of protest activities to be taken against HLS in the future (even the near future) is protected speech under the First Amendment.  See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 900-06 (1982).   On the mere facts as alleged in the indictment, the posting of the "top 20 terror tactics" (in (b)) was also protected speech -- the first time it was broadcast on the Internet, and each time the information was rebroadcast on other websites, including the SHAC Website

     The posting of the information at issue on the Internet was protected speech within the scope of the First Amendment and cannot be considered as an "overt act" in furtherance of the charge that any defendant conspired to violate the AEPA (or any other criminal statute).   As set forth further below (in Part B), the posting of this information was clearly not a crime -- even if the information had been posted on the Internet within the time frame of the conspiracy.  The information at issue was provocative in nature, but well within the marketplace of ideas protected against Government intrusion by the First Amendment.  The Supreme Court has consistently, forcefully upheld the breadth of protection accorded provocative speech.  See below, Part B,  at 44-50, and cases discussed therein.

*b)* *Actions Alleged to Have Been Taken Against HLS Within the Time*
*Frame of the Conspiracy*

The next section of the indictment lists the following as "overt acts" against HLS ***within***

the time frame of the conspiracy charged in Count One:

> (g) the "SHAC Website announced an electronic form of attack against HLS and
> posted a computer application designed to cause certain commands to be sent
> automatically to the HLS website" at a time broadly described as "in or about
> June 2002" [as with earlier incidents set forth in (a) to (f), there is no
> allegation that any individual defendant or human conspirator was involved in
> this act of publication] (Ex. A at p. 12, ¶ 25);

> (h) unnamed "individuals [not any defendant and not any alleged conspirator]
> using the above utility caused HLS' server to overload, rendering it, and hence
> the HLS website, inoperable," again within the broad time frame of "in or
> about June 2002" (Ex. A at p. 12, ¶ 26);

> (i) over a month later, on or about July 12, 2002, the "SHAC Website announced
> that its 'multi pronged attack on the workers, shareholders and clients' of HLS
> was being successfully carried out" [without any allegation of involvement of
> any individual defendant or human conspirator] (Ex. A at p. 12, ¶ 27);

> (j) over two and a half months later, in or about October 2002, the "SHAC
> Website posted an announcement listing the home address and telephone
> number of CA, an HLS employee" [no involvement of any individual
> defendant or human conspirator alleged] (Ex. A at p. 12, ¶ 28);

> (k) later, in or about October 21, 2002, the SHAC Website posted an
> announcement relating to signs displayed in and around Princeton, NJ, which

referred to an HLS employee as "deluded and deranged," and listed her home address and telephone number" [no involvement of any individual defendant or human conspirator alleged] (Ex. A at p. 13, ¶ 29);

(l) about four weeks later, on or about November 17, 2002, the SHAC Website posted an announcement that two HLS employees had "resigned after months of pressure, including protests, property destruction, [and] phone blockades at home and work" [no involvement of any individual defendant or human conspirator alleged] (Ex. A at p. 13, ¶ 30);

(m) over a year later, in or about December 2003, "individuals engaged in a 'Distributed Denial of Service' against HLS known as a 'Zombie Attack,' which caused the HLS Website to be inoperable" [no involvement of any defendant or human conspirator alleged] (Ex. A at p. 13, ¶ 31); and

(n) thereafter, again broadly described as in or about December 2003, the "SHAC Website reported on the 'Zombie Attack' on HLS, attributing the attack to Russian computer hackers" [no involvement of any individual defendant or human conspirator alleged] (Ex. A at p. 13, ¶ 32).

In summary, then, for the period of time falling within the time frame alleged in Count One, no entity other than the "SHAC Website" or otherwise unidentified "individuals" is alleged to have committed any acts which might be construed as against HLS. Only the corporate defendant SHAC, then, might be construed as a conspirator. But SHAC is not alleged to have conspired with any human conspirator at all. This is a fatal defect in Count One. See United States v. Sain, 141 F.3d at 474-75 ("there must be at least two natural individuals for a conspiracy involving a corporation to exist because two entities must have the required mental state to form a

conspiracy"). In Count One, no conspirator capable of forming the requisite mental intent has been charged with any unlawful conduct; there is no agreement specified as to any unlawful object , and no overt act alleged towards the achievement of that agreement.

The actions all attributed to the SHAC Website, in turn are protected speech activities under the First Amendment. See actions listed above at (g), (i), (j), (k), (l), (n) [all attributed to the SHAC Website, generally]. The indictment does not give any indication of how the individual defendants have come to be charged as knowing and willful conspirators in the posting of information on the website, so as to be held criminally accountable for their use of a facility in interstate and foreign commerce for the purpose of causing physical disruption to HLS -- *even if* the elements of the AEPA had been properly set forth within the text of Count One.

> **B.**      **The Conduct and Speech at Issue Is Protected Under the First Amendment, and Defendants Have Not Otherwise Been Charged Therein With Any Act for Which They Could Be Held Accountable Under the AEPA**

The First Amendment is a bar to this prosecution under Count One, as well as to each of the other counts cited in the indictment. An unbroken line of Supreme Court cases protects the defendants from facing criminal penalties for their exercise of their constitutionally-protected rights of political protest. See, e.g., NAACP v. Claiborne Hardware, 458 U.S. 886, 913 (1982) ("This Court has recognized that expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" (Citation omitted)).

A veritable litany of Supreme Court cases has solidified the broad rights accorded protesters under the First Amendment. In Texas v. Johnson, 491 U.S. 397 (1989), the Court held that, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Id. at 414. In Roth v. United States, 354 U.S. 476 (1957), the Court stated that

the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Id. at 484.

In Garrison v. Louisiana, 379 U.S. 64 (1964), the Court upheld the rights of citizens to speak out in public about matters of concern: "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Id. at 74-75. See generally New York Times v. Sullivan, 376 U.S. 254, 266 (1964) (The First Amendment "attempt[s] to secure the widest possible dissemination of information from diverse and antagonistic sources."). In Thomas v. Collins, 323 U.S. 516 (1945), further, the Court described the concept of the "[f]ree trade in ideas" as "mean[ing] free trade in the opportunity to persuade to action, not merely to describe facts." 323 U.S. at 537.

The dissemination of the information at issue in Count One -- no matter who was responsible for that action -- was protected by the First Amendment. See, e.g., Brandenburg v. Ohio, 395 U.S. 444, 447-48 (1969) ("[T]he mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." (quoting Noto v. United States, 367 U.S. 290, 297-98 (1961)); see generally Ashcroft v. Free Speech Coalition, 535 U.S. 234, 253 (2002) (because "the Court's First Amendment cases draw vital distinctions between words and deeds," the Government may not punish speech because it increases the chance that someone other than the speaker will commit an unlawful act).

The Supreme Court explicated the broad scope of the First Amendment's protection of protesters and dissident voices in a trilogy of cases, starting with Watts v. United States, 394 U.S. 705 (1969). The Watts case involved a Vietnam War era prosecution against a political demonstrator who had announced to an audience a threat against President Lyndon Johnson. The speaker's words

were no mere generalized expression of dislike for L.B.J.   The speaker specifically identified his victim by name, and he specified the action he would take to cause that victim's death.  Indeed, at a public protest, the draft-aged demonstrator had taken the stage and announced, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."  394 U.S. at 706.

The Watts Court held these words -- albeit a threatening form of speech -- to fall within a category of "political hyperbole" protected as political advocacy under the First Amendment.  394 U.S. at 708.  The Court defined political hyperbole by limiting it to constitutionally protected political debate that is "often vituperative, abusive, and inexact," and recognized the "principle that debate on public issues should be uninhibited, robust, and wide-open."   394 U.S. at 708.

Following from Watts, then, the threatening nature of the words, by itself, is not enough to justify casting the speech outside the protective scope of the First Amendment.  And once one gets past the sensational nature of the allegations of the indictment and looks at the words and messages cited, and the context of so many of the events (reports of actions taken by others after the events; expressions of general political opposition to the corporate goals of HLS and the means by which that corporation conducts its business), it becomes apparent that there is not much left after the First Amendment analysis of the substance in the indictment.

The Supreme Court cases undercutting the Government's case -- Watts and its progeny -- are the foundational bulwarks of free speech doctrine.  For example, just two months after Watts, the Court issued the landmark opinion of Brandenburg v. Ohio, 395 U.S. 444 (1969).  Brandenburg defined the test under the First Amendment for the regulation of political advocacy, and that test remains the standard today.

As in the Watts case, the facts of Brandenburg involved protected political speech that contained hateful, vicious and even violent imagery.  The speaker specifically advocated violence

against racial minorities. 395 U.S. at 444-46. The speaker in Brandenburg had been indicted under an Ohio statute that penalized "advocat[ing] . . . the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform." 395 U.S. at 444. The Court nonetheless held that the contexts are strictly limited in which the Government could punish or regulate such speech. Under Brandenburg, political speech -- even when it contains hateful, vicious, or even violent imagery -- can be regulated only if three distinct elements are present: (1) the speech incites illegal action, (2) the speaker intends to instigate such illegal action, and (3) the speech is uttered in a context in which the illegal action is likely to occur immediately. 395 U.S. at 447. The Court held that "advocacy of the use of force or lawful violence" may not be prohibited "except where such advocacy is directed to inciting and producing imminent lawless action and is likely to incite or produce such action." 395 U.S. at 447.

In the third case -- NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982) -- the Supreme Court again held that, in the circumstances presented, the First Amendment protected the words of a speaker who identified his victim and targeted that victim for specific acts of severe criminal violence. The threats at issue involved specific, serious threats made against a finite and easily identified group of blacks who were targeted by the local civil rights organization for shopping at white-owned stores during a boycott. Charles Evers, the field secretary of the NAACP locally, had told a crowd that the blacks who broke the boycott would answer to him and " 'have their necks broken' by their own people." 458 U.S. at 900 n. 28. Evers made what might appear to have been an explicit, personal, statement of intent to inflict serious bodily injury on an identifiable victim, who had good reason to take Evers seriously: Evers' publicly-broadcast words were, "[W]e're gonna break your damned neck." 458 U.S. at 902.

The Supreme Court held that the First Amendment protects threats made against private persons in a context where the threats -- even of severe physical harm -- are not likely to be carried out ***immediately***, even though (1) the speech at issue threatened specific acts of violence against a finite and easily identifiable group of persons in a small town, (2) the targets of the threats could reasonably believe that the threats would be carried out, and (3) the threats were uttered in a context where physical violence of the sort advocated by the speakers actually occurred during the weeks that followed the threatening speeches.  458 U.S. at 902-06, 909-10, 928.

The Government may argue that the information campaign against HLS conducted by SHAC and its adherents is outside the protections of the First Amendment because the activities at issue involved action rather than words.  But that would be a hollow argument.  As these allegations have been itemized above on pages 37-43, nine out of the fourteen allegations against the defendants relate specifically and only to the publication on the SHAC Website of information deemed objectionable by HLS, but without any allegation that any human being, at all, anywhere in the world, took part in that publication.  The remaining five allegations relate to acts by unnamed and otherwise unidentified third parties who are not alleged to have been acting as part of ***any*** conspiracy.  See, e.g., Virginia v. Black, 538 U.S. 343, 358 (2003) (the First Amendment affords protection to symbolic or expressive conduct as well as actual speech); see generally id. at 358-59 (areas in which the First Amendment permits restrictions on the content of speech are extremely limited to those "which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" [quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 382-83 (1992); Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)]).

The Government may also allege that the anti-HLS words and actions of SHAC and the individual defendants fall outside the protections of the First Amendment, if the information at issue can be construed as a true threats. But the Supreme Court addressed the issue of what is a "true threat" recently in Virginia v. Black, 538 U.S. 343 (2003), and the definition would not encompass the messages of SHAC or its supporters, where the stated goal is to cause economic results, and all of the allegations set forth in the indictment relate -- at the very worst -- to economic impact, and not to any physical injury forewarned, intended towards, directed at, or caused to any human:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a *particular* individual or group of individuals. . . . Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of *bodily harm or death*.
> [538 U.S. at 360-61 (citations omitted; emphasis added)].

See NAACP v. Claiborne Hardware, 458 U.S. at 928-29 ("Even when public speech sounds menacing, even when it *expressly* calls for violence, it cannot form the basis of liability, unless it amounts to incitement or directly threatens the actual injury to particular individuals."); see generally Whitney v. California, 274 U.S. 357, 374 (1927) (Brandeis, J., conc.: "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears.").

The Supreme Court has repeatedly, forcefully, unflinchingly reaffirmed the protections to be accorded speakers under the First Amendment. The Court has just as strongly upheld the rights of dissident speakers to voice, and to act out, their protest, even in an exuberant, provocative manner. It follows inexorably that the Government is barred by the Constitution form prosecuting defendant Kjonaas (or any of the other defendants, for that matter) under Count One of the indictment, for the exercise of his constitutionally-protected rights of protest against animal experimentation, even

where that protest involves the expression of the opinion that HLS must be forced to close its

business.  See Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949)  (Speech "may indeed best serve

its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they

are, or even stirs people to anger.   Speech is often provocative and challenging.   It may strike at

prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an

idea."); Thornhill v. Alabama, 310 U.S. 88, 102 (1940) ("Freedom of discussion, if it would fulfill its

historic function in this nation, must embrace all issues about which information is needed or

appropriate to enable the members of society to cope with the exigencies of their period.").

Defendant Kjonaas petitions this Court to order Count One dismissed for the further

reason that Count One does not set forth any cause of action under the criminal laws of the United

States for which the defendant may be forced to stand trial.[15]

---

[15]   The indictment, so defective cannot be cured.  Dismissal is the only remedy.  See Russell v.
United States, 369 U.S. 749, 770 (1962):

> [It is the] settled rule in the federal courts that an ***indictment may not be amended
> except by resubmission to the grand jury***, unless the change is merely a matter of
> form.   "If it lies within the province of a court to change the charging part of an
> indictment to suit its own notions of what it ought to have been or what the grand
> jury would probably have made it if their attention had been called to suggested
> changes, the great importance which the common law attaches to an indictment by
> a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which
> the Constitution says 'no person shall be held to answer,' may be frittered away
> until its value is almost destroyed. . . .  Any other doctrine would place the rights
> of the citizen, which were intended to be protected by the constitutional provision,
> at the mercy or control of the court or prosecuting attorney; for, if it be once held
> that changes can be made by the consent or the order of the court in the body of the
> indictment as presented by the grand jury, and the prisoner can be called upon to
> answer to the indictment as thus changed, the restriction which the constitution
> places upon the power of the court, in regard to the prerequisite of an indictment,
> in reality no longer exists." We reaffirmed this rule only recently, pointing out that
> "The very purpose of the requirement that a man be indicted by grand jury is to
> limit his jeopardy to offenses charged by a group of his fellow citizens acting
> independently of either prosecuting attorney or judge."
>
> [369 U.S. at 770-71 (emphasis added; internal citations and footnote omitted;
> ellipsis as in original).]

### C.     The AEPA Is Unconstitutional, As Applied and on Its Face, with the Dismissal of Count One Therefore Required

Defendant Kjonaas challenges the constitutionality of the AEPA, as applied and on its face, under the First Amendment,[16] where the statute criminally penalizes defendants for the exercise of their rights (1) of protest against the actions of HLS in conducting animal experiments and tests, (2) to disseminate information about animal experimentation, animal rights, and HLS over the Internet and in public, and (3) to assemble peaceably to focus public attention on the need for reform of animal experimentation laws and the governmental regulation of animal laboratories.

Additionally, defendant Kjonaas challenges the constitutionality of each of the statutes as applied to him in this prosecution, where he is forced to proceed to trial on an indictment which does not reflect that the grand jury had before it any facts linking him within the conspiracies or the substantive acts charged in the indictment. Under the Fifth Amendment,[17] as well, defendant Kjonaas has been deprived of his rights to a grand jury and of due process. See Russell v. United States, 369 U.S. 749, 761-62 (1962); see also U.S. Constit. Amend VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation[.]").

If, for any of the reasons already set forth in this brief, this Court agrees that the indictment has not set forth a cause of action against the defendants under the statutes charged, or

---

[16] U.S. Constit. Amend. I: "Congress shall make no law . . . abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

[17] U.S. Constit. Amend. V: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ; nor shall any person be . . . deprived of life, liberty, or property, without due process of law[.]"

that the indictment fails to set forth the elements of the statutes cited, this Court then should

dismiss the indictment on those grounds, and thereby not reach the constitutional issues presented

as to the validity of the statutes when subjected to constitutional scrutiny.  See, e.g., Califano v.

Yamasaki, 442 U.S. 682, 692 (1979) ("A court presented with both statutory and constitutional

grounds to support the relief requested usually should pass on the statutory claim before

considering the constitutional questions."); see also Ellis v. Railway Clerks, 466 U.S. 435, 444

(1984); Crowell v. Benson, 285 U.S. 22, 62 (1932); United States v. Cisneros, 169 F.3d 763, 768

(D.C. Cir. 1999) ("Refusing to adjudicate constitutional issues unless it is strictly necessary to do

so is a time-honored practice of judicial restraint").[18]

The defendants stand charged under the AEPA on the Government's theory of conspirator

liability -- although the indictment does not allege that the individual defendants entered into any

agreement, had any common purpose, or any intent to achieve any common goal.  See above at

pp. 39-41.  The indictment fails to specify any connection between the defendants and the specific

conduct alleged, other than the mere fact that each had some "affiliation" with SHAC (either as

president, campaign coordinator, or as simply "affiliated" with SHAC).  The indictment suggests

---

[18] In Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346-47 (1936),  Justice
Brandeis, in his concurrence, set forth the series of rules by which the Supreme Court had
"avoided passing upon a large part of all the constitutional questions pressed upon it for
decision."  Some of those basic rules included:

> The Court will not "anticipate a question of constitutional law in advance
> of the necessity of deciding it."  "It is not the habit of the Court to decide
> questions of a constitutional nature unless absolutely necessary to a decision
> of the case."

> The Court will not pass upon a constitutional question although properly
> presented by the record, if there is also present some other ground upon
> which the case may be disposed of. This rule has found most varied
> application. Thus, if a case can be decided on either of two grounds, one
> involving a constitutional question, the other a question of statutory
> construction or general law, the Court will decide only the latter.

that anyone, anywhere, who could be construed in any manner as affiliated with SHAC, or with the animal rights causes it endorsed and furthered, could also have been named in this indictment, and forced to stand accountable for any of the information posted on the SHAC Website. There is, after all, no allegation that any of the defendants committed any specific act(s) in connection with the posting of the information cited as an overt act. There is no allegation that any of the defendants, within the time frame of the conspiracy, had any connection at all with any overt act alleged in Count One against an animal enterprise. See Table A, above, at pp. 11-12.

The Court should apply strict scrutiny to the AEPA as applied, since it is used here to prosecute the defendants on the basis of the expressive conduct of their speech. See generally United States v. Popa, 187 F.3d 672, 675 (3d Cir. 1999). Even if intermediate scrutiny is applied, the statute at issue still must meet the criteria set forth by the Supreme Court in United States v. O'Brien, 391 U.S. 367 (1968), including that "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of [an important or substantial governmental] interest]." Id. at 376. Here, the statute is applied by the Government to include within its scope persons whom the Government has identified as "affiliates" in an otherwise unspecified way with SHAC, or SHAC's animal rights campaign. The AEPA, as applied, fails constitutional scrutiny as applied to the conduct attributed to defendant Kjonaas and to all of the other defendants, because, as it has been charged in the indictment, it penalizes any defendant (or any other person) based on any minimal contact that person might be alleged to have had with SHAC, or even with the general cause of animal rights. The AEPA is also overbroad on its face.

---

[297 U.S. at 346-47 (Brandeis, J., conc.) (internal citations omitted)].

The deficiencies of the allegations of Count One, as just set forth at length, have carry-over impact on the analysis of the legal sufficiency of all of the remaining Counts of the indictment. The fundamental flaws of the indictment are equally applicable to all.

The defendants have been charged in each of the Counts arising out of the use, or anticipated use, of the Internet or other electronic media (e.g., the "black fax" conspiracy allegations of Count Six). But the indictment does not allege any connection linking any individual defendant with any electronic medium beyond the allegation that "[t]he activities of SHAC and the SHAC Website were chosen and coordinated at various times by the [individual] defendants" (except defendant McGee), or that the individual defendant had an otherwise-unspecified "affiliation" with SHAC (defendant Kjonaas as "President"; Gazzola as "campaign coordinator"; and the other individual defendants as "affiliated" with SHAC). See Ex. A at p. 3. There is no other allegation connecting any individual defendant with the conspiracy. See United States v. Welch, 327 F.3d at 1090 (sufficiency of the indictment is to be determined "on the basis of the allegations made on its face," and the trial court is generally "bound by the factual allegations contained within the four corners of the indictment").

The facts as alleged are surely insufficient as a matter of law to save each of the conspiracy counts (Counts One, Two, and Six) from dismissal, where there is nothing to link any defendant with a conspiracy to "use a facility in interstate or foreign commerce," or "to utilize a telecommunications device" for any purpose at all, and in particular not for the conspiracy with which these defendants have been charged. See generally Russell v. United States, 369 U.S. at 764-65 (it is not sufficient for the indictment merely to parrot the language of a statute, but it must give notice of the details the grand jury determined to be sufficient to require the defendant to stand trial for the charge set forth in the indictment).

If these defendants can stand so charged, and this indictment can withstand this motion to dismiss as to the allegations and the statement of the law set forth in Count One, then the AEPA, as enforced by the Government through this prosecution, is overbroad in its language, sweeping in its scope, and vague as to its application. The statute fails to give notice to a defendant of what words or actions relating to an animal enterprise -- or any entity or person which that enterprise may seek to include in its orbit as a victim within the scope of the AEPA -- may result in criminal prosecution, and which words or acts are outside that statute. Accordingly, the statute does not comply with the "precision that the First Amendment requires when a statute regulates the content of speech." See Reno v. ACLU, 521 U.S. at 874. That deficiency infects all of the other counts of the indictment with equal force.

As used by the Government in this indictment, the AEPA is also impermissibly vague under the Fifth Amendment because it fails to give notice of its scope of coverage in a manner sufficient to satisfy the due process clause of that Amendment. Further, the vagueness of the statute allows a grand jury to hand up an indictment that merely mirrors the statutory language, without having the grand jury presented with any of the underlying acts upon which the Government relies in linking the defendant facing indictment with the crime charged. See generally Russell v. United States, 369 U.S. at 764-65 (1962) (indictment "must do more than simply repeat the language of the criminal statute" to inform the defendant of the legal basis for the grand jury's action in handing up the indictment).

The Reno Court set forth the analysis for lower courts to apply in assessing whether "the many ambiguities concerning the scope of [the] coverage [of a criminal statute] render it problematic for the purposes of the First Amendment." Reno, 521 U.S. at 870. The vagueness of the AEPA should be "a matter of special concern" for the same two reasons identified by the

Reno Court as to the Communications Decency Act (the CDA), 47 U.S.C. § 223(a) and (d) (1996) -- the statute at issue before the Reno Court.

First, as with the CDA, the AEPA "is a content-based regulation of speech." The Reno Court held that "[t]he vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." 521 U.S. at 871-72.

The second reason cited by the Reno Court is as applicable to the AEPA as to the CDA: Each is a "criminal statute. In addition to the opprobrium and stigma of a criminal conviction, the CDA threatens violators with penalties" which include years of incarceration. 521 U.S. at 872. "The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." 521 U.S. at 872. According to the Reno Court, "[a]s a practical matter, this increased deterrent effect, coupled with the 'risk of discriminatory enforcement' of vague regulations, poses greater First Amendment concerns" than those raised in cases where only civil regulations (rather than criminal laws) are at issue. 521 U.S. at 872. Addressing the vagueness of the CDA, the Reno Court stated further, in words with carryover significance to the analysis of the AEPA: "Given the vague contours of the coverage of the statute, it unquestionably silences some speakers whose messages would be entitled to constitutional protection. That danger provides further reason for insisting that the statute not be overly broad." 521 U.S. at 874. The Reno Court held: "We are persuaded that the CDA lacks the precision that the First Amendment requires when a statute regulates the content of speech." 521 U.S. at 874. (That same constitutional deficiency infects the Interstate Stalking Act and the black fax counts (Counts Two to Six)).

For these additional reasons, defendant Kjonaas asks this Court to issue an order dismissing Count One of the Superseding Indictment.

## POINT II

**COUNT TWO (CONSPIRACY TO COMMIT INTERSTATE STALKING) AND COUNTS THREE TO FIVE (THE INTERSTATE STALKING SUBSTANTIVE COUNTS) OF THE INDICTMENT SHOULD BE DISMISSED BECAUSE THEY FAIL TO SET FORTH A CHARGE UNDER WHICH DEFENDANT KJONAAS OR ANY OTHER DEFENDANT COULD BE HELD CRIMINALLY ACCOUNTABLE; FURTHER, THE STATUTE AT ISSUE CANNOT WITHSTAND CONSTITUTIONAL SCRUTINY**

Count Two alleges that defendants SHAC, Kjonaas, Gazzola, and Conroy conspired to violate the Interstate Stalking Act, 18 U.S.C. § 2261A(2).[19]  In Counts Three to Five, those defendants have been charged with substantive violations of that Act as to three separate victims, who are identified in the indictment by initials, only, as SD, MH, and RH.

 The crux of Count Two is that the defendants charged therein conspired to use the Internet to engage in a course of conduct which caused the statutorily-defined degree of fear as to SD (an employee of M. Corp.), MH (an employee of a subsidiary of M. Corp.), and RH (an employee of M. Corp.).   (Ex. A at pp. 23-24).  The charge, as set forth in the indictment, is as follows:

> [that the defendants named therein] did knowingly and wilfully combine, conspire and agree with one another and with others to use a facility in interstate and foreign commerce to engage in a course of conduct that placed a person, a member of the immediate family of that person, or a spouse or intimate partner of that person, in reasonable fear of death or serious bodily injury to any of the persons described above, with the intent to place a person in another State in reasonable fear of the death of, or serious bodily injury to, that person or any of the persons named above, contrary to Title 18, United States Code, Section 2261A(2).
>
> . . . .
>
> In violation of [18 U.S.C. § 371].

---

[19]  See statute quoted in the Appendix to this brief at p. 69.

[Ex. A at p. 23].

The count also incorporates by reference specified paragraphs of Count One (specifically, ¶¶ 1, 6, 9-14, 16-18, 36-39, 42, and 49-51) as overt acts. Those referenced paragraphs of Count One, wherein the specified victims are described, include the following:

¶¶ 36-39: information about SD, an M. Corp. employee, whose name and address had been listed on the SHAC Website in or about March 2002, and whose home "*was vandalized*" on or about March 9, 2002; the SHAC Website posted a report on that vandalism the following day;

¶ 42: information about MH; "On or about August 3, 2002 and dates thereafter, *individuals harassed* MH and *protested* at the home of MH, an employee of a subsidiary of M. Corp., whose home address had been posted on the SHAC Website"; and

¶¶ 49-51: information about RH; "*individuals vandalized* the home of RH, an employee of M. Corp.," on or about June 15, 2002; on or about August 10, 2002, "*members of the conspiracy, including defendant LAUREN GAZZOLA*, *assembled* outside the home of RH, an employee of M. Corp. and, using a megaphone, *threatened* RH, his wife and family with burning down their home"; the SHAC Website "posted a report of the demonstration" the following day.

[Ex. A at pp. 14-18].

We incorporate by reference the information and the reasons set forth in the Statement of Facts and Point I as to the deficiencies of the indictment with regard to the allegations against defendant Kjonaas and all other defendants. As with Count One, the remaining counts of the indictment repeat the same flaws, as the counts mimic the language of the statutes cited therein without the specification of the elements of the offenses charged, or a listing of the conspiratorial and substantive acts alleged against defendant Kjonaas and the other defendants. See generally Russell v. United States, 369 U.S. at 764-65.

With respect to Count Two, these deficiencies are as follows: The conspiracy charge is not laid out beyond the mere mention of the allegation that the defendants "combine[d], conspire[d] and agree[d] with one another and with others." (Ex. A at p. 23). There is no allegation of the essential element of agreement within the conspiracy, beyond the vague claim that the defendants agreed "to use a facility in interstate and foreign commerce." That "facility" appears to have been the SHAC Website.

That "agreement" language, as well, does nothing more than parrot the statutory language, with no facts to back it up. See above at pp. 30, 54. Only defendant SHAC itself is linked with the Website; but the corporate defendant lacked the mental capacity knowingly to have conspired in the manner set forth in this count. See above at pp. 39-40. As detailed in Point I, there is no allegation anywhere in the indictment linking any of the individual defendants to the specific postings on the SHAC Website. See above at pp. 25-28, 37-43. More critically for Count Two, there is no allegation anywhere in the indictment linking the individual defendants named in that Count to the information published on the SHAC Website about SD, MH , and RH, specifically -- or even M. Corp., generally. Indeed, there is no allegation in the indictment linking the individual defendants, alone or collectively, with *any* use of the Internet at all, ever. See above at pp. 25-28. And there is no allegation in the indictment linking these individuals with a computer at all, other than the generalized statement that "[t]he activities of SHAC and the SHAC Website were chosen and coordinated at various times by" individual defendants who included Kjonaas, Gazzola and Conroy. See above at pp. 7-8, 24.

There is no allegation that these defendants had any role whatsoever in the publication of any information anywhere on the Internet or through any other electronic medium about SD, MH, or RH. Indeed, the indictment does not even allege that personal information about RH had been posted on

the Internet prior to the activities at his home, as set forth in the indictment at paras. 49 to 51. (Ex. A at pp. 17-18).

Count Two has further deficiencies:  It is an essential element of the Interstate Stalking Act that the defendant acted against "a person in another State."  18 U.S.C. § 2261A(2)(B).   Again, the language of Count Two merely mimics the statute; it does not identify in what state SD, MH, or RH was alleged to have been located at the relevant time.

These deficiencies, in turn, carry over into Counts Three to Five, in which defendants SHAC, Kjonaas, Gazzola, and Conroy have been charged with substantive violations of the Interstate Stalking Act with regard to each of the three named victims, SD, MH, and RH.   Counts Three to Five again specify -- as they must, under the statute cited -- that the defendants used a facility in interstate or foreign commerce (the Internet) to commit the crime charged.   But each of the Counts has the same deficiencies as Counts One and Two:  Nothing at all links these individual defendants with the Internet, or even a computer, for the relevant acts.   See above at pp. 25-28, 37-43.  The corporate defendant (SHAC) in turn, necessarily lacks the capacity to have formed the requisite intent; it cannot act knowingly.   See above at pp. 39-40.

Counts Two to Five of the indictment arise under the Interstate Stalking statute, 18 U.S.C. § 2261A, codified within 18 U.S.C. chap. 110A of the Domestic Violence and Stalking Act.  Enacted in 1996 and amended in 2000, the statute has been used as the basis of prosecution  in only a very, very small number of cases, as far as counsel has been able to locate.   All of those cases have involved family-types of matters and incidents within the commonly-recognized category of flagrant incidents of domestic stalking.  See, e.g., United States v. Al-Zubaidy, 283 F.3d 804 (6th Cir. 2002), cert. denied, 536 U.S. 948 (2002);  see also United States v. Rose, 315 F.3d 956 (8th Cir. 2003), cert. denied, 538 U.S. 1067 (2003).   None has included an allegation that the events at issue involved a

conspiracy to use the Internet as the means of conveying the offending messages to other alleged conspirators. None is remotely relevant to the Government's theory that the use of the Internet and principles of conspiracy can somehow link these defendants as having committed acts of interstate stalking against individuals employed by companies that have done business of HLS. But the Government's theory is more than simply novel; it is without legal foundation, for all of the reasons set forth so far in this brief.

The Government use of the Interstate Stalking Act also implicates the same constitutional concerns addressed in the analysis of why the application of the statute in Count One must fail constitutional scrutiny. We incorporate the same analysis here by reference. <u>See</u> above at pp. 51-56.

For the reasons set forth, then, defendant Kjonaas petitions the Court to order the dismissal of Counts Two to Five of the Superseding Indictment.

**COUNT SIX OF THE INDICTMENT (THE "BLACK FAX" CONSPIRACY CHARGE) MUST BE DISMISSED BECAUSE IT FAILS TO SET FORTH A CHARGE UNDER WHICH DEFENDANT KJONAAS OR ANY OTHER DEFENDANT COULD BE HELD CRIMINALLY ACCOUNTABLE; FURTHER, THE STATUTE AT ISSUE CANNOT WITHSTAND  CONSTITUTIONAL SCRUTINY**

Count Six of the indictment, in turn, charges Defendant Kjonaas and other defendants with conspiracy to violate the Communications Act of 1934, 47 U.S.C. § 223(a)(1)(C).[20]  Count Six alleges that defendants SHAC, Kjonaas, Gazzola, Conroy, and Harper "did knowingly and wilfully combine, conspire and agree with one another and with others to utilize a telecommunications device to abuse threaten and harass persons at the called number and who received the communication without disclosing the identity of the person utilizing the telecommunications device[.]"  (Ex. A at p. 28).

We incorporate by reference the earlier sections of this brief, and note the following:  There is no specific allegation anywhere in the indictment that any of the individual defendants used any telecommunications device for any purpose whatsoever, ever.  See generally above at pp. 25-28.  As overt acts in furtherance of the conspiracy alleged, Count Six cites three postings on the SHAC Website relating to black faxes.  (Ex. A at p. 29, ¶¶ 3-5).   For the reasons set forth earlier in this brief,  all of that information is protected within the First Amendment.   See above at pp. 44-59. Nothing about that posting constitutes an illegal act.

As the final overt act, the indictment alleges that defendant Harper gave a presentation in Seattle, Washington on October 17, 2002, wherein he gave certain information about sending black faxes.  (Ex. A at pp. 29-30, ¶ 6).  We can only demur, as we assume for purposes of this motion to

---

[20]   See statute quoted in the Appendix to this brief at p. 70.

dismiss that the allegations of the indictment are to be taken as true. But the question inexorably follows: So what? Every one of the overt acts alleged for Count Six relates to constitutionally-protected speech. There is no crime alleged.

The Court of Appeals for the D.C. Circuit found this very same statute constitutionally deficient, as applied, in United States v. Popa, 187 F.3d 672 (D.C. Cir. 1999), as it noted that the statute regulates the expressive conduct of speech, making the punishment depend on the content of what is said. 187 F.3d at 674-79. The statute is not content-neutral because it "applies only if the person makes the call 'without disclosing his identity'." 187 F.3d at 675 (dictum: the language of the statute "at least appears to make the prohibition depend upon the content of the call"); see generally Gormley v. Director, Conn. State Dep't of Probation, 632 F.2d 938, 941-42 (2d Cir. 1980) (construing a state statute closely tracking the federal statute, and stating the constitutional infirmity: " '[A] recital on the telephone of the most sublime prayer with the intention and effect of harassing the listener would fall within its ban as readily as the most scurrilous epithet.' Indeed, by its express terms the statute may be violated where no conversation at all occurs." [internal citation omitted]), cert. denied, 449 U.S. 1023 (1980).

The Popa Court held the statute failed constitutional scrutiny as applied to a caller who had made anonymous phone calls from Virginia to the U.S. Attorney's Office for the District of Columbia. In the calls, Popa had vilified the sitting U.S. Attorney as "a criminal, a negro," a "whore, born by a negro whore," who "violated . . . our rights." 187 F.3d at 673-74. The Popa Court held that the statute failed intermediate scrutiny as applied because the "annoy, abuse, . . . or harass" forms of the intent element (quoting the language of the statute) imposed an impermissible burden on speech which exceeded any asserted governmental interest. 187 F.3d at 676. The Popa Court determined that Popa's calls fell within the protected category of "public or political

discourse" because they involved, in part, "complaints about the actions of a government official." 187 F.3d at 677. The Court held the restriction on speech imposed by the statute exceeded that needed to further any governmental interest, because it "could have been drawn more narrowly, without any loss of utility to the Government, by excluding from its scope those who intend to engage in public or political discourse." 187 F.3d at 677.

In the present case, the Government seeks to hold defendant Kjonaas (as well as SHAC and three individual defendants) criminally accountable under 47 U.S.C. § 223(a)(1)(C) for conspiring to have faxes sent to various targeted companies. (Ex. A at pp. 28-29). Yet the indictment makes clear that the faxes attributed to SHAC were ***not*** anonymous, but contained specific identifying information. Indeed, according to the indictment, the "black faxes" could be accessed from the SHAC Website, and the Website announced to all in cyberspace that it "posted a calendar of events which included . . . black fax Mondays," and on those dates the form black faxes were to be sent to the targeted companies at fax numbers listed on the SHAC Website.[21] (Ex. A at P. 29). The indictment, in turn, alleges a conspiracy of unspecified persons merely to attempt, without any completed act alleged. (See Ex. A at 28-29). Count 6, then, alleges -- at best -- an attempt to commit an inchoate offense -- a further reason it should be dismissed.

We incorporate by reference the constitutional analysis set forth above, at pages 51-56, under which each of the statutes at issue in the indictment must fall, when scrutinized under the First and

---

[21] See Ex. K attached to the Certification of Isabel McGinty in support of the motion of defendant Kjonaas for Preliminary Relief, filed with the Court on Oct. 28, 2004, consisting of Discovery Pages provided by Mark L. Bibi of HLS to the FBI (pages Bates numbered C1000073 to -075):
  The discovery provided by the Government in this matter includes form black faxes which consist of partly-black pages, which make clear in their word-text that the faxes are hardly anonymous, but instead have been sent in protest against the killing of animals by HLS. Indeed, the sender is identified in the text of the fax itself as a political protester opposed to the business practices of the recipient corporation; the SHAC website, in turn, gives the world (including the

Fifth Amendments.  For all of the reasons cited, we petition the Court to order the dismissal of Count

Six.

---

recipient corporation) the message that the faxes are directly related to the animal rights campaign
against HLS.

## POINT IV

**DEFENDANT KJONAAS RESPECTFULLY REQUESTS
THAT HE BE ALLOWED TO JOIN IN ALL PRE-TRIAL
MOTIONS BROUGHT BY HIS CODEFENDANTS IN THIS
MATTER TO THE EXTENT THAT SUCH MOTIONS ARE
NOT INCONSISTENT WITH HIS INTERESTS**

Defendant Kjonaas petitions the Court to allow him to join in the factual and legal contentions set forth by his codefendants, to the extent that those motions are consistent with his factual and legal contentions. This will save judicial resources by avoiding duplicitous filings and arguments, while preserving the due process rights of this defendant.

## <u>CONCLUSION</u>

For the reasons set forth in this brief, Defendant Kevin Kjonaas respectfully petitions the Court to issue an order dismissing the Superseding Indictment as to all counts.

Respectfully submitted,

/s/
Isabel  McGinty (IM-8891)
Attorney for Defendant Kevin Kjonaas

Dated:  January 28, 2005

**APPENDIX:**

**Relevant Statutes**

*1.  __Animal Enterprise Protection Act ["AEPA"] -- charged in Count One__*

The Animal Enterprise Protection Act, 18 U.S.C. § 43 provides, in pertinent part, that:

(a)  Offense. -- Whoever --
  (1)  travels in interstate or foreign commerce, or uses or causes to be used the mail or any facility in interstate or foreign commerce for the purpose of causing physical disruption to the functioning of an animal enterprise; and
  (2)  intentionally damages or causes the loss of any property (including animals or records) used by the animal enterprise, or conspires to do so,

shall be punished as provided for in subsection (b).

(b) Penalties. --
  . . .
  (2) Major economic damage. -- Any person who, in the course of a violation of subsection (a), causes economic damage exceeding $10,000 to an animal enterprise shall be fined under this title or imprisoned not more than 3 years, or both.
  . . .
(d)  Definitions. -- As used in this section --
  (1) the term "animal enterprise" means --
    (A) a commercial or academic enterprise that uses animals for food or fiber production, agriculture, research, or testing;
    . . .
  (2)  the term "physical disruption" does not include any lawful disruption that results from lawful public, governmental, or animal enterprise employee reaction to the disclosure of information about an animal enterprise;
  (3) the term "economic damage" means the replacement costs of lost or damaged property or records, the costs of repeating an interrupted or invalidated experiment, or the loss of profits; . . . .

## 2. *Interstate Stalking Statute -- charged in Counts Two to Five*

The Interstate Stalking statute, 18 U.S.C. § 2261A, provides, in pertinent part:

> Whoever --
>
> . . .
>
> (2) with the intent --
>
> . . .
>
> (B) to place a person in another State or tribal jurisdiction, or within the special maritime and territorial jurisdiction of the United States, in reasonable fear of the death of, or serious bodily injury to --
>
> (i)      that person;
>
> (ii)     a member of the immediate family . . . of that person; or
>
> (iii)    a spouse or intimate partner of that person,
>
> uses the mail or any facility of interstate or foreign commerce to engage in a course of conduct that places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons described in clauses (i) through (iii),
>
> shall be punished as provided in section 2261(b).

## 3. *Conspiracy Statute:  Conspiracy to commit offense or to defraud United States -- charged in Counts Two and Six*

18 U.S.C. § 371 provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
>
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

## 4. *Principals Statute -- charged in Counts Three to Five*

18 U.S.C. § 2 provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**5.** ***The Communications Act of 1934 -- charged in Count Six***

47 U.S.C. § 223(a)(1)(C) provides, in pertinent part:

(a)  Whoever --

    (1) in interstate or foreign communications --

        . . . .

        (C) makes a telephone call or utilizes a telecommunications device, whether or not conversation or communication ensues, without disclosing his identity and with intent to annoy, abuse, threaten, or harass any person at the called number or who receives the communications;

. . .

shall be fined under Title 18, or imprisoned not more than two years, or both.