**RECEIVED**

SEP 16 2004

AT 8:30_____ M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA   :   Criminal No. 04-373 (MLC)

          v.   :

                                      18 U.S.C. §§ 43, 371, 2261A,
STOP HUNTINGDON ANIMAL   :            and 2
CRUELTY USA, INC.,                     47 U.S.C. § 223(a)(1)(C)
KEVIN KJONAAS, a/k/a   :
"Kevin Jonas," a/k/a "Steve
Shore," a/k/a "Jim Fareer,"   :
LAUREN GAZZOLA,
a/k/a "Angela Jackson," a/k/a   :
"Danielle Matthews,"
JACOB CONROY,   :          SUPERSEDING INDICTMENT
JOSHUA HARPER,
ANDREW STEPANIAN,   :
DARIUS FULLMER, and
JOHN MCGEE   :

      The Grand Jury in and for the District of New Jersey,

sitting at Newark, charges:

## COUNT ONE

    1.  At times relevant to this Indictment:

### INDIVIDUALS AND ENTITIES

    a.  Huntingdon Life Sciences ("HLS") was a corporation

organized under the laws of the State of Delaware with its

principal place of business at the Princeton Research Center, 100

Mettlers Lane, East Millstone, New Jersey.  HLS trades on the

stock exchange as company symbol LSRI.  HLS was started and

maintains facilities in the United Kingdom.  It is one of the

leading pharmaceutical testing companies.  As part of its drug

testing procedures, many of which are mandated by law, HLS uses

animals for, among other things, testing the safety of drugs and chemicals that various manufacturers seek to bring to market. HLS is an "animal enterprise" as that term is defined by Title 18, United States Code, Section 43(d)(1), in that it is a commercial enterprise that uses animals for research and testing. As part of its business operation, HLS utilizes a website as well as e-mail.

b. Stop Huntingdon Animal Cruelty, USA ("SHAC") was a not-for-profit corporation incorporated under the laws of the State of Delaware, with its principal place of business located in New Jersey. SHAC is an organization first started in the United Kingdom and then incorporated in the United States. SHAC was formed to interrupt the business of HLS and ultimately to force it to cease operations altogether due to its use of animals for research and testing. SHAC has used a multi-pronged attack against HLS targeting its workers and shareholders as well as companies (and their employees) which received services from, or provided them to, HLS. SHAC distributed a newsletter and operated a series of websites that disseminated its animal rights ideology and furthered its mission by, among other things, posting information relating to individuals and organizations that SHAC targeted for action. This information included the names, addresses and other personal information about individuals who were employed by HLS and other targeted companies. These

2

websites included www.shacusa.net; www.shacamerica.com;
www.shacamerica.net; www.shacamerica.org; www.stephenskills.com;
www.october29.org; and www.december1.com (hereinafter sometimes
collectively referred to as the "SHAC Website"). The activities
of SHAC and the SHAC Website were chosen and coordinated at
various times by the defendants KEVIN KJONAS, a/k/a "Kevin
Jonas," a/k/a "Steve Shore," a/k/a "Jim Fareer," LAUREN GAZZOLA,
a/k/a "Angela Jackson," a/k/a "Danielle Matthews," JACOB CONROY,
JOSHUA HARPER, ANDREW STEPANIAN, and DARIUS FULLMER.

     c. Defendant KEVIN KJONAS, a/k/a "Kevin Jonas," a/k/a
"Steve Shore," a/k/a "Jim Fareer" was the President of SHAC and
resided in New Jersey.

     d. Defendant LAUREN GAZZOLA, a/k/a "Angela Jackson,"
a/k/a "Danielle Matthews" was the campaign coordinator for SHAC
and resided in New Jersey.

     e. Defendant JACOB CONROY was affiliated with SHAC and
resided in New Jersey.

     f. Defendant JOSHUA HARPER was affiliated with SHAC
and resided in Seattle, Washington.

     g. Defendant ANDREW STEPANIAN was affiliated with SHAC
and resided in New York.

     h. Defendant DARIUS FULLMER was affiliated with SHAC
and resided in New Jersey.

i.   Defendant JOHN MCGEE was affiliated with SHAC and resided in New Jersey.

j.   "S. Inc." was an investment banking firm with its principal place of business in Little Rock, Arkansas.  As part of its business operation, S. Inc. utilized a website as well as e-mail.

k.   "M. Corp." was a company with its principal place of business in New York, New York, which provided insurance brokerage services on behalf of large corporations and others.  As part of its business operation, M. Corp. utilized a website as well as e-mail.

l.   "Q" was a company headquartered in New York, New York, involved in investing in companies on behalf of clients.  As part of its business operation, Q utilized a website as well as e-mail.

m.   "W. Corp." was a company headquartered in Jersey City, New Jersey, involved in trading the stock of publicly traded companies on behalf of clients.  As part of its business operation, W. Corp. utilized a website as well as e-mail.

n.   "BNY" was a financial institution having its principal place of business in New York, New York, which provided financial services to individuals and corporations.  As part of its business operation, BNY utilized a website as well as e-mail.

o. "C. Corp." was a global pharmaceutical company headquarted in Emeryville, California. As part of its business operation, C. Corp. utilized a website as well as e-mail.

2. From at least as early as October, 2001, through February, 2004, at Somerset, in the District of New Jersey, and elsewhere, defendants

> STOP HUNTINGDON ANIMAL CRUELTY, USA INC.,
> KEVIN KJONAAS, a/k/a "Kevin Jonas,"
> a/k/a "Steve Shore," a/k/a "Jim Fareer,"
> LAUREN GAZZOLA,
> a/k/a "Angela Jackson," a/k/a "Danielle Matthews,"
> JACOB CONROY,
> JOSHUA HARPER,
> ANDREW STEPANIAN
> DARIUS FULLMER, and
> JOHN MCGEE

did knowingly and willfully combine, conspire and agree with one another and others to use a facility in interstate and foreign commerce for the purpose of causing physical disruption to the functioning of HLS, an animal enterprise, and intentionally damage and cause the loss of property used by HLS, in an amount exceeding $10,000.

## OBJECT OF THE CONSPIRACY

3. It was the object of the conspiracy to physically disrupt the operations of HLS and drive it out of business either by: (a) directly disrupting the business of HLS or (b) disrupting the business of companies that either provided services to, or purchased services from, HLS, thereby forcing those businesses to

5

cease doing business with HLS and make it impossible for HLS to conduct its business.

MANNER AND MEANS

4. It was part of the conspiracy that the defendants embarked on a campaign to enlist animal rights activists to engage in activity meant to harm the business of HLS in any manner available.

5. It was further part of the conspiracy that e-mail and web-based communications were used to disseminate information and coordinate the campaign to shut down HLS.

6. It was further part of the conspiracy that the defendants espoused and encouraged others to engage in "direct action," which as described by SHAC involved activities that "operate outside the confines of the legal system." For instance, the SHAC Website posted what it termed the "top 20 terror tactics," which described "direct actions" that could be taken against companies or individuals such as:

> demonstrations at one's home using a loudspeaker;
>
> abusive graffiti, posters and stickers on one's car and house;
>
> invading offices and, damaging property and stealing documents;
>
> chaining gates shut, and blocking gates;
>
> physical assault including spraying cleaning fluid into one's eyes;

6

smashing the windows of one's house while the
individual's family was at home;

flooding one's home while the individual was away;

vandalizing one's car;

firebombing one's car;

bomb hoaxes;

threatening telephone calls and letters including
threats to kill or injure one's partner or children;

e-mail bombs in an attempt to crash computers;

sending continuous black faxes causing fax machines to
burn out;

telephone blockades by repeated dialing to prevent the
use of the telephone; and

arranging for an undertaker to call to collect one's
body.

7.   It was further part of the conspiracy to conduct
telephone and e-mail blitzes, fax blitzes and computer blockades
against HLS in order to divert HLS employees from their regular
work.

8.   It was further part of the conspiracy that
information would be disseminated through the SHAC Website to
coordinate computer attacks on HLS with the intent of causing
damage to, or shutting down, HLS' computer systems.

9.   It was further part of the conspiracy that SHAC
would post the names, addresses, home telephone numbers and other
personal information of HLS employees on the SHAC Website and
encourage people to engage in acts of harassment and intimidation

7

against those HLS employees at their homes, through mailings, telephone calls, home demonstrations, vandalism of their real and personal property and other "direct action," in an attempt to place them in reasonable fear of serious bodily injury and/or death and cause targets to resign from HLS and thereby further disrupt HLS' business activities.

10. It was further part of the conspiracy that acts of intimidation and vandalism perpetrated on HLS employees would be reported on the SHAC Website in a manner designed to foster additional acts against those same employees as well as others whose personal information had been posted on the SHAC Website.

11. It was further part of the conspiracy that acts perpetrated on HLS and its employees, which were reported on the SHAC Website, would be used as examples in order to intimidate, harass and threaten other individuals and companies and place individuals in a reasonable fear of serious bodily injury and/or death.

12. It was further part of the conspiracy that each week SHAC designated a company that was either doing business with HLS or was a customer of HLS as the "target of the week" in order to make that company the victim of "direct action" by animal rights supporters and force the company to cease its business relationship with HLS.

13. It was further part of the conspiracy that SHAC targeted certain companies on an ongoing basis in order to pressure those companies into ceasing their business relationships with HLS. SHAC and the defendants selected as "ongoing targets" certain companies deemed vital to HLS' ability to maintain its business operation.

14. It was further part of the conspiracy that once a company was either a "target of the week" or an ongoing target of the campaign to shut down HLS, those companies would be subject to many of the same "direct actions" that HLS itself was subjected to. Thus, these target companies would be the recipients of telephone and e-mail blitzes, fax blitzes and computer blockades designed to harm their businesses and thereby force them to cease doing business with HLS.

15. It was further part of the conspiracy that information would be disseminated through the SHAC Website to coordinate computer attacks on certain "targets of the week" or "ongoing targets" in order to cause damage to, or shut down, the computer systems of the target company.

16. It was further part of the conspiracy that once a company was either a "target of the week" or an "ongoing target," employees of those companies would be subject to many of the same "direct actions" that HLS employees were subjected to. Thus, the names, addresses, home telephone numbers and other personal

information of employees of the target companies would be posted

on the SHAC Website, and viewers of the website were encouraged

to engage in acts of harassment and intimidation against those

employees at their homes, through mailings, telephone calls, home

demonstrations and vandalism of their real and personal property.

This was done to threaten and intimidate individuals employed by

companies doing business with HLS to place them in reasonable

fear of serious bodily injury and/or death and to cause them to

resign their positions. The defendants thereby intended to

disrupt the operations of the target companies and force them to

cease doing business with HLS, which in turn would disrupt HLS'

business.

     17. It was further part of the conspiracy that the

SHAC Website reported on acts perpetrated on "targets of the

week" or "ongoing targets" and their employees, to be used as

examples to intimidate, harass and threaten other individuals and

companies and place individuals in a reasonable fear of serious

bodily injury and/or death.

     18. It was further part of the conspiracy that

defendants and others would take steps to conceal their conduct

by, among other things, using false names; using computer

programs designed to scramble e-mail messages so that they could

not be read or understood by anyone other than an individual

having the proper code; burning documents; falsely attributing

10

conduct to other entities; and using computer software to wipe
information from computer hard drives.

In furtherance of the conspiracy and in order to effect
its object, the following acts were committed in the District of
New Jersey and elsewhere:

### I.   THE ATTACKS ON HLS AND ITS EMPLOYEES

19.  On or about February 15, 2001, the SHAC Website
posted an announcement which stated in part: "we'll be at their
offices, at their doorsteps, on their phones or in their
computers.  There will be no rest for the wicked."

20.  On or about March 6, 2001, the SHAC Website listed
the "top 20 terror tactics" that could be used against
organizations and individuals in order to harm HLS and ultimately
cause it to shut down.

21.  On or about March 31, 2001, after the SHAC Website
postings described above, protesters appeared at the New Jersey
residence of HJ, an HLS employee, and banged on the windows and
doors at his home.

22.  On or about April 2, 2001, after the SHAC Website
postings described above, rocks were thrown through windows of
HJ's home; one of the cars in HJ's driveway was overturned and
vandalized; and a second car in HJ's driveway was also
vandalized.

23.   On or about May 30, 2001, defendant JOHN MCGEE and another slashed the tires on the car of DD, an HLS employee, and spray painted on his house.

24.   After the May 30, 2001 attack on the home of DD, the SHAC Website posted names and home addresses of HLS employees and stated with respect to DD that his home "was visited several times, had car windows broke, tires slashed, house spray painted with slogans.  His wife is reportedly on the brink of a nervous breakdown and divorce."

25.   In or about June, 2002, the SHAC Website announced an electronic form of attack against HLS and posted a computer application designed to cause certain commands to be sent automatically to the HLS website.

26.   In or about June, 2002, individuals using the above utility caused HLS' server to overload, rendering it, and hence the HLS website, inoperable.

27.   On or about July 12, 2002, the SHAC Website announced that its "multi pronged attack on the workers, shareholders and clients" of HLS was being successfully carried out.

28.   In or about October, 2002, the SHAC Website posted an announcement listing the home address and telephone number of CA, an HLS employee.

12

29.   On or about October 21, 2002, the SHAC Website posted an announcement relating to signs that were posted in and around the Princeton, New Jersey area, which referred to CA as "deluded and deranged" and listed her home address and telephone number.

30.   On or about November 17, 2002, the SHAC Website posted an announcement stating, in part, that HJ and another HLS employee "resigned after months of pressure, including protests, property destruction, [and] phone blockades at home and work."

31.   In or about December, 2003, individuals engaged in a "Distributed Denial of Service" against HLS known as a "Zombie Attack," which caused the HLS website to be inoperable.

32.   In or about December, 2003, the SHAC Website reported on the "Zombie Attack" on HLS, attributing the attack to Russian computer hackers.

II.   THE ATTACK ON S. INC.

33.   In or about October, 2000, SHAC caused the website www.stephenskills.com to be launched in order to apply pressure on S. Inc. to cease doing business with HLS.

34.   On or about February 28, 2001, the SHAC Website announced a successful electronic attack against S. Inc. which "saw over a thousand activists activate a floodnet program from their computers that enabled them to 'flood' S. Inc.'s website

several times per minute with download requests thereby slowing down and clogging up the system."

35. On or about January 3, 2002, the SHAC Website, claiming that it received an anonymous report, announced that the home of WS, the head of S. Inc., was vandalized in the early morning hours of January 3. Specifically, the web-posting stated that activists "jumped over his gate to gain access to the front of the house .... quickly smashed out his porch lights and windows, and as an alarm went off, plastered the front of his house with over 15 paint bombs .... then spray painted PUPPY KILLER on the sidewalk and ran off."

### III. THE ATTACK ON M. CORP.

36. In or about February 10, 2002, the SHAC Website listed M. Corp. as a target. The SHAC website stated, "hitting their insurance company will keep HLS on the defensive ... and show SHAC sets the pace ... [L]et M*** know that we are about to raise the premium on pain." The website posting also advised readers to "stay tuned for office addresses and internal phone numbers."

37. In or about March, 2002, the SHAC Website listed the names and addresses of various M. Corp. employees around the United States including SD and MR. In addition, the SHAC website listed, in certain instances, the home telephone numbers of M. Corp. employees; the names of their spouses; the names, ages and

14

dates of birth of their children; where these children attended school; license plate numbers of the employees' cars; and the churches that the employees and their families attended.

38. On or about March 9, 2002, the home of SD, an employee of M. Corp., was vandalized.

39. On or about March 10, 2002, the SHAC Website posted a report of the vandalism at the home of SD.

40. On or about March 9, 2002, the home of MR, an employee of M. Corp., was vandalized.

41. On or about March 10, 2002 the SHAC Website posted a report of the vandalism at the home of MR.

42. On or about August 3, 2002 and dates thereafter, individuals harassed MH and protested at the home of MH, an employee of a subsidiary of M. Corp., whose home address had been posted on the SHAC Website.

43. On or about July 29, 2002, the SHAC Website announced that FT, a Director at M. Corp., was scheduled to be at the Lightpath Golf Tournament at the Meadowbrook Golf Club in New York from July 29 through August 4, 2002. The web posting also listed FT's home address and home telephone and fax number.

44. On or about July 30, 2002, the Meadowbrook Golf Club was vandalized; its putting greens were destroyed and the words "FT pup-killer wuz hea" were dug into the grass on one of the greens.

45.    On or about August 1, 2002, the SHAC Website
posted the following message:

> The FT Commando Division of the Animal
> Liberation Front claims responsibility for
> the destruction of 4 greens and 4 holes at
> the Meadowbrook Golf Club/PGA Lightpath
> classic.  FT, BMOC to M Corp., and his super
> friends /League of Justice wreaked havoc upon
> the course, sabotaging all of the PGA's week
> long tournement [sic].  The FT commandos dug
> 3 foot deep holes at 4 of the 18 holes,
> removed the metal casings and flags, scarred
> each putting green with different trenches
> and holes.
>
> . . . .
>
> Damages from this action may in fact exceed
> hundreds of thousands of dollars between the
> damage to the well-maintained golf course,
> the disruption to the PGA event and to the
> club itself.

46.    On or about September 17, 2002, the SHAC Website
posted the following:  "25 activists paid a visit to the posh
Plandome home of FT, director at M. Corp.... Chants of 'blood
money! - his beach!, blood money! - his pool!, blood money! - his
yacht!' and bullhorn speakouts describing his role in the murder
of 500 animals daily drove neighbors out of their houses to see
what was all the commotion...."

47.    On or about September 19, 2002, individuals
vandalized the home of FT, spray painting the words "murder,"
"leave town," and "M*** pull out of HLS" on his and his
neighbor's property.

48. On or about September 21, 2002, the SHAC Website posted the following:

> Last evening members of the Animal Liberation Front, paid a visit to the home of FT, honorary director to M Corp. We have been monitoring the protection and home for quite some time now, FT we were well aware of the security patrols at your home, the guards and their shift changes and the fact that last week they cut the security from 24 hrs. a day, every day, to fri/sat/Sunday and then decided to go back to full time security. Did you think that armed guards or the installation of motion sensors, cameras, lights, and steel grating around your basement windows would somehow make the animal liberation movement go away? Of course not!
>
> Last evening we waited for your security guard to fall asleep then went right in under their noses and got to painting, leaving your house a red bloody mess, just like your hands!
>
> FT's home was donned with anti-HLS and ALF slogans, the words "killer" and "murderer leave town" can be seen all the way across the harbor.

The posting went on to threaten that this was "only the beginning."

49. On or about June 15, 2002, individuals vandalized the home of RH, an employee of M. Corp.

50. On or about August 10, 2002, members of the conspiracy, including defendant LAUREN GAZZOLA, assembled outside the home of RH, an employee of M. Corp. and, using a megaphone, threatened RH, his wife and family with burning down their home.

17

51.   On or about August 11, 2002, SHAC Website posted a report of the demonstration at the home of RH.

52.   On or about April 21, 2002, individuals assembled outside the home and on the deck and private property surrounding the home of ML, an M. Corp. employee.  The demonstrators banged on the home and its windows, and shouted that they knew where ML worked, knew where ML lived and would be back.

53.   On or about July 10, 2002, a smoke bomb was set off at the offices of a subsidiary of M. Corp. in Seattle, Washington causing the evacuation of a high-rise office tower, and a second smoke bomb was set off at the offices of M. Corp. in Seattle, Washington, causing the evacuation of that high-rise office tower as well.  After these events, the SHAC Website posted a report about the smoke bomb attacks.

IV.   THE ATTACK ON Q

54.   On or about October 23, 2001, an e-mail was sent to animal rights activists targeting Q as an "hls: Investor of the week."  The e-mail also listed personal information regarding PQ, a principal of Q, including his home address; home telephone number; the address of his vacation home and its telephone number; the make and license plate number of his automobile; a description of him and his wife; the name of his dog; and his brother's name, address and home telephone number.  The e-mail stated:

18

Now more than ever, we need to hit hls's
other two original investors who have
callously stood by the lab through two
damning undercover investigations. In the
Financial Times article P***** Q****** is
quoted as saying, 'We have received a lot of
harassment, but it hasn't changed our
position." Since both have been listed as
Investor of the Week before and have not
budged from their backing of animal cruelty,
we have decided to be more stern in our
tactics and strategic in our focus. Below is
not only the contact information for Q's
office but also personal information
anonymously leaked to SHAC-USA that include
the phone numbers and addresses of his homes.

55. On or about February 3, 2002, individuals broke
windows and splashed paint at the building where PQ resided.

56. In or about February, 2002, the SHAC Website
reported the vandalism that occurred at the residence of PQ.

V.   THE ATTACK ON W. CORP.

57. In or about July, 2001, the SHAC Website listed W.
Corp. as a Market Maker of the Week, thereby targeting W. Corp.
for direct action.

58. On or about July 11, 2001, in a matter of hours
over 2 million e-mails were sent through W. Corp.'s computer.
This barrage of e-mails compromised the computer server and
caused damage to W. Corp.'s operations.

59. On or about September 10, 2002, W. Corp. received
a letter from SHAC, signed by Angela Jackson, an alias utilized
by defendant LAUREN GAZZOLA, requesting written confirmation that
W. Corp had ceased as a Market Maker of HLS stock stating:  "If

19

we can obtain a statement, on company letterhead confirming that [W. Corp.] no longer acts as a Market Maker for LSRI, and has no intention of doing so in the future, we are happy to contact our supporters and confirm that the campaign against [W. Corp] has ended. This should bring a prompt end to the phone calls and faxes and e-mails your company is receiving."

VI.   <u>THE ATTACK ON BNY</u>

60. From at least as early as in or about April, 2001, the SHAC Website listed BNY as a target.

61. On or about May 13, 2001, defendants KEVIN KJONAAS, LAUREN GAZZOLA, ANDREW STEPANIAN, DARIUS FULLMER and others appeared at the doorstep of BNY employee TP's home and shouted, cursed and threatened his wife.

62. After the May 13, 2001 verbal attack upon TP's wife, the SHAC Website reported the incident.

63. On or about July 24, 2001, the home of BR, a BNY employee, was vandalized and his boat was damaged. According to a SHAC press release: BR's "Amerikkkan Flag was lowered and discarded like the trash it is, and replaced with the only flag that matters, a pirate flag!"

## VI. THE ATTACK ON C. CORP.

64. On or about May 29, 2003, the SHAC Website announced that C. Corp., a global pharmaceutical company, was a target of the SHAC campaign. Referring to C. Corp. employees, the SHAC Website stated: "We know where you are, we know what you look like we know where you socialize and best of all we know where you live!"

65. On or about August 18, 2003, the SHAC Website announced that animal rights activists had demonstrated at the home of KS, a C. Corp. employee, and that they had "swarmed her neighborhood, taking over her street..."

66. On or about August 21, 2003, the SHAC Website announced that animal rights activists had demonstrated at the home of KS and spent time "littered throughout her surrounding neighborhood, talking out on the bullhorn..."

67. On or about September 16, 2003, the SHAC Website announced that animal rights activists had demonstrated at the home of KS and stated "at about 12 am we bid him a fond goodnight and left questioning: So K****, did you tuck your family into bed and explain why we were out there, or were you too cowardly to be home? Either way, we win. Because WE ALWAYS WIN."

68. On or about October 15, 2003, the SHAC Website posted the following:

> K**** "the killer" S****** of C. Corp.'s
> toxicology department has been infiltrated.

21

> She is a longtime treasurer of the Cascade
> Orienteering Club.... The Club's Officers;
> board members; co-ordinators, and members
> have all been written polite e-mails
> explaining the nature of K**** S******* dirty
> business. They were then asked for personal
> or embarrassing information on K****. When
> no one responded in days they were bombarded
> with e-mails depicting K**** as the cold-
> blooded killer she is. The Club's e-mail
> list had also been infiltrated, and now
> nothing is secret.

The web posting went on to list information about the club and

its members including their names, home addresses, home telephone

numbers and personal e-mail addresses.

69. On or about the late evening of May 15, 2003, and
the early morning hours of May 16, 2003, animal rights activists
protested at the home of AH with bullhorns.

70. On or about May 16, 2003, the SHAC Website posted
a report of the demonstration at the home of AH stating:

> Very early this morning C[. Corp.] employees
> and board members woke up to the sounds of
> activists screaming though bullhorns,
> personal alarms blaring in the front yards
> and to find flyers with their pictures, names
> and addresses posted up around their
> neighborhoods exposing the sick animal
> killing scum that they are.

71. On or about August 18, 2003, individuals went to
the home of AH and, pounded on her front door, rang her doorbell
and shouting "open the door you fucking bitch."

In violation of Title 18, United States Code, Section
43.

22

<u>COUNT TWO</u>

1.  Paragraphs 1, 6, 9-14, 16-18, 36-39, 42, 49-51 of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.  From at least as early as March, 2001 through in or about December, 2002 at Somerset, in the District of New Jersey, and elsewhere, the defendants

> STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.,
> KEVIN KJONAAS, a/k/a "Kevin Jonas,"
> a/k/a "Steve Shore," a/k/a "Jim Fareer,"
> LAUREN GAZZOLA, a/k/a "Angela Jackson,"
> a/k/a "Danielle Matthews," and
> JACOB CONROY

did knowingly and wilfully combine, conspire and agree with one another and with others to use a facility in interstate and foreign commerce to engage in a course of conduct that placed a person, a member of the immediate family of that person, or a spouse or intimate partner of that person, in reasonable fear of death or serious bodily injury to any of the persons described above, with the intent to place a person in another State in reasonable fear of the death of, or serious bodily injury to, that person or any of the persons described above, contrary to Title 18, United States Code, Section 2261A(2).

3.  Defendants and others committed overt acts in furtherance of the conspiracy as set forth in paragraphs 1, 6, 9-14, 16-18, 36-39, 42 and 49-51 of Count One of this Indictment in order to effect its object.

23

In violation of Title 18, United States Code, Section 371.

## COUNT THREE

1. Paragraphs 1, 6, 9-14 and 36-39 of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2. From at least as early as March 9, 2002 through in or about December, 2002 at Somerset, in the District of New Jersey, and elsewhere, the defendants

> STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.,
> KEVIN KJONAAS, a/k/a "Kevin Jonas,"
> a/k/a "Steve Shore," a/k/a "Jim Fareer,"
> LAUREN GAZZOLA, a/k/a "Angela Jackson,"
> a/k/a "Danielle Matthews," and
> JACOB CONROY

did knowingly and with the intent to place a person in another State in reasonable fear of death or serious bodily injury to that person, specifically SD, or a member of the immediate family of SD, or a spouse or intimate partner of SD, use a facility in interstate and foreign commerce to engage in a course of conduct that placed SD in reasonable fear of the death of, or serious bodily injury to, SD or a member of the immediate family of SD, or a spouse or intimate partner of SD.

In violation of Title 18, United States Code, Sections 2261A and 2.

1.    Paragraphs 1, 6, 9-14 and 42 of Count One of this
Indictment are repeated and realleged as if fully set forth
herein.

2.    From at least as early as August 3, 2002 through in
or about December, 2002 at Somerset, in the District of New
Jersey, and elsewhere, the defendants

> STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.,
> KEVIN KJONAAS, a/k/a  "Kevin Jonas,"
> a/k/a "Steve Shore," a/k/a "Jim Fareer,"
> LAUREN GAZZOLA, a/k/a "Angela Jackson,"
> a/k/a "Danielle Matthews," and
> JACOB CONROY

did knowingly and with the intent to place a person in another
State in reasonable fear of death or serious bodily injury to
that person, specifically MH, or a member of the immediate family
of MH, or a spouse or intimate partner of MH, use a facility in
interstate and foreign commerce to engage in a course of conduct
that placed MH in reasonable fear of the death of, or serious
bodily injury to, MH or a member of the immediate family of MH,
or a spouse or intimate partner of MH.

In violation of Title 18, United States Code, Sections
2261A and 2.

## COUNT FIVE

1. Paragraphs 1, 6, 9-14 and 49-51 of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2. From at least as early as April 28, 2002 through in or about December, 2002 at Somerset, in the District of New Jersey, and elsewhere, the defendants

> STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.,
> KEVIN KJONAAS, a/k/a "Kevin Jonas,"
> a/k/a "Steve Shore,"a/k/a "Jim Fareer,"
> LAUREN GAZZOLA, a/k/a "Angela Jackson,"
> a/k/a "Danielle Matthews," and
> JACOB CONROY

did knowingly and with the intent to place a person in another State in reasonable fear of death or serious bodily injury to that person, specifically RH, or a member of the immediate family of RH, or a spouse or intimate partner of RH, use a facility in interstate and foreign commerce to engage in a course of conduct that placed RH in reasonable fear of the death of, or serious bodily injury to, RH or a member of the immediate family of RH, or a spouse or intimate partner of RH.

In violation of Title 18, United States Code, Sections 2261A and 2.

## COUNT SIX

1. Paragraphs 1, 6, 9-14, 16-18, 20, 36-39, 42, 49-51 of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2. From at least as early as October, 2001, through February, 2004 at Somerset, in the District of New Jersey, and elsewhere, the defendants

> STOP HUNTINGDON ANIMAL CRUELTY, USA, INC.,
> KEVIN KJONAAS, a/k/a "Kevin Jonas,"
> a/k/a "Steve Shore," a/k/a "Jim Fareer,"
> LAUREN GAZZOLA, a/k/a "Angela Jackson,"
> a/k/a "Danielle Matthews,"
> JACOB CONROY, and
> JOSHUA HARPER

did knowingly and wilfully combine, conspire and agree with one another and with others to utilize a telecommunications device to abuse, threaten and harass persons at the called number and who received the communication without disclosing the identity of the person utilizing the telecommunications device, contrary to Title 47, United States Code, Section 223(a)(1)(C).

## OVERT ACTS

In furtherance of the conspiracy and in order to effect its object, the following acts in addition to the overt act set forth in paragraph 20 of Count One of this Indictment were committed in the District of New Jersey and elsewhere:

3.  In or about November, 2001, the SHAC Website posted the names and addresses, telephone numbers and facsimile numbers of various officers of S. Corp. along with a "hint" that "a great way to block the number you are calling/faxing from is to dial *67 BEFORE you dial the number" noting it is "[g]reat for sending black faxes!"

4. In or about May, 2002, the SHAC Website posted a calendar of events which included what it termed black fax Mondays on a series of Mondays in May, June and July, and which provided facsimile numbers of various targeted companies.

5.  In or about July, 2002, the SHAC Website directed individuals who visited it to a section in the website where they could obtain black faxes.

6.  On or about October 17, 2002, defendant Joshua Harper gave a presentation to a group of people in Seattle, Washington

wherein he explained how to send black faxes noting that "it knocks out the entire line of communication" of the recipients of the black faxes.

In violation of Title 18, United States Code, Section 371.

A TRUE BILL

FOREPERSON

CHRISTOPHER J. CHRISTIE
United States Attorney

Crim. *No. 04-373*

---

*United States District Court*

DISTRICT OF NEW JERSEY

# THE UNITED STATES OF AMERICA

vs.

STOP HUNTINGDON ANIMAL
CRUELTY USA, INC.
KEVIN KJONAAS, a/k/a
"Kevin Jonas," a/k/a "Steve Shore,"
a/k/a "Jim Farrer," LAUREN GAZZOLA,
a/k/a "Angela Jackson, "a/k/a
"Danielle Matthews" JACOB CONROY,
JOSHUA HARPER, ANDREW
STEPANIAN, DARIUS FULLMER,
AND JOHN MCGEE

---

# SUPERSEDING INDICTMENT

---

**CHRISTOPHER J. CHRISTIE**
**U.S. Attorney, Newark, New Jersey**

**Charles B. McKenna, AUSA**
**United States Attorney's Office**
**970 Broad Street, Room 700**
**Newark, New Jersey 07102**
**(973) 645-2716**