and now 32 other named persons (including defendants Conroy, Fullmer, Gazzola, Harper, and Stepanian), as well as four others known only by first names, and two others known as "Mez" and "Sun Tzu":

> have committed, are committing, and will continue to commit violations of [18 U.S.C. § 1951] (interference with commerce by threats or violence), hereinafter referred to as the "Hobbs Act"; 2 (Aiding and abetting); 371 (Conspiracy); 875 (Threatening interstate communications); and 1952 (Interstate travel in aid of racketeering) hereinafter collectively referred to as the "Specified Federal Offenses." Specifically, the subjects of this investigation are operating an international extortion scheme against companies engaged in or doing business with companies engaged in animal-based medical research or "exploitation." Pursuant to this scheme, companies and their employees are subjected to harassment, arson, property damage, and even physical attack until they discontinue their ties to animal-based research.
> [Da328-Da329]

The affidavit alleged that probable cause existed "to believe that the aforementioned subjects" -- i.e., defendant Kjonaas and the 32 named violators and the additional 6 designated by partial or screen names -- as well as unidentified others, utilize the targeted telephone numbers to commit the crimes just listed "on an ongoing basis." Da329.

The affidavit commences with a statement of the criminal histories of the alleged "violators" that repeats the deficiencies of the earlier affidavits. See Da331-Da333. The affidavit then narrates additional activities attributed to animal rights activists against Legacy Trading, E-Trade, Marsh, and HLS, while omitting that the activities listed violated no laws, and did not fall within the scope of any of the specified federal offenses. Da333-Da354.

The affidavit quotes from a telephone call attributed to defendant Kjonaas about the incorporation of SHAC. Da354-Da355. Although the description appears to detail

lawful activities of effecting the incorporation of SHAC, the affiant states, without providing any basis for the speculation: "Your Affiant *feels* that KJONAAS has incorporated SHAC as a 501(c)(3) non-profit corporation in order to illicit [sic] donations from people who believe they may be providing funds for legitimate animal rights issues." Da355 (emphasis added).

The affidavit requests authorization for the continued monitoring of the second phone line for reasons that include the following: "If monitoring were to be discontinued over this phone, evidence of criminal activity *may* be lost. Based on prior use of this phone, your Affiant *believes* that criminal conversations will continue to occur over this telephone." Da355 (emphasis added). The affidavit then attributes to defendant Kjonaas telephone conversations about protests against HLS, with the affiant's "surmises" of how this must be linked with "SHAC's intent to increase their illegal activity targeting HLS employees as part of their illegal scheme to close the company." Da356-Da357. The affiant's speculations have no basis in the facts as set forth in the affidavits, and no relation to the statutes within whose terms the "violators" are alleged to have committed criminal acts. The affidavit sets forth the allegations that other methods of investigation and surveillance, to date, have not yet yielded the basis on which the Government could proceed with the prosecution of the named "violators." Da358-Da382.

As with the predecessor affidavits, the January 11, 2003 affidavit and application does not set forth information sufficient to meet the standard of probable cause that any of the named "violators," including defendant Kjonaas, had acted in violation of the specified federal statutes.

**F.    Jan. 24, 2003 Application (e-mail)**
      *(Chart A, column 6)*

On January 24, 2003, the Department of Justice applied to the United States

District Court of the District of Minnesota for an order, again pursuant to 18 U.S.C. §

2518, authorizing the 30-day continued interception of electronic communications for the

same two internet e-mail addresses attributed to defendant Kjonaas.  Da395-Da397;

Da404-Da406.

In her affidavit in support of the application, FBI Special Agent Tompa stated, on

the basis of all information which she had received and determined to be reliable, as well

as her reliance on the prior affidavits of ATF Special Agent Calvin Meyer and her own

prior affidavits, that defendant Kjonaas and 34 other named persons (including

defendants Conroy, Fullmer, Gazzola, Harper, and Stepanian), and two additional

persons with unknown last names, and two others (identified as "Mez" and "Sun Tzu"):

> have committed, are committing, and will continue to commit violations
> of [18 U.S.C. § 1951] (Interference with commerce by threats or
> violence); 2 (Aiding and abetting); 371 (Conspiracy); 875 (Threatening
> interstate communications); and 1952 (Interstate travel in aid of
> racketeering) hereinafter collectively referred to as the "Specified Federal
> Offenses." Specifically, the subjects of this investigation are operating an
> international extortion scheme against companies engaged in or doing
> business with companies engaged in animal-based medical research or
> "exploitation." Pursuant to this scheme, companies and their employees
> are subjected to harassment, arson, property damage, and even physical
> attack until they discontinue their ties to animal-based research.
> [Da408]

The affidavit alleged that probable cause existed "to believe that the

aforementioned subjects" -- i.e., defendant Kjonaas and the  listed violators -- as well as

unidentified others, utilize the targeted e-mail accounts to commit the crimes just listed

"on an ongoing basis." Da408-Da409.

In support of the allegations, the affidavit then incorporates by reference the listings of the criminal histories of the persons listed as "violators," as set forth in the prior affidavits of Special Agents Tompa and Meyer. <u>See</u> Da411. The deficiencies of this affidavit repeat those already listed for the earlier affidavits.

The affidavit then attributes to defendant Kjonaas criminal involvement by the mere use of encryption methods for e-mails. Da413-Da415. The affidavit also suggests that defendant Kjonaas has used e-mails and the internet for the purpose of targeting HLS and companies doing business with HLS for criminal acts, although such allegations do not fit within the scope of the specified federal offenses on which the authorization application was based. <u>See</u> Da416-431. The affidavit does not set forth information relevant to criminal acts encompassed within the scope of the federal acts cited as the basis for the application. Further, the affidavit suggests that discussion over e-mail of lawful protest against HLS should provide a basis for the electronic surveillance sought. Da416-Da431. The affidavit ends with the statement that prior methods of surveillance and investigation have not provided the basis for the prosecution of the named "violators" for the statutes cited. <u>See</u> Da431-Da456.

### G.    The Feb. 10, 2003 Application (wire)
*(Chart A, column 7)*

On February 10, 2003, the Department of Justice again applied to the United States District Court for the District of Minnesota for an order, pursuant to 18 U.S.C. § 2518, authorizing the continuation, for an additional 30 days, of the interception of wire communications to and from telephone numbers 732 545-7560 and 732 545-7570, subscribed to by Kevin Kjonaas. Da467-Da469; Da479-Da481. In his affidavit in support of the application, ATF Special Agent Meyer stated, on the basis of all

information which he had received and determined to be reliable, that defendant Kjonaas and now 35 other named persons (including defendants Conroy, Fullmer, Gazzola, Harper, and Stepanian), as well as one other known only by first name, and two others known as "Mez" and "Sun Tzu":

> have committed, are committing, and will continue to commit violations of [18 U.S.C. § 1951] (Interference with commerce by threats or violence); 2 (Aiding and abetting); 371 (Conspiracy); 875 (Threatening interstate communications); *1028 (Identity theft); 1030 (Computer fraud and abuse); 842 (Unlawful acts);* and 1952 (Interstate travel in aid of racketeering) hereinafter collectively referred to as the "Specified Federal Offenses." Specifically, the subjects of this investigation are operating an international extortion scheme against companies engaged in or doing business with companies engaged in animal-based medical research, *which subjects term* "exploitation." Pursuant to this scheme, companies and their employees are subjected to harassment, arson, property damage, and even physical attack until they discontinue their ties to animal-based research.
> [Da483 (emphasis added for new text)].

The affidavit alleged that probable cause existed "to believe that the aforementioned subjects" -- i.e., defendant Kjonaas and the 35 named violators and the additional 3 designated by partial or screen names -- as well as unidentified others, utilize the targeted telephone numbers to commit the crimes just listed "on an ongoing basis." Da483.

The affidavit commences with a statement of the criminal histories of the alleged "violators" that repeats the deficiencies of the earlier affidavits. See Da485-Da488. The affidavit states that the person identified as "violator" Christine Garcia "appears to be an attorney in the state of California" whose communications had been intercepted. Da487. She has been removed from the list of "violators" set forth in the present application. Da487. No explanation is provided, however, for most of the others whose names appear on each of the applications as to how they have come to be designated spots on

the "violators" list, other than their apparent involvement in the animal rights community and related protest activities.

The affidavit then quotes excerpts of conversations attributed to defendant Kjonaas relating to discussion of HLS directors, following which the affiant speculates without basis: "[Y]our Affiant surmises that KJONAAS and TAYLOR are conspiring in an international extortion scheme to illegally close HLS by targeting newly appointed HLS/LSR board members for harassment by SHAC activists in hopes of causing the new board members to resign themselves from HLS/LSR's board." Da492. The Affiant further speculates, "These telephone conversations illustrate that the international conspiracy to illegally close HLS is being directed by KJONAAS in the US and TAYLOR and AVERY in the UK." Da493.

The affiant further speculates as to the criminal intent to be layered onto other conversations attributed to defendant Kjonaas, including in a conversation with his mother. Da521-Da522; see Da493-523.

The affidavit again sets forth the allegations that other methods of investigation and surveillance, to date, have not yet yielded the basis on which the Government could proceed with the prosecution of the named "violators." Da523-Da552.

As with the predecessor affidavits, the January 24, 2003 affidavit and application does not set forth information sufficient to meet the standard of probable cause that any of the named "violators," including defendant Kjonaas, had acted in violation of the *specified* federal statutes, including the additional statutes now added as the basis for the application (18 U.S.C. §§ 842, 1028, 1030).

**H. Feb. 21, 2003 Application (e-mail)**
   ***(Chart A, column 8)***

On February 21, 2003, the Department of Justice again applied to the United

States District Court of the District of Minnesota for an order, pursuant to 18 U.S.C. §

2518, authorizing the 30-day continued interception of electronic communications for the

same two internet e-mail addresses attributed to defendant Kjonaas. Da559-Da561;

Da578-Da581.

In her affidavit in support of the application, FBI Special Agent Tompa stated, on

the basis of all information which she had received and determined to be reliable, as well

as her reliance on the prior affidavits of ATF Special Agent Calvin Meyer and her own

prior affidavits, that defendant Kjonaas and 35 other named persons (including

defendants Conroy, Fullmer, Gazzola, Harper, and Stepanian), and one additional person

with unknown last name, and two others (identified as "Mez" and "Sun Tzu"):

> have committed, are committing, and will continue to commit violations
> of [18 U.S.C. § 1951] (Interference with commerce by threats or
> violence); 2 (Aiding and abetting); 371 (Conspiracy); 875 (Threatening
> interstate communications); *1028 (Identity theft); 1030 (Computer fraud
> and abuse); 842 (Unlawful acts);* and 1952 (Interstate travel in aid of
> racketeering), hereinafter collectively referred to as the "Specified Federal
> Offenses." Specifically, the subjects of this investigation are operating an
> international extortion scheme against companies engaged in or doing
> business with companies engaged in animal-based medical research,
> *which subjects term* "exploitation." Pursuant to this scheme, companies
> and their employees are subjected to harassment, arson, property damage,
> and even physical attack until they discontinue their ties to animal-based
> research.
> [Da583 (emphasis added for new text for the e-mail application)].

The affidavit then alleges new, specific bases (albeit vague, conclusory and

unelaborated-upon bases) for the probable cause determination:

> There is probable cause to believe that the target computers being used by
> KJONAAS, who is suspected, as detailed in this Affidavit and in prior

> Affidavits authorized by this Court, as being the leader of a domestic terrorist organization. [Sic.]
>
> There is probable cause to believe that the target computers have or will be used in connection with the commission of the Specified Federal Offenses.
>
> [Da584.]

In support of the allegations, the affidavit then incorporates by reference the listings of the criminal histories of the persons listed as "violators," as set forth in the prior affidavits of Special Agents Tompa and Meyer. See Da587. The deficiencies of this affidavit repeat those already listed for the earlier affidavits.

The affidavit then attributes to defendant Kjonaas criminal involvement on the basis of reports of animal rights campaigns and actions, as reported on the internet. See Da587-593. The affidavit attributes to defendant Kjonaas criminal involvement by the mere use of encryption methods for e-mails. Da594-Da595. The affidavit also suggests that defendant Kjonaas has used e-mails and the internet for the purpose of targeting HLS and companies doing business with HLS for criminal acts, although such allegations do not fit within the scope of the specified federal offenses on which the authorization application was based. See Da595-Da605. The affidavit does not set forth information relevant to criminal acts encompassed within the scope of the federal acts cited as the basis for the application. Further, the affidavit suggests that discussion over e-mail of lawful protest against HLS should provide a basis for the electronic surveillance sought. Da595-Da605. The affidavit ends with the statement that prior methods of surveillance and investigation have not provided the basis for the prosecution of the named "violators" for the statutes cited. See Da605-Da640.

I.    **Apr. 22, 2003 Application (search warrant for 101 Home Street in Somerset, NJ)**[2]
      *(Chart A, column 9)*

On April 22, 2003, the Department of Justice applied to the United States District

Court of the District of New Jersey for a search warrant authorizing the search of 101

Home Street in Somerset, NJ, the home of defendant Kjonaas. Da641-Da642.

In his affidavit in support of the application, FBI Special Agent John F. Bennett

stated, on the basis of all information which he had received and determined to be

reliable:

> The facts and circumstances of this investigation as set forth below show
> that there is probable cause to believe that a search of the Premises will
> uncover records, computers and other material set forth in Attachment B
> relating to violations of Title 18 United States Code, Sections 2 (aiding
> and abetting); *43 (animal enterprise terrorism);* 371 (conspiracy); 875
> (threatening interstate communications); 1028 (illegal activity related to
> identification information); 1030 (fraud an[d] related activity in
> connection with computers); and 1952 (interstate travel in aid of
> racketeering), hereinafter collectively referred to as the "Specified Federal
> Offenses."
> [Da646-Da647 (emphasis added)].

This affidavit marks the first time that the Government has cited 18 U.S.C. § 43,

the Animal Enterprise Protection Act of 1992, as a basis for the relief sought. But the

timing of the application is surely significant. Title III bars courts from issuing

surveillance authorizations, except in connection with the investigation of certain

enumerated crimes under specific statutory provisions. See 18 U.S.C. § 2516.

---

[2] Defendant Kjonaas renews his request that the Government provide the discovery
relating to this search warrant (specifically, the signature page to follow appendix page
Da674, the signed court order, and the return lists, and contemporaneous itemizations of
evidence seized). Without the order and return list, defendant's counsel cannot assess the
compliance of the search with the terms set by the authorizing court, or within the scope
of relevant laws.

The facts at issue did not fall within a Hobbs Act offense, since there has been no extortion-related activity attributed to, or attributable to, the named "violators" in all of the affidavits discussed so far. Nonetheless, the Government relied on the Hobbs Act as the basis for the Title III surveillance authorizations to fit within the terms of 18 U.S.C. § 2516. As time passed, and as laid out on Chart A, the Government added additional statutory citations to fit the surveillance applications further within the scope of Title III. Specifically, in the November 27, 2002 application, the Government cited the Travel Act, 18 U.S.C. § 1952 (see 18 U.S.C. § 2516(1)(c)); in the February 10 and 21, 2003, applications, the Government also added 18 U.S.C. §§ 1028 (identity theft) (see 18 U.S.C. § 2516(1)(c)). See Da130-Da133, Da481-Da485; Da581-Da587.

Thereafter, however, the Supreme Court decided Scheidler case, wherein the Court held that where the "petitioners did not obtain or attempt to obtain property from respondents, . . . there was no basis upon which to find that they committed extortion under the Hobbs Act." Scheidler v. National Organization for Women, Inc., 537 U.S. 393, 409 (decided Feb. 26, 2003).

When the Government, two months later, on April 22, 2003, sought the warrant for the search of the residence that defendant Kjonaas shared with his codefendants, the Government accordingly stopped citing the Hobbs Act. The Government nonetheless continued to cite statutes without relation to the facts alleged in the affidavit in support of the warrant, specifically 18 U.S.C. §§ 1028 (identity theft), 1030 (computer fraud), and 1952 (Travel Act). But the Government now added, as well, 18 U.S.C. § 43, the Animal Enterprise Protection Act, for the first time as a basis for the warrant sought. Even after all the surveillances effected through the earlier orders, and the sifting through all the

information collected to date against defendant Kjonaas, it appears that the Government formalized the fact that there was nothing to support a prosecution under the Hobbs Act, and there never had been. Similar fatal weaknesses infect the other statutory bases cited by the Government for all the orders sought and issued in this prosecution.

The April 22, 2003 affidavit attributes to defendant Kjonaas criminal involvement on the basis of his use of the internet and e-mail, and his participation in alleged animal rights activities. As with the predecessor applications, the affiant relied on mere innuendo flowing from the defendant's alleged involvement with the animal rights community and protest movement; lawful protests against the animal experimentation industry in general, and HLS in particular; use of the internet, e-mail, and encryption technology; and advocacy on behalf of political and industrial reform. The affidavit, in sum, colors lawful speech and protest activities as insidious and inherently criminal in nature, and seeks to attribute to defendant Kjonaas criminal involvement based on his mere associational and free speech activities and contacts.

As with the predecessor affidavits, the affidavit in support of the application for the search warrant fails to set forth information sufficient to meet the standard of probable cause that defendant Kjonaas had acted in violation of the *specified* federal statutes, as those statutes are itemized within the application and affidavit itself. See Da641, Da646-Da647.

## POINT I

**THIS COURT (1) SHOULD CONDUCT AN EVIDENTIARY HEARING PURSUANT TO <u>FRANKS v. DELAWARE</u> AS TO THE MISSTATEMENTS AND OMISSIONS FROM THE AFFIDAVITS SUBMITTED BY THE GOVERNMENT FOR THE COURT ORDERS RELATING TO THE SEARCHES AND SEIZURES AT ISSUE, AND (2) AFTER THAT HEARING, SHOULD ORDER SUPPRESSED ALL EVIDENCE SEIZED BY THE GOVERNMENT, WITH ALL FRUITS DERIVED THEREFROM, PURSUANT TO THE INTERCEPTION OF WIRE AND ELECTRONIC COMMUNICATIONS, AND THE SEARCH OF 101 HOME STREET, SOMERSET, NJ**

The nine affidavits on which the Government has relied in this matter have attributed to defendant Kjonaas violations of specified federal criminal statutes. But the Government made no showing, at the time that it submitted the affidavits to the reviewing courts (and indeed, even thereafter), that probable cause existed that defendant Kjonaas violated or would violate any of the statutes cited by the Government for the relief requested -- issuance of the order for Title III surveillance or the search of the private residence).

Accordingly, defendant Kjonaas moves the Court to order an evidentiary hearing, pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), based on the misstatements and omissions of fact in the affidavits submitted by the Government in support of its applications for wiretaps and electronic intercepts, and for the issuance of the warrant authorizing the search of the defendants' residence at 101 Home Street in Somerset, NJ. Mr. Kjonaas also moves the Court to order, following that hearing, the suppression of all evidence obtained by means of the wiretaps, electronic intercepts, and home search, on

the basis that the remaining content of the applications and affidavits (when reviewed without the misstatements, and with omissions amended accordingly) was insufficient to establish probable cause for commission of the offenses upon which the applications were based. See Franks v. Delaware, 438 U.S. 154 (1978); U.S. Constit. amend. IV; 18 U.S.C. §§ 2515, 2516, and 2518.

## A.    *The Applicable Law Relating to Seizures Effected Under Search Warrants and Title III Surveillance Authorization Orders*

To protect the "right of the people to be secure in their persons, houses, papers, and effects," the Fourth Amendment prohibits "unreasonable searches and seizures" and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.   In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court recognized the constitutional right to challenge the truthfulness of statements contained in a search warrant affidavit. 438 U.S. at 155-56. Under Franks, the Court must hold an evidentiary hearing upon a substantial preliminary showing that (1) a false statement was included in the affidavit(s); (2) the false statement was made knowingly and intentionally, or with reckless disregard for the truth; and (3) the allegedly false statement was necessary to the finding of probable cause. 438 U.S. at 155-56; see United States v. Canfield, 212 F.3d 713, 717-18 (2d Cir. 2000); United States v. Johns, 851 F.2d 1131, 1133-34 (9th Cir. 1988). If the defendants ultimately establish these elements by a preponderance of the evidence, the Court must void the wiretap and suppress the fruits thereof. Franks, 438 U.S. at 155-56.

Courts have recognized that an affidavit may be misleading, as well, if material information is *omitted*. See United States v. Frost, 999 F.2d 737, 743 n.2 (3d Cir. 1993) (Franks test applies " to situations where affiants have omitted information from the

34

affidavit"), cert. denied, 510 U.S. 1001 (1993); see also United States v. Calisto, 838 F.2d 711, 714-16 (3d Cir. 1988); see also United States v. Rumney, 867 F.2d 714, 720 (1st Cir. 1989) ("[m]aterial omissions may also be the basis for a Franks hearing."), cert. denied, 491 U.S. 908 (1989); United States v. Williams, 737 F.2d 594, 604 (7th Cir. 1984) ( "[w]e acknowledge that the rationale of *Franks* applies to omissions . . . "), cert. denied, 470 U.S. 1003 (1985); United States v. Martin, 615 F.2d 318, 328 (5th Cir. 1980).

With regard to the Title III applications, probable cause for the issuance f the authorizations must have existed at the time the Government applied for the issuance of the authorizations. See also United States v. Martino, 664 F.2d 860, 866 (2d Cir. 1981) ("It is elementary that the probable cause needed to validate the issuance of an authorization for a wiretap must exist at the time of issuance."), cert. denied, 458 U.S. 1110 (1982). In order to support a finding of probable cause for the wiretaps requested, and for the requested forms of electronic surveillance, as in the e-mail intercepts conducted in this matter, the Government was required to set forth sufficient evidence that (1) the defendant was committing, had committed, or was about to commit a specified offense (18 U.S.C. § 2518(3)(a)); (2) communications relevant to that specific offense would be intercepted through the wiretap (18 U.S.C. § 2518(3)(b)); and (3) the defendant, as the focus of the wiretap investigation or the electronic surveillance, would use the tapped phone or e-mail address in the context of committing the *specific offense* cited by the Government as the basis for the application (18 U.S.C. § 2518(3)(d)). See United States v. Armocida, 515 F.2d 29, 35 (3d Cir.), cert. denied sub nom. Joseph v. United States, 423 U.S. 858 (1975); see generally United States v. Meling, 47 F.3d 1546, 1551 (9th Cir.), cert. denied, 516 U.S. 843 (1995); United States v. Brown, 761 F.2d

1272, 1275 (9th Cir. 1985). A link between the individual, the telephone (or e-mail address), *and the offense*, therefore, must be established. See United States v. James, 494 F.2d 1007, 1020 (D.C. Cir.), cert. denied sub nom. Jackson v. United States, 419 U.S. 1020 (1974).

The search of defendant Kjonaas' home, as well as the wiretap and electronic surveillance activities, are all subject to the Fourth Amendment, which requires that warrants be issued only "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Berger v. New York, 388 U.S. 41, 54-55 (1967). In the case of wiretap applications and orders, as the Supreme Court noted in Berger, "the need for particularity and evidence of reliability in the showing required when judicial authorization of a search is sought is especially great[.]" Id. at 56. The reason, of course, is the especially intrusive nature of electronic surveillance, which invades not only the privacy of the "suspect" but also the constitutionally protected privacy of third parties who may have had confidential conversations over the tapped telephones on subjects wholly unrelated to the suspected criminal activity. See generally United States v. Perez, 247 F. Supp. 2d 459, 471-84 (S.D.N.Y. 2003).

In United States v. Sandoval, 550 F.2d 427 (9th Cir. 1976), cert. denied, 434 U.S. 879 (1977), the Court found that Title III guards against unwarranted electronic surveillance excursions to "get everyone." Fishing expeditions are precluded by "an affidavit with 'specifics' and not merely conclusions, the requirements of probable cause, and by the necessity of obtaining judicial review by an impartial magistrate." Id. at 431.

The requirement of particularity is both a constitutional and statutory prerequisite. By statute, each order authorizing the interception of oral and wire communications must specify the identity of the persons whose communications are to be intercepted, the nature and location of the communications facilities as to which authority to intercept is granted, a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates. 18 U.S.C. § 2518(4)(a), (b), (c). Overly broad or vague descriptions of the communications to be intercepted do not meet this particularity requirement. See, e.g., United States v. Leisure, 844 F.2d 1347, 1356 (8th Cir.), cert. denied, 488 U.S. 932 (1988). Accordingly, the Fourth Amendment requires that the Government show that it has probable cause to believe that a specific crime has been or is being committed before it may invade constitutionally protected areas, and this particularity requirement is only satisfied if a wiretap order identifies (1) the telephone line to be tapped, and (2) the particular conversations to be seized, in connection with the criminal activity specifically proscribed by the statute upon which the application is founded. See United States v. Carneiro, 861 F.2d 1171, 1178 (9th Cir. 1988).

A Franks hearing is warranted upon a substantial preliminary showing that: (1) the affiant omitted information from the search warrant affidavit; (2) the affiant intended the omission of information to mislead the Court issuing the order authorizing the search requested, or made the omissions in reckless disregard of the misleading effect; and (3) the Court would not have authorized the wiretap or other search had the omitted information been included. See United State v. Hernandez, 80 F.3d 1253, 1260 (9th Cir. 1996); see also United States v. Dozier, 844 F.2d 701, 706 (9th Cir. 1988) (after

eliminating false information and/or adding omitted information, the Court must consider the totality of the circumstances, under Illinois v. Gates, 462 U.S. 213, 230-31 (1983), to determine whether or not probable cause has been established), cert. denied, 488 U.S. 927 (1988).

In the present case, the Court should evaluate two principal issues: (1) whether the false statements or omissions in the affidavit(s) were made deliberately or with reckless disregard for the truth, and (2) if so, and the false statements are set aside, whether the "corrected" affidavit(s) would support a finding of probable cause. See generally United States v. Perez, 247 F. Supp. 2d at 471-84.

The discussion of the applicable legal principles which follows will address, first, the scienter requirement and, in particular, what constitutes "recklessness" for these purposes; and second, the concept of probable cause; followed by some additional Fourth Amendment principles that are relevant to the inquiry at hand.

1.    *The Scienter Requirement*

The Fourth Amendment does not require that every statement in a warrant affidavit be true, because law enforcement officers often must rely on hearsay information, tips from informants, and information sometimes "garnered hastily." Franks v. Delaware, 438 U.S. at 164. Rather, as the Supreme Court explained in Franks, the affidavit must be:

> "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true. It is established law, that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter.
>
> [Franks, 438 U.S. at 164 (citations omitted).]

38

Consequently, defendant Kjonaas specifically challenges the affidavits on the basis that the "inaccuracies or omissions are the result of the affiant's deliberate falsehood or *reckless disregard* for the truth." Canfield, 212 F.3d at 717-18 (emphasis added). The inaccuracies underlying the applications were not the result of negligence or innocent mistake. See generally Franks, 438 U.S. at 171; see Wayne R. LaFave, Search & Seizure § 4.4 (3d ed. 1996).

To assess the materiality of omitted information, the Fourth Amendment requires that a neutral and detached judge must review the facts to determine the existence of probable cause, and "[i]t follows that a police officer *cannot* make unilateral decisions about the materiality of information." Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000) (emphasis added). Hence, material omissions made with an intent to mislead or with a reckless disregard for the truth also must be corrected before the Court considers the sufficiency of a search warrant affidavit. Wilson v. Russo, 212 F.3d at 787-88; see Canfield, 212 F.3d at 718.

Caselaw has provided scant precedent for a precise definition of "reckless disregard" in the search warrant context. The Franks Court refers to information that is not "appropriately accepted by the affiant as true," Franks, 438 U.S. at 165, but "[u]nfortunately" it gives "no guidance" beyond observing that " 'negligence or innocent mistake [is] insufficient.'" United States v. Davis, 617 F.2d 677, 694 (D.C. Cir. 1979) (quoting Franks, 438 U.S. at 171), cert. denied sub nom. Gelestino v. United States, 445 U.S. 967 (1980); see also Rivera v. United States, 728 F. Supp. 250, 258 (S.D.N.Y. 1990) ("Judicial precedent has established this standard of deliberate falsehood and reckless disregard to support a Franks challenge, but research has disclosed no case defining

'reckless disregard' in this setting."), aff'd in relevant part, 928 F.2d 592, 604 (2d Cir.

1991).

In Rivera, the district court applied a "serious doubt" standard:

> The words themselves . . . suggest that "reckless disregard for the truth"
> means failure to heed or to pay attention to facts as [the DEA investigator
> affiant] knew them to be. If [the affiant] made statements which failed to
> take account of the facts as he knew them, or which he *seriously doubted*
> were true, that would show reckless disregard for the truth.
> [Rivera, 728 F. Supp. at 258 (emphasis added)].

Variations of the "serious doubt" standard, imported from the First Amendment

context, St. Amant v. Thompson, 390 U.S. 727, 731-32 (1968), have been widely adopted

by federal courts. That is, "[t]o prove reckless disregard for the truth, the defendants had

to prove that the affiant 'in fact entertained serious doubts' as to the truth of his

allegations." United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001) (citation

omitted); United States v. Williams, 737 F.2d at 602 (agreeing with United States v.

Davis, 617 F.2d at 694, in holding that the First Amendment definition should be applied

by analogy in the Franks context).

There is a corollary to the "serious doubt" standard: "Because states of mind

must be proved circumstantially, a fact finder may infer reckless disregard from

circumstances evincing 'obvious reasons to doubt the veracity of the allegations.' "

Whitley, 249 F.3d at 620; see, e.g., Wilson v. Russo, 212 F.3d at 787-88 (distinguishing

between assertions and omissions, and in defining the former, "we have borrowed from

the free speech arena and equated reckless disregard for the truth with a 'high degree of

awareness of [the statements'] probable falsity' " and noting "reckless disregard for the

truth is exhibited when expressing that which was not 'believed or appropriately accepted'

as true" (citations omitted)); see also United States v. Schmitz, 181 F.3d 981, 986-87 (8th

Cir. 1999) ("[T]he test for determining whether an affiant's statements were made with reckless disregard for the truth is not simply whether the affiant acknowledged that what he [or she] reported was true, but whether, viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported."); United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (same); Beard v. City of Northglenn, 24 F.3d 110, 116 (10th Cir. 1994) (same); see also United States v. Senchenko, 133 F.3d 1153, 1158 (9th Cir.) ("high degree of awareness of probable falsity"), cert. denied, 525 U.S. 872 (1998).

As to omissions, as the Third Circuit has explained, they "are made with reckless disregard if an officer withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" Wilson v. Russo, 212 F.3d at 788 (quoting United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993)); see United States v. Rivera, 928 F.2d at 604 ("[R]ecklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." (citations omitted)). In Jacobs, for example, the Eighth Circuit concluded that the officer acted with reckless disregard when he told the magistrate that a drug-sniffing dog showed "interest" in the defendant's bag, but omitted the information that the dog had not gone into "alert," as it was trained to do if drugs were present. 986 F.2d at 1234. In Wilson, the Third Circuit held that an officer's failure to disclose the difference between the defendant's actual height (5'11") and the height descriptions as reported by the two victims for their assailant (between 6'3" and 6'5") was reckless, according to the Court, because any reasonable person would have wanted to know this fact. 212 F.3d at 788.

Hence, to prevail on the first prong of the <u>Franks</u> test, the defense seeks to prove by a preponderance of the evidence that (1) the drafters of the affidavit(s) included therein information that they knew was false, (2) they had a serious doubt as to the truth of the statement(s) at the time they included the statement(s) in the affidavit(s), or (3) they had obvious reason to doubt the veracity of the statement(s). As to the omitted information, the defendants must prove by a preponderance of the evidence that any reasonable person would have known that this was the kind of information that the judge to whom the applications for the orders were submitted would have wanted to know.

## 2. Absence of Probable Cause for the Issuance of the Search Warrant and the Surveillance Authorization Orders

If the Court decides that false statements or material omissions in the search warrant affidavit or the surveillance authorization affidavits were made knowingly or recklessly, the Court must then "correct" the affidavit by "disregard[ing] the allegedly false statements," or filling in the omitted information and then proceed to "determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." <u>Canfield</u>, 212 F.3d at 718 (citations and internal quotations omitted). If, upon a *de novo* review, the Court determines that the "corrected" affidavits failed to provide a sufficient basis to find probable cause, the Court must strike the warrants and grant suppression. <u>See id.</u> "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.' " <u>Id.</u> (quoting <u>United States v. Ferguson</u>, 758 F.2d 843, 849 (2d Cir.), <u>cert. denied</u>, 474 U.S. 1032 (1985)).

A search warrant may issue only "upon probable cause," U.S. Const. amend. IV, and probable cause exists only where the known facts and circumstances are sufficient to

support a "reasonable belief" that "contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). A judge presented with a search warrant application must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The affidavit must provide sufficient facts to permit the judge to draw the inferences necessary to a finding of probable cause, and the judge must not merely rely without question on the assertions in the affidavit but must make an independent evaluation. Giordenello v. United States, 357 U.S. 480, 485-86 (1958); see Illinois v. Gates, 462 U.S. at 239 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."); see also United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983), cert. denied sub nom. Sanchez v. United States, 466 U.S. 904 (1984) (the probable cause standard for Title III is the same as that used to obtain ordinary search warrants).

"In practice, the probable cause standard, however rendered, is as familiar as it is unhelpful." United States v. Perez, 247 F. Supp. 2d at 475. The Supreme Court Illinois v. Gates called it "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." 462 U.S. at 232. Indeed, although probable cause is a "mosaic" that is "multifaceted" and a "fluid concept," the standard takes its "substantive content" from the particular context in which the standard is being assessed. Ornelas, 517 U.S. at 696-

98 (citing Brinegar v. United States, 338 U.S. 160, 175 (1949) ("The standard of proof [for probable cause] is . . . correlative to what must be proved."); see Ker v. California, 374 U.S. 23, 33 (1963) ( "This Court[ ] [has a] long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application"; "[e]ach case is to be decided on its own facts and circumstances." (internal quotations omitted))). In other words, in the balancing that every Fourth Amendment challenge requires, "to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime" and still "give fair leeway for enforcing the law in the community's protection," the particular context -- that is, "what must be proved" -- must be kept in mind. Brinegar, 338 U.S. at 176.

### 3. *Additional Fourth Amendment Considerations*

Certain additional Fourth Amendment principles are of particular importance to this case. Defendant Kjonaas argues that the Government -- in its repeated applications for surveillance authorizations, on the basis of speech, advocacy, and associational contacts not within the scope of the statutes on which the Government relied -- acted unreasonably, and with reckless disregard for the truth.

#### a) *Reasonableness*

The "central requirement" of the Fourth Amendment is "reasonableness." Illinois v. McArthur, 531 U.S. 326, 330 (2001). The "touchstone" of reasonableness is "measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996). Generally, a Fourth Amendment examination "requires a contextualized reasonableness analysis that seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the state."

Lauro v. Charles, 219 F.3d 202, 209 (2d Cir. 2000) (citing Graham v. O'Connor, 490

U.S. 386, 396 (1989)).   Although reasonableness is most often considered in the context

of warrantless searches or seizures, reasonableness is nonetheless required even when a

warrant is procured.   See generally United States v. Ramirez, 523 U.S. 65, 71 (1998)

("The general touchstone of reasonableness which governs Fourth Amendment analysis

governs the method of execution of the warrant." (citation omitted)).

 The Fourth Amendment requires reasonableness not only as to whether a search

should be "conducted at all, but also to ensure reasonableness in the manner and scope of

searches and seizures that are carried out." Lauro, 219 F.3d at 211.  In addition, "the

reasonableness of the police's actions in conducting a search or seizure must be judged, in

part, through an assessment of the degree to which those actions further the legitimate

law enforcement purposes behind the search or seizure." Id.

### b) *Search of the Home Shared by Defendant Kjonaas and Other Defendants*

 The search warrant issued on April 22, 2003 targeted the home in which

defendant Kjonaas (as well as other defendants) lived.  Courts have long observed that in

Fourth Amendment jurisprudence, the home has something of a "special status" and have

"emphasized the sanctity of the private home, and the particular gravity the Fourth

Amendment accords to government intrusions on that privacy." Lauro, 219 F.3d at 211.

The Supreme Court has repeatedly declared that "[t]he Fourth Amendment embodies

[the] centuries-old principle of respect for the privacy of the home," Wilson v. Layne,

526 U.S. 603, 610 (1999), and has noted the " 'overriding respect for the sanctity of the

home that has been embedded in our traditions since the origins of the Republic.' " Id.

(quoting Payton v. New York, 445 U.S. 573, 601 (1980)).  Indeed, " 'physical entry of the

home is the chief evil against which the wording of the Fourth Amendment is directed' " and it is "the warrant procedure [that] minimizes the danger of needless intrusions of that sort." Payton, 445 U.S. at 586 (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)).

On the other hand, of course, as Justice Jackson observed for the Court in Johnson v. United States, 333 U.S. 10 (1948):

> Crime, even in the privacy of one's own quarters, is . . . of grave concern to society, and the law allows [evidence of] such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. ***When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.***
> [333 U.S. at 14 (emphasis added; footnotes omitted)].

### c) The Good Faith Exception

In the event of a successful challenge under Franks, the good faith exception set forth in United States v. Leon, 468 U.S. 897 (1984), does not apply. As the Leon Court made clear: "Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 923 (citing Franks ); see United States v. Reilly, 76 F.3d 1271, 1273 (2d Cir. 1996) ( "It bears emphasis, however, that the good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts. Good faith is not a blanket excuse for any police behavior. A warrant is not a general hunting license, nor is it a mantle of omnipotence, which cloaks its holders in the King's power to 'do no wrong.' And perhaps

most important, it is not an excuse if the police are not frank with the magistrate in proceedings to obtain the warrant -- proceedings that are typically ex parte.").

The Government cannot insulate one agent's deliberate or reckless misstatement in an affidavit merely by relaying it through another agent personally ignorant of its falsity. See Franks, 438 U.S. at 164 n.6; United States v. Wapnick, 60 F.3d 948, 956 (2d Cir. 1995) (noting that "when the informant is himself a government official, a deliberate or reckless omission by the informant can still serve as grounds for a Franks suppression" because "[o]therwise, the government would be able to shield itself from Franks suppression hearings by deliberately insulating affiants from information material to the determination of probable cause"), cert. denied, 517 U.S. 1187 (1996); see also United States v. Whitley, 249 F.3d at 621 ("Subsequent decisions have slightly expanded the Franks principle to include the state of mind not only of the affiant, but also of those governmental agents from whom the affiant received false information incorporated into the affidavit. In other words, the validity of the search is not saved if the governmental officer swearing to the affidavit has incorporated an intentional or reckless falsehood told to him by another governmental agent."); United States v. Brown, 298 F.3d 392, 408 (5th Cir. 2002) (same), cert. denied, 537 U.S. 1134 (2003).

## B. *Application*

The section which follows applies that law to the facts presented, to address, first, whether the agents knowingly or recklessly falsely stated or materially omitted information in the affidavits submitted to the reviewing court for the orders requested; and second, whether, with the false information set aside and the omitted information provided, the "corrected" affidavit supports a finding of probable cause.

### 1. *The Agents' State of Mind*

On the facts presented, the Government agents were well on notice that the persons labeled as "violators" were involved in animal rights advocacy activities, and that they had speech and associational rights guaranteed by the Constitution against Government intrusion. Nonetheless, the Government agents repeatedly characterized the actions of defendant Kjonaas and the other "violators" as consistently and inexorably criminal in nature, and colored any word, speech, or action against HLS or the animal experimentation industry as subversive, unlawful, and proscribed by the criminal statutes cited by the Government as the bases for the repeated applications. This constituted reckless disregard for the truth.

As courts have held, recklessness may be inferred where information "clearly critical" to the probable cause determination has been omitted. See Rivera, 928 F.2d at 604. In other words, although the inquiry into the agents' state of mind is distinct from the inquiry into the materiality of the false statements to probable cause, the two are related. See, e.g., United States v. Castillo, 287 F.3d 21, 26 n.5 (1st Cir. 2002) (noting that materiality is connected to the state of mind inquiry by the "closeness of the probable cause question").

### 2. *Probable Cause*

The Court should look to the information remaining in the affidavit(s) after the inaccurate statements are stricken and the omitted information is included. The Court should then consider whether the "corrected" affidavit provides "a residue of independent and lawful information" sufficient to permit a judge reasonably to conclude that there was a fair probability that the searches and seizures requested would result in evidence of the

criminal activity at issue in the specific statutes upon which the Government based the application.  See United States v. Perez, 247 F. Supp.2d at 475, 482-83.

The Court, in reviewing the affidavits, should strike the misleading criminal history information which the Government has cited for the "violators," for the reasons discussed above at pages 10, 17, 19, 21, 22, 25, 26, and 29.  The Court should strike all information by which the Government seeks to impute to defendant Kjonaas criminal activity on the basis of his mere associations and advocacy of political causes, including the cause of animal rights.  The Court should strike the Government's attempts to impute criminal intent and criminal activity to defendant Kjonaas where the Government has based this innuendo on defendant Kjonaas' alleged use of encryption technology and delete functions, where such procedures are freely accessible to any of the millions of users of computers, the internet, and/or even basic word processing programs.  The Court should strike all references to defendant Kjonaas' alleged involvement with animal rights activists and organizations, as well as such diverse groups as news media organizations, where such activity is a commonplace in society, and citizens are free to associate, join or contact such groups at any time without threat of Government intrusion into their protected constitutional rights.  The Court should strike all references to lawful advocacy actions attributed to defendant Kjonaas and to animal rights activists, which were directed at urging individuals and companies (such as Legacy Trading) to cease doing business with HLS.  The Court should strike references to lawful on-site demonstrations at the offices or other locations associated with HLS and its related businesses and industry contacts, including demonstrations at private homes.

After all of that false and misleading information has been eliminated from the

affidavits, there would be little, if any, "residue" left to consider.

In reviewing the affidavits, the reviewing court cannot consider material outside of the affidavit. See Aguilar v. Texas, 378 U.S. 108, 109 n.1 (1964) ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention." (citation omitted)); see U.S. Const. amend. IV ("no Warrants shall issue, but upon probable cause, supported by Oath or affirmation"). Thus, evidence that emerged after the warrant issued -- even if it were construed as highly relevant to the agents' state of mind -- cannot be considered in the probable cause inquiry in the first instance. See United States v. Perez, 247 F. Supp. 2d at 482 n.11.

In the end, the residue left that might arguably be construed as incriminating arises directly out of defendant's alleged membership in animal rights organizations, and his contact with and associations with animal rights activists. Cases have held, however, that "proof of mere membership in [an organization], without a link to actual criminal activity, [is] insufficient to support a finding of probable cause." United States v. Brown, 951 F.2d 999, 1003 (9th Cir. 1991) (finding membership in corrupt police unit did not establish probable cause); see Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1294-95 (9th Cir. 1999) (finding assertion that environmental group (Earth First!) "had a reputation for violence, property destruction and sabotage" did *not* establish probable cause). Mere membership in an organization, without any other link to actual criminal activity, will support a finding of probable cause *only* where the organization is engaged in criminal activity to such an extent that it must be considered "wholly illegitimate." United States v. Rubio, 727 F.2d 786, 793 (9th Cir. 1983) ("where

there is no allegation that the enterprise is wholly illegitimate, . . . evidence of mere association would not necessarily aid in obtaining a conviction . . . ; otherwise, the Fourth Amendment would offer little protection for those who are innocently associated with a legitimate enterprise"); United States v. Perez, 247 F.3d at 481-82; see also Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); see also United States v. Johnson, 539 F.2d 181, 192 n.40 (D.C. Cir. 1976), cert. denied, 429 U.S. 1061 (1977) ("The mere fact of association with a person engaged in illegal activities is, of course, insufficient to support a finding of probable cause, for present or any other purposes." (citations omitted)).

Here, a judge could not reasonably conclude, from the four corners of the "corrected" affidavit, that defendant Kjonaas and/or SHAC was engaged in criminal activity to such an extent that all animal rights advocacy and actions to achieve political results attributed to each could only be considered "wholly illegitimate" in the criminal sense. See generally United States v. Perez, 247 F. Supp. 2d at 482-83.

Again, "the Fourth Amendment's touchstone is reasonableness, and a search's reasonableness is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed to promote legitimate governmental interests." United States v. Knights, 534 U.S. 112, 118-19 (2001). The Court must evaluate the reasonableness of the searches at issue by engaging in a practical, common-sense analysis, taking into account the particular context in which probable cause is being assessed, and balancing the rights of citizens to be secure in their homes and in their use of communications technology from unwarranted

intrusion against the needs of law enforcement.

In the context of this case, a finding of probable cause would not be reasonable. If the Government is correct in its position that membership in the SHAC or attendance at an animal rights protest *alone* was sufficient to support a finding of probable cause, then probable cause existed to intrude into the homes of, or the electronic or telecommunications systems used by, countless other individuals (including the scores of others vaguely named as "violators" within the affidavits) merely because their e-mail addresses has accessed one of the websites attributed to SHAC or its animal rights campaign. This cannot be what the Fourth Amendment contemplated.

"Just as there is no higher standard of probable cause when First Amendment values are implicated, however, there is no lower standard when the crimes are repugnant and the suspects frustratingly difficult to detect." United States v. Perez, 247 F. Supp. 2d at 484.

For all the reasons set forth, defendant Kjonaas petitions the Court to grant his application for a Franks hearing, following which he will ask the Court to order suppressed all evidence seized by the Government in the searches conducted pursuant to the authorizations itemized on Chart A, above.

## CONCLUSION

For the reasons set forth herein, Defendant Kevin Kjonaas respectfully petitions the Court to order that an evidentiary hearing should be conducted pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), following which this Court should order the suppression of all evidence -- and all fruits derived therefrom -- obtained by the Government from the (1) interception of wire communications, (2) interception of electronic communications, and (3) the search of defendant's home at 101 Home Street, Somerset, NJ.

Respectfully submitted,

/s/
Isabel  McGinty (IM-8891)
Attorney for Defendant Kevin Kjonaas

Dated:  March 11, 2005