UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA       :    Criminal No. 04-373 (AET)

    v.                         :

STOP HUNTINGDON ANIMAL         :
CRUELTY USA, INC.,
KEVIN KJONAAS, a/k/a           :
"Kevin Jonas," a/k/a "Steve
Shore," a/k/a "Jim Fareer,"    :
LAUREN GAZZOLA,
a/k/a "Angela Jackson," a/k/a  :
"Danielle Matthews,"
JACOB CONROY,                  :
JOSHUA HARPER,
ANDREW STEPANIAN, and          :
DARIUS FULLMER                 :

---

MEMORANDUM OF THE UNITED STATES IN OPPOSITION TO
THE POST-TRIAL RELIEF SOUGHT BY THE DEFENDANTS

---

CHRISTOPHER J. CHRISTIE
United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:

Charles B. McKenna
Ricardo Solano Jr.
Assistant U.S. Attorneys

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . .    1

Statement of the Case and Procedural History  . . . . . .    2

    I.   INDICTMENT AND TRIAL . . . . . . . . . . . . . .    2

    II.  THE FACTS PROVEN AT TRIAL . . . . . . . . . . .    5

        A.   Targeting Huntingdon Life Sciences . . . .    5

        B.   Targeting Secondary Victims . . . . . . . .   15

            1.   Stephens, Inc. . . . . . . . . . . .   15

            2.   Bank of New York . . . . . . . . . .   19

            3.   Quillcap . . . . . . . . . . . . . .   22

            4.   Marsh . . . . . . . . . . . . . . .   23

            5.   Chiron . . . . . . . . . . . . . . .   32

        C.   Wiretap Evidence . . . . . . . . . . . . .   34

        D.   Search of 101 Home Street and Other Evidence   37

Argument  . . . . . . . . . . . . . . . . . . . . . . . .   40

    I.   THE EVIDENCE CONCLUSIVELY ESTABLISHED EACH
       DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT . .   40

    II.  THE EVIDENCE, TAKEN AS A WHOLE, REMOVES THIS
       CASE FROM THE AMBIT OF THE FIRST AMENDMENT  . .   47

        A.   The Defendants' Conduct Is Not Protected  .   50

        B.   Defendants Are Also Liable For Aiding
            and Abetting Interstate Stalking . . . . .   65

        C.   The Jury Applied The Appropriate
            Standard For "True Threats" . . . . . . . .   68

        D.   Defendant SHAC's Arguments That
            The Convictions Constitute A

Prior Restraint And Are Contest-
Based Lack Merit . . . . . . . . . . . .    70

III.   THE COURT PROPERLY CHARGED THE JURY ON
THE ELEMENTS OF COUNT ONE – 18 U.S.C. § 43  . .    72

IV.    EVIDENCE OF THE ASSAULT OF BRIAN CASS
WAS PROPERLY ADMITTED . . . . . . . . . . .    80

V.     EVIDENCE OF THE VARIOUS VICTIMS
WAS PROPERLY ADMITTED . . . . . . . . . . .    87

VI.    THERE WAS SUFFICIENT EVIDENCE TO
SUSTAIN THE STALKING CHARGE
AGAINST THE CORPORATE DEFENDANT . . . . . . . .    94

VII.   THERE WAS SUFFICIENT EVIDENCE TO
SUSTAIN THE CHARGE OF USING A
TELECOMMUNICATIONS DEVICE FOR
PURPOSES OF HARASSMENT  . . . . . . . . . .    98

VIII.  THE INTERNET IS AN INSTRUMENT
OF INTERSTATE COMMERCE  . . . . . . . . . . .   100

IX.    DEFENDANT SHAC'S REMAINING
ARGUMENTS LACK MERIT  . . . . . . . . . . .   101

X.     THE COURT SHOULD DENY KJONAAS'S
CLAIM OF INEFFECTIVE ASSISTANCE
AS PREMATURE  . . . . . . . . . . . . . . .   102

XI.    IN THE ALTERNATIVE, KJONAAS'S
CLAIM OF INEFFECTIVE ASSISTANCE
FAILS ON THE MERITS . . . . . . . . . . . .   105

A.   Defendant Has Failed To Set Forth
Facts To Support A Claim of Ineffective
Assistance Based Upon The Denial Of The
Right To Testify  . . . . . . . . . . .   105

B.   Defendant Has Failed To Demonstrate
Deficient Performance Or Actual Prejudice .   109

C.   Defendant Must Demonstrate Actual Prejudice   120

Conclusion . . . . . . . . . . . . . . . . . . . . . .   121

**PRELIMINARY STATEMENT**

The United States respectfully submits this memorandum of law in opposition to the motion of the defendants for a Rule 29 judgment of acquittal or in the alternative for a new trial pursuant to Federal Rule of Criminal Procedure 33. The United States respectfully reserves its right to supplement its responses by oral argument.

<u>**STATEMENT OF THE CASE AND PROCEDURAL HISTORY**</u>

**I.   INDICTMENT AND TRIAL.**

On March 2, 2006, a jury in this case returned verdicts of guilty against all of the defendants on all of the charges in the Superseding Indictment.  The verdicts came after a full and fair trial conducted by this Court where each of the defendants was ably represented by counsel.  Each of the defendants has now renewed previously-made motions for judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure as well as seeking new trials pursuant to Federal Rule of Criminal Procedure 33.  As will be discussed herein, these motions are without merit and should be denied in their entirety.

In May 2004, a grand jury sitting in Newark, New Jersey returned a five Count Indictment against Stop Huntingdon Animal Cruelty, U.S.A., Inc. ("SHAC") and seven individuals[1] charging in Count One a conspiracy to violate Title 18, United States Code, Section 43, the Animal Enterprise Protection statute, in that the individual defendants conspired with one another and with others to use a facility in interstate and foreign commerce for the purpose of causing the physical disruption to the functioning of Huntingdon Life Sciences ("HLS") and to intentionally damage and cause the loss of property used by HLS in an amount exceeding

---

[1]   The individual defendants were Kevin Kjonaas, the then-president of SHAC; Lauren Gazzola; Jacob Conroy; Joshua Harper; Andrew Stepanian; Darius Fullmer; and John McGhee.

$10,000. Specifically, the defendants targeted individuals and companies for the purpose of causing the disruption of HLS' business.[2] Count Two charged SHAC and three of the defendants[3] with conspiring to violate the interstate stalking statute, 18 U.S.C. § 2261A(2), and Counts Three through Five charged SHAC and the same three defendants with substantive counts of stalking.

On September 16, 2004, the grand jury returned a Superseding Indictment which added a sixth count charging SHAC and four individual defendants with conspiring to use a telecommunications device to abuse threaten and harass persons contrary to 47, U.S.C. §223(a)(1)(c), in violation of 18 U.S.C. § 371.

The essence of the conspiracy to violate the Animal Enterprise Protection Statute is that the defendants embarked on a campaign to enlist and incite animal rights activists to engage in activity meant to harm the business of HLS in any manner available -- including violence. SHAC utilized e-mail and web-based communications to disseminate information and inflame its constituency and call them to violent action as well as to coordinate the activities of individuals in furtherance of the campaign to shut down HLS and thereby disrupt its business. SHAC

---

[2] Defendants argue that only direct harm to HLS can violate 18 U.S.C. § 43. However, harm to companies doing business with HLS for the express purpose of disrupting the business of HLS in the course of the conspiracy is actionable under the statute.

[3] The individual defendants were Kevin Kjonaas; Lauren Gazzola; and Jacob Conroy.

espoused and encouraged others to engage in what it termed "direct action." The SHAC website described direct action as activities which "operate outside the confines of the legal system."

This matter proceeded to trial on June 6, 2005. However, during her opening statement, counsel for defendant Kjonaas – Isabel McGinty – fell ill, and the trial was postponed. Ultimately, Kjonaas, after consulting with additional counsel appointed for him by the Court, requested a mistrial that was joined in by all defendants and their respective counsel. The Court granted the motion, removed Ms. McGinty as Kjonaas' trial counsel, and appointed a new attorney for him. This matter was then reassigned from Judge Cooper's Court to this Court.

On or about November 18, 2005, Mr. Kjonaas requested to change counsel and, notwithstanding that he had claimed originally that he was bereft of funds to hire an attorney, engaged the services of private counsel.[4] Prior to the court appointing private counsel, a hearing was held to ensure that this was in keeping with Mr. Kjonaas' wishes and that the new attorney, Eric Schneider, was able to properly prepare the matter for trial.

The trial proceeded before this Court and a jury on February

---

[4] At no time prior to the submission of his certification in support of a new trial motion did Kjonaas claim that he was "forced to seek new counsel." Kjonaas Aff. ¶ 4.

6, 2006.  After the Government rested, the Court granted a joint

defense request for a one-day adjournment to properly line up

their witnesses and prepare their case.  The defense case

included testimony by one of the defendants – Joshua Harper – and

testimony by the then-president of the corporate defendant.  The

defense also presented several other witnesses.  After closing

arguments and jury deliberations, all of the defendants were

found guilty of all the Counts in which they were charged.

**II.  THE FACTS PROVEN AT TRIAL**.

In its case in chief, the United States called 45 witnesses

and introduced hundreds of documents.  In addition, the

Government introduced videotapes of the defendants and their co-

conspirators, as well as the fruits of a court-authorized wiretap

on the telephones and computers located at 101 Home Street, the

residence of the defendants Kjonaas, Gazzola and Conroy, the

leaders of SHAC.  The Government also introduced a large amount

of materials seized pursuant to a court-authorized search of 101

Home Street.

While the Court sat throughout the trial and is conversant

with the facts, certain matters will be discussed herein to

illustrate the sufficiency of the evidence to prove to a jury

each of the charged offenses beyond a reasonable doubt.

**A.  Targeting Huntingdon Life Sciences**.

The Government called as its first witness Brian Cass who

discussed the work of HLS, the animal enterprise in this case.
Mr. Cass testified about what HLS did as a company, where it was
located, how many employees it had and where those employees
worked.    Mr. Cass testified how the company first came to be a
target of SHAC, UK, an animal rights campaign that eventually
took root in the United States as SHAC, USA.   Mr. Cass testified
about what occurred in England at the hands of SHAC, UK.   He also
testified that it was part of his management style to be open
with his employees and that employees throughout the company were
kept apprised of what was occurring relative to animal rights
activists and SHAC in particular (Tr. 2/7/06 at p. 135; 2/8/at p.
244))[5].   Mr. Cass also testified that he knew of the defendant
Kjonaas because Kjonaas "has been a spokesperson for SHAC in
both, I would say, the United Kingdom and the United States."
(Tr. 2/7/06 at p. 137). In addition, Mr. Cass testified that he
saw Kjonaas "on a couple of occasions at our facility in
Huntingdon," England.   (Id.).

Mr. Cass also testified about SHAC in the United Kingdom
going after financial companies tied to HLS.   In particular, he
testified regarding a loan that had been issued to HLS by the
Royal Bank of Scotland, and how ultimately after the Royal Bank
of Scotland (Tr. 2/7/06 at p. 146) was targeted by SHAC, U.K. it

---

[5]   Citation to the transcript will have the abbreviation Tr.
followed by the date of the particular transcript referred to and
the page from the transcript.

6

sold the loan. The loan was sold to Stephens, Inc. which was subsequently targeted by the defendants through SHAC in the United States.

Finally, Cass testified that on February 23, 2001 at 7:45 p.m. he was severely beaten outside of his home by three masked individuals with pick-axe handles.  One of the people who took part in the beating was David Blinkinsopp.  A photograph of Mr. Cass just after the beating was admitted in evidence at that point. (Govt. Ex. 8001).  A copy of that photograph was found on the computers at 101 Home Street in two separate files.  In addition, one of the computers at 101 Home Street had icons on the computer screen with the name Blinkinsopp.[6]  A large, posterboard blowup of the photograph of Mr. Cass after the beating was also found at 101 Home Street.  (Govt. Ex. 2007).

After Mr. Cass testified, several HLS employees testified about what had occurred relative to them.  In particular, Mark Bibi testified about having been listed as a target on the SHAC website.  Part and parcel of being listed as a target was having your personal information – including your home address – listed on the website.  After being listed as a target, Mr. Bibi's house was spray painted with slogans denouncing HLS and animal research and a large rock was thrown through a car window in his driveway.

---

[6]    Both Kjonaas and Harper admitted knowing Mr. Cass' assailant, David Blinkensopp, during speeches admitted into evidence.

(Tr. 2/8/06 at p. 151).[7]

Henning Jonnasen, an HLS employee, testified that he and his wife were home in April 2001, when, at approximately 10:30 at night, rocks were thrown through the windows of his home. He explained how he and his wife crawled to safety and called the police. He testified that in his driveway his cars were overturned. (Tr. 2/8/06 at pp. 237-38). Mr. Jonnasen testified that this event changed his life. (Tr. 2/8/06 at p. 239). After the attack, the SHAC website boasted about the attack on Mr. Jonnason's home and published photos of the damage along with a statement that "these are people directly responsible for the poisoning, torture and death of five hundred animals a day, 180,000 a year at Huntingdon Life Sciences and these people have home addresses." (Govt. Ex. 1024). After Mr. Jonnason resigned from HLS, the SHAC website published information that he (Mr. Jonnason) along with another HLS employee had resigned "after months of pressure, including protests, property destruction, phone blockages at home and work." (Tr. 2/8/06 at p. 240; Govt. Ex. 1026A).

---

[7] In a statement emblematic of the distortion of the record presented by defendant SHAC, USA in its memorandum of law, it posits: "the sum of the Bibi complaint was that the legal demonstrations caused him inconvenience." (SHAC Br. at p. 17). Referring to one's house being spray painted with slogans and a rock through one's car window as an "inconvenience" is typical of the cavalier attitude that SHAC and the other defendants took with respect to their victims.

Donald Wagner, the Director of Information Technology testified to denial of service attacks that were perpetrated on HLS. For instance, a SHAC website posting (Govt. Ex. 1033) stated that "the Clogscript tool has now been updated to flood HLS's e-mail server. This will make it very difficult for them to send external e-mails in both the U.K. and USA." (Tr. 2/8/06 at p. 256). The posting went on to instruct readers how to download the proper software to assist in the attack. This particular denial of service attack caused the HLS servers to crash thus rendering the HLS website unusable. (Tr. 2/8/06 at p. 258).[8] The damage to the computer system required the company to replace the computer hardware, purchase new and more effective firewalls and new software to combat the attack. (Tr. 2/8/06 at p. 259). Richard Michealson, the Chief Financial Officer of HLS, later testified that the cost of this was $15,000 and the cost of lost business due to the unavailability of the HLS website was approximately $400,000.00. (Tr. 2/9/06 at p. 186). After the attack, the SHAC website published a posting which stated in part that "2,000 SHAC activists have staged a virtual sit-in on the website of a controversial animal testing company Huntingdon Life Sciences and succeeded in bringing he website down." The posting also stated: "Customers need to remember that if HLS's e-mails

---

[8]    The attack caused 800,000 hits on the HLS website in a period of approximately three hours which overloaded the capacity of the computer system. (Tr. 2/8/06 at p. 258).

and website can be crashed, then what is coming next?  Maybe
people hacking client details off their computers."  (Govt. Ex.
1035).

A second attack on the HLS computer system – a Zombie attack
– was also reported on the SHAC website, although it was
attributed to SHAC Russia.[9] (Tr. 2/8/06 at p. 265; Govt. Ex.
1038). The Zombie attack, like the denial services attack, took
down the HLS computer system. (Tr. 2/7/06 at pp. 265-66).

Andrew Baker, the Chairman of Life Sciences Research, the
holding company that owns all of the outstanding stock of HLS
testified that, like others at HLS, he was labeled a target by
the SHAC website. (Govt. Ex. 1048A).  The SHAC website listed his
home address and the name of his wife.  Mr. Baker testified that
after his name and address were listed on the SHAC website he
began receiving a large amount of abusive telephone calls and
mail (Tr. 2/9/06 at pp. 111, 99).  Protesters began showing up at
the residence with bullhorns, shouting at the residents of the
building where Mr. Baker lived and effecting the ingress and
egress to the building.  (Tr. 2/9/06 at pp. 111-12).  A picture
of Mr. Baker with a line through his face was painted on the
sidewalk outside his home. (Tr. 2/9/06 at pp. 112-13).  After one
protest, the SHAC website posted a message stating that "Andrew,

---

[9]  Surprisingly, the purported Russian posting was in rather
good English.

all of your senior management and science staff have no idea what we have in store for you. Murderers, layers (sic) thieves and perverts deserve to be treated as such. In the near future when we see you in the gutter stripped or your riches and fabricated respect, the only handout you will get is our spit." (Govt. Ex. 1042A).

In addition to Mr. Baker testifying as to his own status as a SHAC target, he read an exhibit which listed others who were targets on the SHAC website (Govt. Ex. 1053)- Rodney Armstead[10], Daryl Leong, and his sister-in law Karen Peotti[11] - all of whom had activities occur at their homes after their addresses were posted on the website (Tr. 2/9/06 at p. 104), Mr. Baker himself had his home in California vandalized on several occasions. The SHAC website listed the address of Mr. Baker's home in California (Govt. Ex. 1043A) referring to it as "Baker's bloody bungalow." A web posting on the SHAC website (Govt. Ex. 1044A) chronicled the November 9, 2003 vandalism of Mr. Baker's home where the home was spray painted with slogans such as "HLS scum" and "puppy killer." (Tr. 2/9/06 at p. 122). Notwithstanding, SHAC's claim that home demonstrations were to "educate" people, a web posting referring to a November 19 demonstration at Mr. Baker's home

---

[10] The SHAC website reported Mr. Armstead having his windows broken out. (Govt. Ex. 1047A).

[11] Mr. Baked testified that he was present when Ms. Peotti received abusive phone calls (p. 106).

(Govt. Ex. 1045A) got it more correct when it stated that the purpose was to inconvenience the neighbors.

Mr. Baker testified that his California home was attacked on three separate occasions. The damage at his home in California was approximately $80,000.00. None of these acts of vandalism occurred until after Mr. Baker's became a target and his address was published on the SHAC website. (Tr. 2/9/06 at p. 140).

Richard Michealson, the Chief Financial Officer of HLS testified that the SHAC campaign has had "a huge impact on [HLS'] market makers and on [HLS'] investors as a result of their targeting campaign." (Tr. 2/9/06 at p. 151). Specifically, Mr. Michealson testified regarding SHAC that:

> They had sought to keep people from being involved with our company and so they have targeted, for example, market makers. They have done the same things with a number of our investors, but when they target a market maker they perform a number of actions that basically disrupt their business and leave them with the impression that if they don't – if they don't accede to their demands, they're going to make their lives a living hell, I think is the phrase they frequently use on their website." (Id. at pp. 151-52)

Mr. Michealson testified that he had seen the SHAC website "both encourage and report on phone blockades, e-mail attacks, faxes." (Tr. 2/9/06 at p. 153).[12] This type of activity has a

---

[12]  The SHAC website provided what it called "calling tips" explaining that people should use payphones for anonymity and to buy calling cards to use at the payphones. The website requested people to "call more than once" and suggested things to say to the people who answered the phone. SHAC also suggested using internet cafes to take advantage of free calling websites. The Posting said "BE CREATIVE – BE RELENTLESS – NO REST FOR THE

12

deleterious effect on companies whose lines of communication are vital to their ability to trade stocks on the open market. The following SHAC website posting is illustrative of the activities against market makers:

> Extremely important action needed. Huntingdon Life Sciences has finally obtained a market maker to complete the LSR transfer and to get their new ticker symbol LSRI traded on the over-the-counter bulletin board an off shoot of NASDAQ. A market maker is a company that matches U.S. buyers to sellers to shares. Last fall HLS had eight market makers and after a nine-week campaign from us using the investor of the week, every single one of them dropped this service to HLS crippling their share price, impeding the trades in their stock and delisting them form the OTCC, the exchange they were on. (Govt. Ex. 1079)

The posting went on to state that "we must take immediate action now to convince this company that trading for HLS means complicity with animal cruelty and that they will face serious trouble from our end." (Tr. 2/9/06 at p. 156). At the time of the trial, Mr. Michealson testified that HLS did not have a single market maker and therefore could not trade LSR on any exchange. (Tr. 2/9/06 at pp. 160- 61).

SHAC also went after stock brokers such as Charles Schwab (Govt. Ex. 1223) and E*Trade (Govt. Ex. 1224) and forced them to drop any activity with HLS stock. The lack of market makers and financial companies willing to deal in HLS stock depressed its

---

WICKED!" (Govt. Ex. 1005). Similar instructions were found in a flyer that was recovered at 101 Home Street. (Govt. Ex. 2013).

price. (Tr. 2/9/06 at pp. 149-50).[13]

In addition to targeting market makers and stock brokers, the defendants and SHAC also targeted individuals who were on the Board of Directors of LSR. Two directors resigned due to the SHAC campaign. (Tr. 2/9/06 at p. 177). When a new director was named – Muhammad Faruque – SHAC targeted him for pressure in order to get him to renounce his position on he Board of Directors. A week after the SHAC campaign against Mr. Faruque began, he resigned his position. (Tr. 2/9/06 at p. 180). Several intercepted telephone calls and emails reveal Kjonaas and Harper coordinating the pressure, email attacks, and phone blockades against Mr. Faruque. (Govt. Ex. 5041, 7016).

As set forth above, Mr. Michealson also talked about damages to HLS directly related to the SHAC campaign. He testified that the costs associated with security, repairs and management time to HLS in dealing with SHAC has been "in excess of a million dollars." This includes two computer crashes which cost approximately $400,000.00 in lost business, $50,000.00 in staffing to address the computer backup, and $15,000 for

---

[13] Mr. Michaelson also testified regarding a false and fraudulent 2002 financial report for HLS posted on the SHAC website. The report was designed to look exactly like the actual 2002 HLS financial report, but misrepresented the financial position of HLS. Under the heading "black eye" in the report, the SHAC website reported on the beating of Mr. Cass for his work at HLS. (Tr. 2/9/06 at pp. 184-85; Govt. Ex. 1071). An e-mail from Conroy to Kjonaas and others showed that Conroy helped create the false report. (Govt. Ex. 7019).

replacing certain computer equipment due to the attacks. (Tr. 2/9/06 at pp. 86). The costs also included a physical break in at the laboratory in New Jersey (Tr. 2/9/06 at p. 191). Indeed, Mr. Michealson testified that "the [SHAC] campaign just since LSRI moved to the States in 2001, the allocation of management time to this project just by itself is in excess of million dollars." (Tr. 2/9/06 at p. 187).

**B.  Targeting Secondary Victims.**

Perhaps the hallmark of the SHAC campaign to close down HLS was its targeting of any company that did business with the animal testing lab. At trial, individuals and representatives of corporations who had been targeted by SHAC testified as to what happened to their companies and what happened to them. In addition, hundreds of documents were introduced where SHAC boasted vandalism that had occurred at the homes and offices of targets; ridiculed the harm suffered by companies and individuals; and threatened more harm to anyone who was in any way related to HLS or any company that did business with it.

1.  <u>Stephens, Inc.</u>

A representative of Stephens, Inc., ("Stephens") an investment banking company based in Little Rock, Arkansas (Tr. 2/9/06 at p. 213) testified about the company and what happened to it after being listed as a target of the SHAC campaign. Stephens became an investor in HLS and ultimately, when the Royal

Bank of Scotland did not renew an outstanding $33 million loan to

HLS due to pressure from the animal rights community in England,

Stephens extended the loan to HLS.  A SHAC website posting (Govt.

Ex. 1081) stated in part:

> Stephens, Inc. is an investment firm headquartered in
> Little Rock, Arkansas and has branch locations in
> several major cities across the country.  They are the
> number one investor with a 15 percent stock in
> Huntingdon Life Sciences and was the chief financier of
> a 33 million dollar bailout package that saved the
> failing lab from foreclosure on January 29th of this
> year.  They are the only reason HLS is still open today
> and are responsible for the deaths of 500 animals that
> die every day in this vile lab.

The posting went on to state:

> An example must be made out of Stephens that if you
> invest in animal cruelty you've got us to deal with.
> We must show all other financial institutions via our
> actions against Stephens Incorporated that having any
> financial connections to HLS will mean blocked up phone
> lines, flooded e-mail systems and mailboxes,
> demonstrators outside and inside of offices, protests
> at the homes of the CEO's and company directors and the
> company name and logo in the press next to the pictures
> of mutilated beagle puppies.

Another posting on the SHAC website (Govt. Ex. 1082) stated that

"[t]here is nowhere Stephens can hide from the U.S. animal rights

movement and we will make sure we are everywhere they are until

they divest from HLS."

According to the testimony, Kjonaas contacted Stephens and

requested to meet with representatives of the company.  (Tr.

2/9/06 at p. 222).  After securing a concession from Kjonaas,

16

Stephens representatives met with him and a woman from England.[14] Kjonaas attempted to convince Stephens to cease doing business with HLS. When Stephens chose to continue doing business with HLS, the company began suffering "fax, phone blockades, e-mail attacks, and actual protests." (Tr. 2/9/06 at p. 226; Govt. Ex. 1094A).

In addition, Lauren Gazzola sent out e-mails calling for the disruption of activities at the Augusta National Golf Club where the head of Stephens was purportedly a member. (Govt. Ex. 1098, 1101); the homes of some Stephens employees in Texas had stickers of mutilated puppies put on them (Govt. Ex. 1086); individuals evaded security and trespassed at the Stephens New York City Office and put stickers of mutilated puppies on the walls (Govt. Ex. 1087A); paint was splattered on the entrance to the Stephens' offices on two occasions (Govt. Ex. 1088, 1091); and a stink bomb was set off in the Stephens Austin, Texas office. (Govt. Ex. 1089).

---

[14] Soon after Stephens was targeted by SHAC, a website with the address www.stephenskills.com appeared on the web. It had the same look as the Stephens website, but was a parody, containing language critical of Stephens and its investment in HLS, and a link to the SHAC website. (Tr. 2/9/06 at p. 217). At the request of Stephens, Kjonaas agreed to have the stehpenskills.com website taken down as a show of good faith. The website was temporarily taken down and replaced with www.BankofNewYorkkills.com. After the meeting, when Stephens did not agree to Kjonaas' demands, the website stephenskills.com went back up.

As part of the campaign against Stephens SHAC planned a large protest to take place on October 29, 2001, in Little Rock, Arkansas.[15] After the October 29 protest, SHAC continued to target Stephens and the SHAC website reported acts of vandalism such as the ransacking of the New York residence of Warren Stephens where porch lights and front windows were smashed out and individuals "plastered the front of the house with 15 'paint bombs' and spray painted 'puppy killer' on the sidewalk outside the house." (Govt. Ex. 1104). Vandals also made $100,000 in purchases on Warren Stephens' credit card." (Govt. Ex. 1105).

Ultimately when SHAC began targeting Stephens' client, Bank of America, Stephens acceded to SHAC's demands, divested itself of stock, and sold the loan to another entity. (Tr. 2/9/06 at p. 264 -66, 272-73, 288) SHAC, however, demanded to know in writing from Stephens who the loan was sold to so that they could target the new entity. (Tr. 2/9/06 at p. 267; Govt. Ex. 1106)[16]. An e-

---

[15] Although the defendants attribute this event to "numerous animal rights organizations" (see SHAC Br. at p. 19; Harper Br. at p. 1) there is only evidence of SHAC being the sponsor of the events. Indeed, defendant Joshua Harper was the on-the-ground coordinator of the event, and defendant Darius Fullmer sent e-mails in furtherance of coordinating the event. (Govt. Ex. 1095, 1097).

[16] Government Exhibit 1106 was an announcement on the SHAC website congratulating people for their hard work in forcing Stephens out. It stated at one point: "All your efforts all your dedication - your promise to outthink, outlast, and outpressure Stephens - has been successful!" It ended: " And await exciting announcements from SHAC in the near future about campaign direction. Be angry. Be creative. Be deliberate. Be effective. And HIT EM HARD!"

mail sent by defendant Darius Fullmer placed the damages caused to Stephens by the SHAC campaign at over $7 million.

### 2. Bank of New York

The Bank of New York ("BNY") handled the American Depository Receipts ("ADR")for HLS when it was based in England. When an American investor wished to purchase stock in a company that was traded on a foreign exchange, an entity was needed to act as the ADR. Because BNY fulfilled that requirement for HLS, it was targeted by SHAC. Brian Rogan, a Senior Executive Vice President, testified that his name and home address and other personal information was published on the SHAC website. (Tr. 2/10/06 at p. 146) After the posting of this information, he began receiving abusive phone calls and items in the mails sent C.O.D. (Tr. 2/10/06 at pp. 146-47). Protesters yelling and screaming things at he and his family began showing up at his home, scaring his young children. (Tr. 2/10/06 at p. 148).[17]

Mr. Rogan awoke one morning to find a dock adjacent to his home spray painted, his boat grounded with holes in it and spray painted, and the American Flag outside his home ripped down and replaced with a pirate flag. This act of vandalism was reported on the SHAC website and "enthusiastically welcomed." (Govt. Ex.

_____

[17]    Mr. Rogan had a young, autistic child who was particularly upset by the screaming. (Tr. 2/10/06 at p. 148).

1122).[18]  Mr. Rogan's family was so shaken that his wife and
children went out of state for six weeks due to a fear for their
safety.  (Tr. 2/10/06 at pp.151-52).  After BNY ceased being the
ADR for HLS the activity against Mr. Rogan ended.

Elaine Perna was married to Thomas Perna, also a senior
executive at BNY.  Like Mr. Rogan, individuals began protesting
at the Pernas' home.  Indeed, Mrs. Perna testified that on
Mother's Day 2001, protesters (identified as Kjonaas, Gazzola and
Stepanian) came up to her door and began banging on it.  They
spit in her face through the screen door, and yelled through a
bullhorn:  "come out you coward and your husband is a F'ing this
and F'ing that."  (Tr. 2/10/06 at pp. 157, 162; Govt. Ex. 4003).
Mrs. Perna testified that this activity made her feel
"threatened":

> since it happened the night – the day before and it
> happened that day, that it was probably going to
> continue to happen.  They [the trespassers] were not
> happy and they were – I was very – I'd like to say
> uncomfortable, but I can't even.  Uncomfortable is an
> understatement of how I felt about it.  I am home alone

_____

[18]    Although the SHAC website attributed the vandalism to
the Pirates for Animal Liberation, the evidence showed that SHAC
was the only group organizing, planning and coordinating the
targeting of victims, and SHAC was the only group taking credit
when targets were forced to drop HLS.  Conveniently, however, if
something illegal occurred SHAC attributed it to someone
anonymous or to a group like "Pirates for Animal Liberation" or
"SMASH HLS TEXAS."  The Government was on several occasions able
to show that the "anonymous" person or the other group were
actually working in concert with SHAC.  (E.g. Gov. Ex. 1177,
1182A, 1207A, 1221, 4013.).  Based upon such evidence, the jury
was clearly allowed to reject the smoke screen the defendants
attempted to create throughout their campaign.

> a lot. Both my sons are in college – were in college.
> My husband travels a lot and I am in the house by
> myself and I wonder what's coming next. (Tr. 2/10/06 at
> p. 158.).

Although he was not at the door, defendant Fullmer stood by at

the curb and watched what happened. A videotape of this incident

was found in 101 Home Street. After the incident, defendant

Fullmer sent out an e-mail detailing the attack on Ms. Perna and

warning "we've shown them that they cannot ignore the cruelty

they are responsible for. Now let's not let them forget it for a

second!" (Govt. Ex. 1121.).

Aside from attacks on its employees, BNY itself was also a

target of the SHAC campaign. After being identified on the SHAC

website (Govt. Ex. 1119), BNY received e-mails and telephone

calls designed to deny BNY the use of its lines of

communications. (Tr. 2/14/06 at p. 56.). In one instance,

Gazzola sent an e-mail explaining to readers how they could get

around filters in the BNY computer system. (Govt. Ex. 1120).

There was also vandalism such as spray painting, broken windows

and vandalized ATM machines at BNY branch offices. (Tr. 2/14/06

at p. 56). Finally, the SHAC website boasted the theft of

confidential BNY documents. (Govt. Ex. 1123). These documents

were found on the computer systems at 101 Home Street. (Tr.

2/21/06 at p. 18; Govt. Ex. 8059).

3. <u>Quillcap</u>

Quillcap is a company that manages investment funds, and is run by Parker Quillen. (Tr. 2/14/06 at p. 76). One of Quillcap's investments was HLS. Mr. Quillen testified that personal information about himself was posted on the SHAC website. (Tr. 2/14/06 at pp.91-92; Govt. Ex. 1113.). That same information was sent via e-mail by Kjonaas, (Govt. Ex. 8060), and found in handwritten form during the search of 101 Home Street.[19] After this information was circulated by Kjonaas and the SHAC website, Mr. Quillen's New York residence was vandalized on two occasions.[20] On one of the days that vandals attacked Mr. Quillen's residence, defendant Fullmer sent an e-mail stating that "Parker Quillen, the CEO of Quillcap Corp. had his house smashed up and splattered with paint as retribution for his investment in HLS," and ending with "[u]pdates to follow." Quillcap ultimately divested itself of HLS stock.[21] When asked

---

[19] The search of 101 Home Street yielded a large number of documents relating to target information that appeared on the SHAC website. For example, notebooks were seized containing information relating to BNY employees, HLS employees, and numerous other targets that appeared on the SHAC website. Also, renderings of how the SHAC website looked – clearly evidencing the design of the website – were also recovered.

[20] One posting from the SHAC website that reported the damage to the Quillen residence stated: "and don't forget Parker. He needs pressure now to let him know that his is only the beginning to the headache." (Govt. Ex. 1113.).

[21] At one point while Quillcap was being targeted Mr. Quillen received a phone message dated February 13, 2002, which stated: "if Quillcap puts something in writing that it has no interest , Lauren's group will call off the campaign (of harassment)." (Govt. Ex. 8035.).

why the company did that Mr. Quillen testified:

> we were scared.  We were being harassed and there was
> violence being threatened.  And, in fact, being done to
> our property.  And I was worried that it was – we were
> going to go the way it went for Brian Cass and the
> other people who actually had been beaten up.  (Tr.
> 2/14/06 at p. 108.).

In addition to these companies, representatives of Deloitte & Touche, the accountants for HLS, and Focal Communications, the telephone and internet service provider for HLS, testified that they were targeted by SHAC because of their relationship with HLS, and the companies ultimately dropped HLS as a client after having numerous acts of vandalism committed against them.

### 4. Marsh

Marsh, Inc. (hereinafter "Marsh") is an insurance brokerage firm headquartered in New York City, with offices around the world and in most major cities in the United States.  Marsh employs approximately 35,000 people.  Guy Carpenter and Seabury and Smith are two Marsh subsidiaries in related insurance fields. (Tr. 2/14/06 at p. 160).  Marsh provided insurance services to HLS.  (Tr. 2/15/06 at p. 117).  As a result, SHAC targeted Marsh and proclaimed:  "the premium on pain is about to go through the roof on HLS's insurers."  (Govt. Ex. 1124, 1125, 1126.).

To that end, the SHAC website posted a map of the United States that permitted viewers to pick any state and open a list of addresses of Marsh offices in that state, along with telephone numbers.  In addition, the names of Marsh employees connected

with those offices were listed and, in some cases, personal information about the individuals such as home addresses and home telephone numbers.

After being targeted by SHAC, Marsh and its employees suffered a large number of illegal attacks, including vandalism at homes and offices across the Country. Marsh offices were invaded in Chicago, (Govt. Ex. 1159); Milwaukee (Govt. Ex. 1168); Boston, (Govt. Ex. 1169); Columbus, Ohio, (Govt. Ex. 1170); and Portland, Oregon.[22]

In Seattle, smoke bombs were set off in the offices of Marsh and its subsidiary Guy Carpenter minutes apart, emptying both high rise buildings. The fact that Marsh had lost 235 people in the World Trade Center attacks that took place in two buildings minutes apart was not lost on the Marsh employees in Seattle. After this attack, Kjonaas appeared on Seattle news reports offering comments, as did Conroy using the alias Frank Hampton. Gazzola also appeared on a Seattle radio talk show to talk about the smoke bomb incidents and SHAC in general. Tapes of the news reports were found in 101 Home Street.

Homes of Marsh employees were also vandalized in Dallas, Texas and Chicago, Illinois. (Govt. Ex. 1159).[23] In New York, a

_____

[22] In addition, a convention attended by Marsh personnel was disrupted and a table manned by Marsh employees overturned. (Tr. 2/15/06 at p. 153; Govt. Ex. 1173.).

[23] In one of the Chicago incidents, an individual who had a name similar to that of a Marsh employee – and whose name was

24

retired Marsh Board member and another high-level Marsh employee
had windows smashed at their residences. Frank Tasco, a retired,
high-level employee had his home vandalized. (Govt. Ex. 1144).
In addition, the SHAC website advertised that Mr. Tasco would be
at a golf tournament at the Meadowbrook Club on long Island.
After the posting, vandals destroyed several greens at the club
digging into one of the greens the words "Frank Tasco puppy
killer wuz here." (Tr. 2/15/06 at pp. 181-85; Govt. Ex. 1145).[24]
The SHAC website incited these attacks through postings like the
following: "Below is tons of new information on Marsh, Inc.,
HLS's insurance broker . . . . This week it's important to
really keep the pressure up. There are many companies and
individuals who are in a prime position to get hammered. Give
'em hell." (Govt. Ex. 1144).

Certain Marsh employees were singled out for especially
harsh treatment. Robert Harper was an employee of Marsh in
Boston. Like other targeted Marsh employees, he had nothing to
do with Marsh's business with HLS. Nevertheless, protesters
began showing up at his residence on a regular basis.[25] His

---

published on the SHAC website – had his home vandalized. The
individual had no connection to Marsh, let alone HLS.

[24] A country club that Frank Tasco belonged to was also
vandalized, (Tr. 2/15/06 at pp. 175-77; Govt. Ex. 1105), and an
event at the club was disrupted. (Tr. 2/15/06 at pp. 173-75;
Govt. Ex. 1149A).

[25] The memorandum of SHAC, USA states that with respect to
Marsh employees Michael Rogan, Robert Harper, Martha Lobo, Marion

name, address, and the names of his wife and young child were published on the SHAC website. (Tr. 2/14/06 at pp. 199-200; Govt. Ex. 1133). Someone notified the post office that his mail should be stopped. (Tr. 2/14/06 at p. 201). His address and telephone number was attached to posters offering items for sale. (Tr. 2/14/06 at pp. 201-02). Red paint was thrown on his front steps. (Tr. 2/14/06 at p. 202; Govt. Ex. 1134). People stood outside his home at night holding candles (Tr. 2/14/06 at p. 202). All of this made Mr. Harper feel "vulnerable, concern for me and my family, angry, not, you know you have a feeling of hopelessness, and helplessness not knowing what you can do because my life was disrupted so much." (Tr. 2/14/06 at p. 205).

Mr. Harper changed the way he lived his life, stating:

I walked to work, so my concern was - the people who came to my house would say they knew where I was, what I was doing, so I would change the route I would take, you know. I'd go down one street and cross over to the left and vice versa, go down another block and I'd always look where I was going. Weekends, we would - we leave town, just because my wife and I didn't want to deal with what might be - what might be coming to our house on Saturday or Sunday.

I used to take my son - sorry. My son was two at the time. Every night I'd come home from work and we'd go on our - we called it a dog hunt; and we'd go to our park and pet all the dogs and that had to stop, you know. He didn't know why we were stopping. I said

Harlos and Sally Dillenback: "each of these persons testified that protest, leafleting and other activities were performed by persons residing in Texas or Massachusetts." SHAC Br. at 21. This is simply a distortion of the record. Moreover, Ms. Lobo is a California resident and Kjonaas was outside her home yelling at her: "you answer to us."

Robby, we just can't do it for now.  We just have to
wait.  So you know, I missed that time with him.  That
was a fun thing we used to do.  (Tr. 2/14/06 at p.
205.).

On August 9, 2002, a large number of people, including

Gazzola appeared outside Mr. Harper's home.  Gazzola yelled many

things at the Harper family including threats to burn his house

down.  In particular, Gazzola, on one rant, screamed into a

bullhorn:

Where were the police when an HLS worker's car got
flipped over in his driveway?  Where were the police
when a Marsh executive had all his windows smashed in
and his house covered in red paint in Chicago? And
where were the police when your house was covered in
red paint a few weeks ago?  They can't protect you.
Your injunctions can't stop us.  We will always find a
way around whatever they throw at us.

Mr. Harper referred to this day as probably "one of the worst in

[his] life" stating:

If anything happened to my wife or my son because of
something I had nothing to do with. I felt so
vulnerable.  It was unbelievable.  We left Boston that
night and said we're out of here.  We thought about
moving.  Ultimately we didn't move, but it was at the
point where our family said it's not worth working for
Marsh.  It's not worth us living here in Boston.  Even
though we enjoyed living in Boston.  This is
ridiculous.  Our life is turned into a nightmare.

My concern was after reading all these things about
what had happened to incite other people[26], that some –
somebody would throw a Molotov cocktail through the
front window of our building in a drive-by in the
middle of the night or waiting for us – either me or my
wife and my son as we walked out the building. You
can't avoid in the city, somebody waiting on the side

_____

[26]  Mr. Harper testified that due to what was happening to
him he read the SHAC website daily.  (p. 204).

to hit me over the head or throw pepper spray in my face. (Tr. 2/14/06 at pp. 208-09.).

Marion Harlos was another Marsh employee who was stalked due to the efforts of SHAC and defendants Kjonaas, Gazzola and Conroy. Ms. Harlos was an employee of the Marsh subsidiary Seabury and Smith in Texas, who had nothing to do with HLS. (Tr. 2/15/06 at pp. 40-41). In February 2002, Ms. Harlos saw her name, home address and home telephone number posted on the SHAC Website. (Tr. 2/15/06 at 42-43; Govt. Ex. 1142). In addition to vandalism occurring at her office, she began receiving threatening telephone calls and mail at her home. (Tr. 2/15/06 at pp. 43-47). Individuals in masks and bandanas began sitting in cars outside her home in the late afternoon or in the hours before the dawn. Indeed, Government Exhibit 4004 was a tape confiscated by the Plano Police Department wherein Nick Mallard and others sat in a car outside Ms. Harolos' residence attempting to get a better description of her.[27] When Ms. Harlos was driven to work by private security hired by Marsh, they attempted to follow her but were stopped by the police. In addition to these early morning and late evening stalking events, there were larger protests staged outside Ms. Harlos' house where they shouted her

---

[27] A private keyring for encrypted e-mails to Nick Mallard was found on three of the computers at 101 Home Street. (Govt. Ex. 8062A, 8062B, 8062D.).

name and the names of her children and "death."[28] (Tr. 2/15/06 at

p. 49; Govt. Ex. 1152).

Ms. Harlos testified how this affected her:

I was petrified.  I was petrified for my children.  I'm
sorry.

I had young children and they were no longer permitted
to go outside and play because we did not know what was
going to take place.  Would someone be in the front
yard; would someone be in the backyard; would someone
come up and talk to them; would someone try to take
them.

At the same time I had neighbors who were threatening
to sue us because of what was going on in our
neighborhood.  It's a quiet community and they felt
that I had brought terror to their neighborhood.  At
one point in time I had a neighbor, he had a lawsuit,
wanting to sue us for devaluation of their property
because I had to have security on my property at all
times.

We didn't go out.  We didn't entertain at home.  The
children were asked to play in their own home during
the week.  When we were at work you had someone at the
house so you couldn't have normal activities of having
people come out and take care of the yard or do those
things, so, our life was put on hold.  (Tr. 2/15/06 at
p. 52)

Ultimately, after nothing stopped the fear that Ms. Harlos felt,

she relocated. (Tr. 2/15/06 at p. 55).

Sally Dillenback was an employee of Marsh in the Dallas

Office.  Like the other Marsh employees targeted by SHAC and the

---

[28]  Ms. Harlos testified that she was aware of others who
had been targeted by SHAC "having things thrown at them.  I heard
of people having tires slashed.  I heard of people's homes being
spray painted.  I heard of people's private clubs being entered
and locker rooms, etc., defaced, physical attacks on
individuals."  (Tr. 2/15/06 at p. 54).

defendants, she had no dealings whatsoever with HLS. Nevertheless, the SHAC website published her name, her home address and her telephone number, the name of her husband and a relative (and the relative's office telephone number), the names of Ms. Dillenback's children and where they went to school, the name of one of her son's teachers the make and license plate number of the car she drove, what country club she belonged to, and the name of the church she and her family attended. (Govt. Ex. 1160). Needless to say, this information on the SHAC website made her "very upset and disturbed." (Tr. 2/15/06 at p. 72).

After the posting of this information the Dillenbacks began receiving "angry and belligerent calls, often threatening" at all hours of the day and night. (Tr. 2/15/06 at p. 74.). They had to change their telephone number. They also began receiving a "tremendous amount of mail," sometimes using an obscene distortion of her name. (Tr. 2/15/06 at p. 76.). On one Sunday morning, Ms. Dillenback went outside her house to find that pictures of mutilated animals were glued all over the brick walls of her home. (Tr. 2/15/06 at p. 77; Govt. Ex. 1162).[29] Ms. Dillenback testified that this act made her "sickened and she was scared. I felt that I had been threatened and my family and I was very apprehensive about what might happen next." (Tr.

---

[29] This type of vandalism also occurred to Michael Rogan, another employee of the Dallas Office after his name and personal information about his family was published on the SHAC website.

2/15/06 at p. 78.). Marsh provided her with 24 hour security at her home. While she welcomed the security: "it was very invasive on our personal life; and it was also very difficult to deal with your neighbors, you know. You went from being a friendly neighbor to somebody that everybody was suspicious about what your activities might be or why you needed 24-hour security at your house." (Tr. 2/15/06 at p.79). The Plano police also provided extra security at the school out of a concern that activists would be a threat to the children.

On multiple occasions, people were found on the Dillenback's property, in trees and in the pool area. (Tr. 2/15/06 at p. 80). In addition there were several incidents when protestors came to the house with large placards depicting mutilated puppies and used bullhorns to scream that Ms. Dillenback insured death and the mutilation of animals. (Tr. 2/15/06 at p. 81, Govt. Ex. 1163A). In one instance, she was home with only her youngest son when approximately 20 people were outside the house. Ms. Dillenback needed to go pick up her daughter from a sleep-over, but was afraid to leave the house, effectively imprisoning her. (Tr. 2/15/06 at p. 83.). In addition to protesting at her office and her home, one Sunday the protesters showed up at her church. According to Ms. Dillenback, she felt incredibly violated that "they would go to my church and say these horrible things." (Tr. 2/15/06 at p. 85.). Ms. Dillenback testified that this was a tremendous disruption to her life stating:

It threatened the security of my family. It changed our activities. We did everything we could to not to leave the children at home alone. We didn't want them playing outside and, you know my husband and I wouldn't go out and leave the kids with a baby-sitter because we feared what might happen. (Tr. 2/15/06 at p. 89).

Out of fear, Ms. Dillenback's husband purchased a semi-automatic shotgun to protect the family. (Tr. 2/15/06 at p. 8.).

Ms. Dillenback also received threats relating to her children. Her son was seven at the time and she received an e-mail asking how she would feel if her seven-year-old son was cut open and filled with poison. This threat, she testified, "was very devastating for me to see." (Tr. 2/15/06 at p. 87).[30]

5. <u>Chiron</u>

Chiron Corp. ("Chiron"), with headquarters in Emeryville, California, was listed on the SHAC website as a target because SHAC claimed Chiron was doing business with HLS. The time frame for this began in May 2003. The SHAC website also listed as targets -- and therefore published personal information about them such as home addresses and telephone numbers and other

---

[30]    Two other Marsh employees testified at trial. Dard Hunter, an employee in the Marsh Sacramento office had, among other things, his home vandalized after his name and personal information was published on the SHAC website. These activities directed against him terrified him and has family (Tr. 2/15/06 at p. 18). Martha Lobo, an executive assistant at Marsh's San Francisco office had, among other things, her home stormed one morning. People with bullhorns led by defendant Kjonaas, banged on her windows, shouted at her that they knew where she worked, knew where she lived and would be back. (Tr. 2/15/06 at p. 28; Govt. Ex. 4006). Kjonaas yelled at her through the bullhorn: "you answer to us."    Ms. Lobo testified that not only was she "terrified" but that her "children were terrified and traumatized."

information -- the Chairman of the Board of Chiron;[31] the Chief Financial Officer of Chiron; and several Chiron employees. (Govt. Ex. 1235A). The posting on the SHAC website stated in part: "We know who you are, we know what you look like, we know where you socialize and best of all we know where you live." After the postings, Chiron employees were harassed at all hours of the day and night, homes were vandalized and spray painted, (Govt. Ex. 1245A), cars were spray painted, (Govt. Ex. 1246), and at the company, the computers were attacked. (Govt. Ex. 1248A.).

On August 28, 2003, two bombs were detonated at the Chiron headquarters in Emeryville. The first bomb exploded at approximately 3:00 a.m. and the second an hour later. (Tr. 2/21/06 at p. 148-49). Both bombs caused damage to the building. After the bombing, the SHAC website posted information about the bombing with Kjonaas stating "If I were HLS or Chiron I would be very worried." (Govt. Ex. 1249A). Later the day of the bombing, telephone records reflect that a call was made from a telephone subscribed to by Kjonaas to a telephone subscribed to by Daniel Andreas San Diego. Authorities in California have charged Daniel Andreas San Diego with setting the bombs at the Chiron facility. After the bombing, SHAC sent out an e-mail informing people that the police were looking for two individuals in a van with Oregon license plates. (Govt. Ex. 1254). The

---

[31]    Included in the information was the name of his wife and daughter and his daughter's employer and e-mail address.

clear purpose of this was to assist these individuals in evading police.  San Diego remains a fugitive to date.

   **C.  Wiretap Evidence**.

   During the course of the trial, the Government introduced approximately 67 telephone calls that were obtained pursuant to a court-authorized wiretap.  The wiretap was placed on two telephones at 101 Home Street; both telephones were subscribed to by Kjonaas.[32]  During the course of the wiretap, which was in place from November 15, 2002 through March 11, 2003, each of the defendants was overheard on multiple conversations.  Most of the calls to or from 101 Home Street were placed or received by Kjonaas, Gazzola or Conroy.  Of the exhibits introduced as evidence, Stepanian and Harper were frequent callers.

   The intercepted conversations showed the defendants' coordination of the SHAC campaign.  For instance, after Marsh ceased providing insurance services for HLS, Kjonaas, Gazzola and Conroy were heard on the phone taking credit for what occurred.[33]

---

   [32]  A wiretap was also placed on the computers at 101 Home Street.  Initially, the wiretap on the computer was authorized to capture the e-mails; after it was realized that many of the e-mails were encrypted, the Government obtained an order for a "full content" intercept which captured all of the screens that appeared on computers while connected to the internet.

   [33]  In one conversation with Dan Lysk on January 20, 2003, Kjonaas told Lysk: "this last month and a half has been probably the busiest and the most productive month and a half to date in the campaign."  This call followed a large December protest in New Jersey, Marsh ceasing it's business with HLS, and two HLS Board members resigning their positions and a replacement board member – Mr. Faruque – being driven out.

Stepanian called and was upset with Kjonaas for not telling him sooner because he had been such a part of the campaign. (Govt. Ex. 5019). These defendants also discussed where to next take the campaign, which Gazzola and Conroy said would be directed at the directors and senior scientists. (Govt. Ex. 5022, 5029).

Indeed, after the edict that the directors and senior scientists would be next, Harper spoke to Kjonaas when two HLS directors resigned due to pressure from the SHAC campaign, (Govt. Ex. 5041), and together they discussed pressuring the new board member, Mr. Faruque, to disassociate himself with HLS. In another conversation, they discussed how his (Mr. Faruque's) e-mail and fax systems had been flooded. (Govt. Ex. 5044).[34]

Other telephone calls illustrate the complicity of each of the defendants in the overall conspiracy.[35] For instance, when Jill in Dallas needed materials for her court case, she called Kjonaas. (Govt. Ex. at 5048.). Jill Natowitz was one of the people involved with Sally Dillenback. Gazzola also spoke to Jimmy from Texas on several occasions and directed him on who to target. (E.g., Govt. Ex. 5046.).

On February 21, 2003, during the SHAC campaign against

---

[34] Harper sent an e-mail, (Govt. Ex. 7016), to Kjonaas and another person in the U.K. notifying them that the e-mail address for Mr. Faruque was incorrect and giving the correct address. This information was then posted on the SHAC website. (Govt. Ex. 1069.).

[35] On certain telephone calls, Gazzola and Kjonaas used aliases.

Deloitte & Touche ("D&T"), Stepanian called and spoke to Gazzola. He told Gazzola how he and his friends had just infiltrated the D&T offices on Long Island. Stepanian recalled how he told the head of the D&T office that "there's about 48 hours until a full fledged campaign is gonna be launched against Deloitte and Touche." (Govt. Ex. 5060). Stepanian, after giving Gazzola the means to access his computer, asked her to prepare a writeup about what had occurred. A writeup describing what had occurred was thereafter posted on the SHAC website ascribing the source of the information as "NY Activist." (Govt. Ex. 1177).

When D&T announced it's decision to drop HLS, Kjonaas explained in a telephone conversation why it happened so quickly: "we won this because of Marsh. All they needed to do was look at Marsh to see what happened and you know, it took 10 days for them to decide that you know what? It's probably gonna happen to us." Kjonnas went on to state: "It's like how we beat Quillcap too 'cause they like right after Stephens and they got a good look at what happened to Stephens and they pulled out too. So it's pretty awesome." (Govt. Ex. 5063).

The wiretap on the computers also illustrated the complicity of the defendants in the conspiracy. For instance, Harper sent an e-mail on March 27, 2003, (Govt. Ex. 6042), in which he noted that "there seem [sic] to be a lack of very visible SHAC targets right now," but explained "[r]ight now there is a customer campaign against HLS that has targets in many cities." Indeed,

36

the SHAC website had posted a listing of HLS customers all across the country.  It was the same customer list that Gazzola worked at putting together with Fullmer, (Govt. Ex. 6006, 6035), and posted on the SHAC website by Conroy.  (Govt. Ex. 8041.).

**D.  Search of 101 Home Street and Other Evidence.**

The search of 101 Home Street yielded a wealth of evidence damning to the defendants.  First and foremost, there were nine computers seized.  An expert in computer forensics – Eoghan Casey – identified who were the most frequent users, and what type of information was on each of the computers.  He opined that two of the computers were used to manipulate the SHAC website, among others.

Furthermore, numerous binders with research and information related to the SHAC campaign were found at 101 Home Street.  There were binders that included information for Bank of New York and Stephens, (Govt. Ex. 2038); binders containing Marsh research, (Govt. Ex. 2039); and HLS research, (Govt. Ex. 2040); and binders containing information on companies SHAC believed were HLS customers, (Govt. Ex. 2042); and suppliers, (Govt. Ex. 2041).  There was also a binder marked correspondence that contained letters from Kjonaas, Gazzola, and others warning companies to stop doing business with HLS, as well as company responses. (Govt. Ex. 2043).

Notebooks were also seized that contained handwritten information about targets that found its way to the SHAC website,

as well as drawings showing the format of the website. One of the papers with personal information included a notation that certain people "need[ed] to be tracked down." (Govt. Ex. 2035.). Other documents, (Gov. Ex. 2038A-2038D), contained information about the movement of Parker Quillen, his addresses in New York and Massachusetts, his description, the description of his wife, what car he drove, where he parked it, and when he returned to New York on weekends.

In addition, there was a file entitled "Kevin's Research" which had information about various pharmaceutical companies and their employees, (Govt. Ex. 2036), as well as a document with the notation "dari's list," (Govt. Ex. 2037), which had the names of numerous pharmaceutical companies including Chiron and Forest Labs, both of which were featured targets of SHAC. In sum, the documents taken from 101 Home Street clearly showed that the residence was the headquarters of SHAC, that Kjonaas, Gazzola and Conroy were at the helm, and that the defendants were involved in carrying out the direction provided by the leaders.

Finally, videotapes and other recordings were admitted in evidence at trial. Speeches by Kjonaas and Harper were admitted wherein they espoused their beliefs that the end justifies the means and that HLS needed to be closed by any means possible. Kjonaas gave a long speech about how companies in England had been shut down through violence and intimidation. Harper gave a speech in Little Rock about how not to get caught after one

committed acts of vandalism; he gave another speech in Seattle wherein he explained how to send a black fax, and how it cuts off the lines of communication of the companies who are attacked in this manner.  Gazzola made a radio broadcast in Seattle where she talked about the SHAC campaign and made no apologies for the tactics.  And several videos of home demonstrations were admitted in evidence.  In one, Gazzola was seen and heard threatening Rob Harper and Kjonaas was seen and heard telling Martha Lobo and her family: "we know where you live and you answer to us."

## ARGUMENT

**I.   THE EVIDENCE CONCLUSIVELY ESTABLISHED EACH DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT.**

All of the defendants have renewed their motions for a judgment of acquittal pursuant to Fed. R. Crim. P 29 based upon an alleged insufficiency of the evidence. In addition, the defendants have moved for a new trial, arguing that the jury's verdict is against the weight of the evidence. For the reasons discussed below, and as illustrated throughout the Statement of Facts, both claims fail.

Although the defendants' motions are based upon an alleged insufficiency of the evidence and a miscarriage of justice, the claims raised simply seek to reargue many of the Court's pre-trial and trial rulings. Rule 33, however, is preserved for cases were "there is a serious danger that a miscarriage of justice has occurred -- that is, that an innocent person has been convicted." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002). It is not simply an avenue for a defendant to "appeal" this Court's rulings; they will certainly have the opportunity to do so to the Third Circuit after sentencing. Defendants have failed to show a serious danger that a miscarriage of justice has occurred. Accordingly, its motions should be denied.

In evaluating whether the evidence is sufficient to support a conviction under Rule 29, this Court: (1) reviews "the evidence in the light most favorable to the Government," United

States v. Perez, 280 F.3d 318, 342 (3d Cir. 2002); (2) "credit[s] all reasonable inferences that support the verdict," id.; and (3) sustains the verdict if the evidence "would allow a rational trier of fact to convict," United States v. Hart, 273 F.3d 363, 371 (3d Cir. 2001) (internal quotation marks and citation omitted). "The scope of review is over the totality of the evidence, both direct and circumstantial." United States v. Antico, 275 F.3d 245, 260 (3d Cir. 2001).

This Court must also "presume[s] that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." United States v. Iafelice, 978 F.2d 92, 94 (3d Cir. 1992); see also United States v. Cothran, 286 F.3d 173, 175 (3d Cir. 2002) (explaining that the reviewing court's role "is not . . . to weigh the evidence or to determine the credibility of the witnesses."); United States v. Scanzello, 832 F.2d 18, 21 (3d Cir. 1987) (recognizing that "all credibility issues [must be] resolved in the government's favor"). The jury, in turn, is empowered to draw any inference that, based upon common sense and experience, reasonably flowed from the evidence. United States v. Navarro, 145 F.3d 580, 593 (3d Cir. 1998). Given these strictures, "[t]he appellant carries a very heavy burden on appeal." Cothran, 286 F.3d at 175; United States v. Anderskow, 88 F.3d 245, 251 (3d Cir. 1996) (noting that "review of the sufficiency of the evidence is governed by strict principles of deference to a jury's findings") (internal

quotation marks and citation omitted).

In evaluating a motion under Rule 33, the Third Circuit has made it clearly that "a district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted." <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002). While the Court does not have to view the evidence "favorably to the Government, but instead exercises its own judgment in assessing the Government's case," the Court should <u>not</u> "reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." <u>United States v. Martinez</u>, 763 F.2d 1297, 1312-13 (11th Cir. 1985). To the contrary,

> [t]he district court must strike a balance between weighing the evidence and credibility of the witnesses and not wholly usurping the role of the jury. Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment. An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances and make an objective

evaluation.  There must be a real concern that an
        innocent person may have been convicted.

United States v. Ferguson, 246, F.3d 129, 1323 (2d Cir. 2001)

(citations and quotation marks omitted).  The defendants have

failed to show a manifest injustice.

        In this case, the evidence discussed at length in the

Statement of Facts certainly showed that Kjonaas, as the

president of SHAC, Gazzola the event coordinator, and Conroy, who

manipulated the website from the computers at 101 Home Street,

were in charge of the mayhem that was being caused.  Furthermore,

although the Government agrees with SHAC's counsel's

characterization of SHAC USA, Inc. as a sham, the evidence showed

that Kjonaas, Gazzola, and Conroy nevertheless acted as agents of

the corporation.  Accordingly, their criminal conduct was a basis

to find the corporate defendant guilty.

        The other three defendants, while not at the top of the

chain, were also involved to a lesser extent.  Harper ran a

"branch" of SHAC in Seattle, and was the person on the ground in

Little Rock coordinating the SHAC campaign there against

Stephens.  Harper was also in touch with Kjonaas, and when Mr.

Faruque was targeted, he had discussion about it and sent the e-

mail correcting Mr. Faruque's e-mail address.  Harper also gave

the Washington speech explaining how black faxes worked, as well

as the Little Rock speech about not getting caught after

committing vandalism.  Andrew Stepanian was a New York

coordinator.  He discussed many things on the phone with Kjonaas
and Gazzola.  He was the person upset at not being told first
thing about Marsh ceasing its business relationship with HLS.  He
was concerned about not being in the inner circle because he had
done the work and wanted the accolades. Stepanian was also the
person who charged into the D&T Offices, threatened the company
and then reported it to Gazzola.  Fullmer, who was present at the
Perna home and certainly aware of what SHAC was and what it did,
joined in the Little Rock activities against Stephens, sent e-
mails reveling in the amount of damages inflicted on Stephens,
and was involved in doing the research on HLS customer that was
then put on the SHAC website to permit others to target companies
and individuals.  The evidence, therefore, was more than
sufficient to prove that each of the defendants agreed with each
other and others to shut down HLS.

     The crux of defendants' argument is that the evidence was
insufficient to show criminal intent -- _i.e._, that they knowingly
joined a conspiracy to commit illegal acts.  Of course, intent
can only be inferred from other facts.  Here, the facts showed
that throughout the course of the multi-year SHAC campaign, each
defendant was well aware of the illegal acts occurring to SHAC
targets -- the very targets against whom they were coordinating
their efforts.  With that knowledge, each defendant continued to
do his or her part to continue targeting other individuals and
companies.  Based upon that pattern -- which is discussed more

fully in the First Amendment argument, Point II, supra, the jury was clearly within its right to conclude that the defendants knowingly conspired to shut down HLS with the intent to use illegal means to accomplish their goal.

The evidence was, likewise, sufficient to find that defendants SHAC, Kjonaas, Gazzola and Conroy agreed to use a facility in interstate commerce (i.e., the internet, telephone lines, and e-mails) to engage in a course of conduct calculated to place another individual or a member of that person's immediate family in reasonable fear of death or serious bodily injury, and that these defendants actually did, or aided and abetted, in placing Sally Dillenback, Marion Harlos, and Robert Harper in reasonable fear of serious bodily injury to them or their family. Certainly, the testimony of each of the victims was sufficient for the jury to conclude that a reasonable person in the shoes of Dillenback, Harlos, and Harper would have reasonably been in fear of serious bodily injury based upon the course of conduct aimed at them -- namely, the telephone calls, the mail, the individuals at their homes at all hours of the day and night, and the vandalism at their homes.

Indeed, the fact that they were a SHAC target and that their personal information was posted on the SHAC website along with postings threatening violence, alone, would be sufficient to place them in reasonable fear. This is so particularly in light of the fact that each victim was aware of what had happened to

other targets.  To that end, postings on the SHAC website made it clear to any target what would happen to him or her.  The evidence was also sufficient to show that Kjonaas, Gazzola, and Conroy were responsible for coordinating the SHAC campaign, including who to target and when to stop, and all three had control over the website.  Based upon this evidence, the jury was well within its right to return guilty verdicts.

Finally, the evidence showed that part of the SHAC campaign was to use telecommunications devices (i.e., fax machines, telephones, and the emails) to abuse, threaten and harass persons at the called number without disclosing the identity of the person utilizing the telecommunications device, as charged in Count Six.  In particular, the evidence showed that the defendants charged in Count Six urged and agreed to have people send what are known as "black faxes" to companies for the express purpose of annoying them.  The black faxes monopolized the recipients' fax machines by printing out black pages, thereby using excess amounts of ink, taking large amounts of time, and in some instances, burning out the machine unit altogether.

For all these reasons, the evidence was sufficient to support the jury's guilty verdicts beyond a reasonable doubt. Moreover, the defendants have failed to show that there has been a miscarriage of justice.  Accordingly, there is no reason to disturb the jury's verdicts.

## II. THE EVIDENCE, TAKEN AS A WHOLE, REMOVES THIS CASE FROM THE AMBIT OF THE FIRST AMENDMENT.

All of the defendants, either individually or by joining the arguments of others, claim that all of their conduct was First Amendment-protected activity. The evidence at trial, however, established beyond a reasonable doubt that the defendants knowingly conspired to shut down HLS through illegal means -- means that included threatening SHAC targets, directing co-conspirators to engage in illegal activity, and inciting violence against others. Accordingly, the defendants' conduct, albeit inclusive of speech, fell outside the First Amendment.[36]

In reviewing the evidence in light of the defendants' First Amendment arguments, there are several general principles that apply. First, the Court must consider the defendants' statements and conduct in the context in which they occurred. See United States v. Bellrichard, 994 F.2d 1318, 1321 (8th Cir. 1993) ("When determining whether an alleged threat falls outside the realm of

---

[36] Other Courts have similarly found that SHAC's activity is not protected by the First Amendment. See Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., 29 Cal. Rpt. 3d 521, 540 (2005) (holding that "the trial court could reasonably conclude SHAC USA's Web site contained credible threats of violence toward Macdonald [an HLS employee] by SHAC USA and Kjonaas"); Teva Pharm. USA, Inc. v. Stop Huntingdon Animal Cruelty USA, et al., 2005 WL 1010454, at * (N.J. Super. Ct. Apr. 1, 2005) (finding "that a prima facie showing has been made that the SHAC website is directed to, and likely to incite, imminent lawless activity" and explaining that "[t]he court would have to turn a blind eye to find that there is no causal connection between the SHAC website and the violence thereafter produced").

protected speech, it is important to focus on the context of the expression."); United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990) (whether conduct or speech is threatening "must be considered in light of [the] entire factual context, including the surrounding events and the reaction of the listeners").  It is not appropriate for the defendants to isolate their conduct and statements from the context in which they occurred -- i.e., the SHAC campaign.  E.g., Gazzola Br. at 9-10 (claiming defendant was "only" involved in "protests during one weekend in Boston, an interview with a Seattle radio station, answering the telephone, a taped interview in Little Rock, using a bullhorn . . ., and several home demonstrations"); Harper Br. at 1 (all that Harper did was give a speech at the University of Washington and organize in Little Rock).[37]

Second, it is important to note that all of the defendants were charged with either conspiring to violate the criminal law or aiding and abetting a violation of the criminal law.  With regard to the conspiracy charges, the Court properly instructed the jury, and the jury found, that the Government had proven beyond a reasonable doubt that (1) the defendants agreed with one another to accomplish an unlawful goal or a lawful goal through unlawful means, (2) each defendant was a knowing member of that

---

[37]     Gazzola's suggestion that she was only "answering the phone" ignores the evidence.  In those conversations, Gazzola was planning and coordinating the activities of SHAC and her co-conspirators.  E.g., (Gov. Ex. 5046).

agreement, and (3) a co-conspirator (but not each defendant

personally), committed an overt act in furtherance of that

agreement. Similarly, with regard to aiding and abetting

liability, the Court properly instructed the jury that the

defendants had to knowingly aid or abet the crime, but did not

have to personally commit the criminal act. Thus, it is

irrelevant that, as defendant Gazzola argues, she did not

"<u>herself</u> even once vandalized property."[38]

Third, although the Court must conduct an independent review

of the evidence if "First Amendment protections are implicated,"

factual findings are nevertheless "entitled to great deference."

<u>United States v. Kosma</u>, 951 F.2d 549, 555 (3d Cir. 1991).

Moreover, "[w]hether a speaker's language constitutes a threat is

a matter to be decided by the trier of fact." <u>Id.</u>; <u>United States

v. Schneider</u>, 910 F.2d 1569, 1570 (7th Cir. 1990).[39]

---

[38]     Gazzola also claims she never once "directly threatened
anyone face-to-face." Clearly that is not true. Gazzola stood
approximately 13 feet outside of Robert Harper's house,
threatened him and his family that the police could not help
them, told them to take a look a what had happened to prior SHAC
targets like Henning Jonnasen as evidence that the police could
not help them, and later screamed that they would burn his house
to the ground. It was for the jury, in the context of all of the
other evidence (including the SHAC postings directed toward
Robert Harper), to conclude whether Gazzola's conduct constituted
true threats or intimidation. Having found that it did, it is
not for the defendants now to re-characterize the evidence.

[39]     Defendant SHAC asks this Court to rely on the doctrine
of "stictissimi (sic) juris." SHAC Br. at 22. The doctrine
translates into "of the strictest right" and arose out of two
Smith Act prosecutions where the defendants were prosecuted for
being members of an organization involved in the advocacy of

Last, the fact that the defendants used speech in the course of violating 18 U.S.C. § 43, 18 U.S.C. § 2261A, and 47 U.S.C. § 223 is not alone a basis to set aside the convictions.  As the Supreme Court has long recognized, "[i]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949); see Rice v. Paladin Enterprises, Inc., 128 F.3d 233, 244 (4th Cir. 1997) ("[E]very court that has addressed the issue . . . has held that the First Amendment does not necessarily pose a bar to liability for aiding and abetting a crime, even when such aiding and abetting takes the form of the spoken or written word.").

## A.    The Defendants' Conduct Is Not Protected.

Notwithstanding the evidence at trial, the defendants are asking this Court to find that their conduct consisted of nothing more than participating in a public, political debate on animal

---

violence.  See United States v. Cerill, 603 F.2d 415, 421 (3d Cir. 1979).  Unlike other cases in which the doctrine was applied, the defendants were not prosecuted for simply being members of SHAC, but rather, because they coordinated and organized the SHAC campaign and, most important, the evidence showed they intended to use illegal tactics as part of the campaign.  The defendants acted with the knowledge of what was happening to SHAC targets and continued, themselves, to target new victims.  Accordingly, because the evidence was not simply one of membership in the group, the doctrine of strictissimi juris does not apply.

testing.  The defendants, however, were not convicted for giving

a speech, participating in a demonstration, or writing a letter

about the evils of animal testing.   Simply put, they were not

convicted for trying to stake out a position in the debate on

animal rights.   Instead, the evidence showed that the defendants

tried to hijack the debate by threatening, intimidating and

directing others to commit illegal acts against their targets.

That the end they sought may be political does not excuse the

criminal means they employed.  To find that the First Amendment

extends to such conduct is to turn the First Amendment on its

head.  Bellrichard, 994 F.2d at 1322 ("a person may not escape

prosecution for uttering threatening language merely by combining

the threatening language with issues of public concern").[40]

Furthermore, even with regard to the defendants' expressive

conduct, all of the parties agree that free speech protections

"are not absolute, and . . . the government may regulate certain

categories of expression consistent with the Constitution."

Virginia v. Black, 538 U.S. 343, 358 (2003).  One category the

Government may regulate are "true threats."  The Court in

---

[40]  Defendant SHAC's claim that the chants of puppy killer
were "part of the historical fabric of this culture," SHAC Br. at
54, is spurious.  Was it part of the historical fabric to
threaten to burn down houses, to scream through bullhorns that
the police can't protect you, and to put people in fear for their
lives?  The Government has found no defense to criminal activity
that the charged conduct was "part of the historical fabric" of a
culture.  Judging by the dearth of case law to support
defendant's outlandish claim, neither could it.

<u>Virginia v. Black</u> defined a "true threat" as "those statements
where the speaker means to communicate a serious expression of an
intent to commit an unlawful act of violence to a particular
individual or group of individuals." <u>Id.</u> at 1548. It is
irrelevant whether the speaker intended to carry out the threat.
<u>Id.</u> In addition, the Court explained that "intimidation . . .
is a type of true threat" and exists "where a speaker directs a
threat to a person or group of persons with the intent of placing
the victim in fear of bodily harm or death." <u>Id.</u>

The First Amendment also does not protect advocacy that is
"directed to inciting or producing imminent lawless action and is
likely to incite or produce such action." <u>Brandenberg v. Ohio</u>,
395 U.S. 444, 447 (1969) (per curiam). As the Court in
<u>Brandenberg</u> explained, while the First Amendment protects the
"the mere abstract teaching of the moral propriety or even moral
necessity for a resort to force and violence," it does not
protect a defendant "preparing a group for violence action and
steeling it to such action." <u>Id.</u>[41]

Likewise, the First Amendment does not protect words or

---

[41]    Counsel for SHAC mistakenly states that "[t]o incite,
the action must follow imminently or so immediately that the
trier of fact can conclude that the word/speech overwhelmed
normal common sense." SHAC Br. at 59. Counsel does not cite any
authority. The standard set forth in <u>Brandenberg</u> addresses
speech that is "directed" and "likely" to incite imminent lawless
action; <u>not</u> speech that actually causes it. That lawless action
followed (as it did in this case) is evidence that the speech was
likely to incite it. Furthermore, there is no requirement that
the listener's normal common sense be "overwhelmed."

conduct that aids and abets a crime.  As the Court of Appeals
made clear in <u>Rice v. Paladin Enterprises, Inc.</u>, "<u>every</u> court
that has addressed the issue . . . has held that the First
Amendment does not necessarily pose a bar to liability for aiding
and abetting a crime, even when such aiding and abetting takes
the form of the spoken or written word."  128 F.3d 233, 244 (4th
Cir. 1997) (emphasis added).

     In this case, as set forth in the Statement of Facts, the
evidence proved beyond a reasonable doubt that the defendants
organized, coordinated, and participated in a campaign of
intimidation and harassment.  The defendants were responsible for
identifying targets, providing the necessary information on each
target, and directing and inciting their co-conspirators.  This
pattern of targeting victims for "direct action," direct action
occurring to the victims, then targeting new victims lasted
several years.  The defendants, therefore, knew that their
targets were subjected to illegal acts.  As a result of acting
with that knowledge, the jury was clearly allowed to infer that
the defendants intended to include the illegal means as part of
their agreement to shut down HLS.

     Indeed, throughout the intercepted telephone calls, outside
of the victims' homes, in the web postings, and in several
speeches, the defendants made it clear that <u>their</u> campaign was
about the illegal direct actions that would befall to targets
unless they severed ties with HLS.  By way of example, Kjonaas

threatened Martha Lobo that "we know where you live" after he and his co-conspirators had just accosted Lobo and her family at their back door. See (Govt. Ex. 4007.), Similarly, Gazzola, after citing several examples of what they had done to prior victims (including the throwing of red paint onto a house and smashing windows), threatened Robert Harper and his family that "the police can't help." See (Govt. Ex. 4003.). Kjonaas and Harper also made it clear during the speeches in Little Rock that their campaign was not about political boycotts or lawful demonstrations. See (Govt. Ex. 4001) (Kjonaas explained that the "recipe for success" in this campaign was formed in throwing rocks onto a target's home until the roof caved in; Harper explained that this campaign was not about appearing reasonable or citing statistics).

Furthermore, the Title III interceptions, the videotapes, and the search materials (including the computers) established that these defendants were the ones responsible for coordinating what was happening to SHAC victims. For example, after they forced Marsh to stop doing business with HLS, Gazzola told a Texas activist that "we have some ideas as to where people should go" next and assured him that they would find a new national target. (Govt. Ex. 4056). SHAC also set up the illegal computer attacks used to crash its target's computers and directed it's supporters on what to do, how to do it, and when to do it.

"Instructing others in a way that is 'directed to inciting or producing imminent lawless action" goes beyond permissible advocacy, and thus, is not protected by the First Amendment. <u>United States v. Schiff</u>, 269 F. Supp. 2d 1262, 1280-81 (D. Nev. 2003) (holding the defendant incited imminent lawless action where he advised purchasers of his materials how to violate the tax laws and purchasers were actually persuaded).

The defendants' argument that Jeffrey Dillbone's testimony shows a lack of "incitement" misses the mark. Dillbone testified that the SHAC website told him who and when to attack, (Tr. 2/10/06 at p. 16), and SHAC sent him e-mails with specific details on how to go about carrying out the attack. (Gov. Ex. 8036.). Such conduct is not protected. <u>See</u> <u>Paladin</u>, 128 F.3d at 248 (emphasizing that there is no protection for those who "intentionally assist and encourage crime and then shamelessly seek refuge in the sanctuary of the First Amendment"). It is of no consequence that Dillbone did not immediately participate in the attack. To the contrary, had he done so, it might have been evidence that Dillbone was acting independently of SHAC. Instead, he acted according to SHAC's specific directions.

Given such evidence, this case is easily distinguishable from the First Amendment cases relied upon by the defendants. In <u>Watts v. United States</u>, a Vietnam war protester told a crowd at a public rally that he was not going to the war and exclaimed, "If they ever make me carry a rifle the first man I want to get in my

sights is [President] L.B.J"; the audience laughed in response. 394 U.S. 705, 706 (1969) (per curiam). The defendants, however, were not convicted for making a single statement at a public rally. Rather, victims were specifically targeted for prolonged periods of time because of their employment with HLS or to a company with business ties to HLS. The defendants' statements also cannot be labeled as conditional hyperbole; the defendants coordinated their efforts to subject their targets to direct action and demanded that they drop HLS. Last, the reaction of the recipients was much different than the crowd in <u>Watts</u>. The victims have not laughed. Instead, witnesses like Robert Harper testified that he was aware that Brian Cass had been beaten with an ax handle by animal rights activities. This information, coupled with being a SHAC target, reasonably led him to stop walking his two-year old son to the local dog walk out of fear that he might be beaten like Cass in front of his child.[42]

Likewise, this case is distinguishable from <u>Brandenburg v. Ohio</u>, 395 U.S. 444 (1969). The defendants were not convicted under an anti-syndicalism statute for comments made during a public rally. Rather, the defendants were convicted because for

---

[42]    Defendant Kjonaas's suggestion that "Cass's assault is simply not part of the pattern of activity" completely misses this point. Kjonaas Br. at 26. It was a part of SHAC's pattern of activity because SHAC used it in its campaign of intimidation, <u>e.g.</u>, (Gov. Ex. 1166) (threatening Marsh employees that they would be treated no differently than Brian Cass) & (Gov. Ex. 2007) (poster of Brian Cass beating), and because victims like Robert Harper were well aware of the Cass beating.

over four years they prepared their group for lawless action and steeled it to such action. Based on the evidence, there was an undeniable causal nexus between the defendants telling SHAC co-conspirators to target an individual or business for lawless action (including harassment, property destruction, computer attacks, and black faxes) and the lawless action that thereafter followed. If it had occurred once or twice over the span of weeks, months or years, the defendants would have an argument that they were engaging in mere abstract advocacy. However, the evidence showed that time and again when the defendants organized a campaign against a target, the lawless action followed. Based upon that evidence, the jury could conclude that the defendants' organized efforts were "directed" and "likely" to incite imminent lawless action. See Teva Pharm. USA, Inc. v. Stop Huntingdon Animal Cruelty USA, et al., 2005 WL 1010454, at *9 (N.J. Super. Ct. Apr. 1, 2005) ("The court would have to turn a blind eye to find that there is no causal connection between the SHAC website and the violence thereafter produced.").

This case is also distinguishable from NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982). In Claiborne, the NAACP and its field secretary organized a boycott on white merchants in Claiborne County, Mississippi. Id. at 898-902. Along with the NAACP, the field secretary for the NAACP was sued for, inter alia, giving two speeches. Id. at 889-90. In the first speech, the defendant told the audience "that blacks who traded

57

with white merchants would be answerable to him" and "'uncle toms' who broke the boycott would 'have their necks broken.'" Id. at 900 n.28. In the second speech, the defendant told the audience: "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." Id. at 902. The Supreme Court found that the "emotionally charged rhetoric" of defendant's speeches did not rise to the level of inciting imminent lawless action. Id. at 928. The Court explained that it was not followed by violence and there was no evidence the defendant authorized, ratified, or directly threatened violence. Id. at 928-29.

Unlike the defendants in this case, the statements in Claiborne did not target specific individuals. The SHAC website, however, identified specific individuals as targets and, in numerous instances, provided their names, home addresses, telephone numbers, spouses, children, or other personal information.

Furthermore, whereas in Claiborne the "emotionally charged rhetoric" was not "followed by acts of violence," Id. at 928, the defendants here knew that their "targets" in the past had been subjected to "direct action," which included acts of violence. Indeed, that was one of the principal purposes of the SHAC website -- to post reports of "direct action" along with warnings that this and more would continue to occur to you if you were a SHAC target. Victims like Sally Dillenback, Robert Harper,

Marion Harlos, Martha Lobo, and Amy Hessler testified that they considered being targeted by SHAC as a serious threat, and feared for their own safety as well as the safety of their family members. The SHAC website, therefore, did not only advocate and direct illegal acts against its targets, it used those illegal acts as part of the campaign of intimidation. It not credible to suggest that such conduct is analogous to the boycotts organized by the NAACP and the two speeches at issue in Clairbone.[43]

This case is instead analogous to Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activities ("ACLA"), 290 F.3d 1058 (9th Cir. 2002) (en banc). In Planned Parenthood, the Court of Appeals addressed whether ACLA's conduct toward physicians and two health clinics that provided medical services to women, including abortions, was protected by the First Amendment. Id. at 1062. ACLA presented a poster during a public press conference at the March for Life event in Washington, D.C., that had the captions "GUILTY . . . OF CRIMES AGAINST HUMANITY" and "THE DEADLY DOZEN" followed by the names

_____

[43] Defendant SHAC characterizes this conduct as "a political movement" and states that: "No reasonable reader would understand that this political campaign was 'physical disruption'" SHAC Br. at 39. This argument is so at odds with the facts elicited at trial as to make it's being put forth preposterous. Moreover, to equate, as defendant SHAC does, the destructive, and vicious conduct in this case which was meant to strike terror in the victims with "tertiary boycotting" (Id.), is to both demean the harm done to the victims in this case, as well as the well-intentioned individuals and groups who have effected peaceful change through legitimate boycotting.

and home addresses of certain physicians who performed abortions
(hereinafter the "DEADLY DOZEN" poster). Id. at 1064-65. The
poster also offered "a '$5000 REWARD' 'for information leading to
arrest, conviction and revocation of license to practice
medicine.'" Id. at 1065. This poster and another one with
similar information (hereinafter the "GUILTY" poster) were
published in a newsletter and presented at other pro-life events.
Id. In addition, ACLA also established the Nuremberg Files
website that listed "[a]pproximately 200 people . . . under the
label "ABORTIONISTS: the shooters," as well as "judges,
politicians, law enforcement, spouses, and abortion rights
supporters." Id. Under the "ABORTIONISTS" section of the
website, physicians names appeared in either black font (if they
were currently working), a grey font (if they had been wounded),
or were struck through if the physician had been murdered. Id.
The names of three physicians murdered by pro-life activists were
struck through. Id.

Following a trial, the jury held ACLA liable under the
Freedom of Access to Clinics Entrances Act for threatening
reproductive health services providers. On appeal, the Court
rejected the ACLA's First Amendment arguments.

ACLA, like the defendants here, argued that the action
against it was barred by the First Amendment because it "was
based on political speech that constituted neither an incitement
to imminent lawless action nor a true threat." Id. at 1070;

60

compare _id._ _with_ Gazzola Br. at 11 ("Gazzola and her co-
defendants were engaging in . . . pure political speech").  In
rejecting ACLA's arguments, however, the Court made it clear that
"context is critical in a true threats case and history can give
meaning to the medium." _Id._ 1078-79.  The Court concluded that,
"[b]ecause of context," it could not find that the posters
described above were "just a political statement." _Id._ at 1079.

The Court reasoned that even if the first couple of posters
of this type were political messages, ACLA knew that after the
first couple of posters were released, three physicians
identified in those posters had been murdered because they
performed abortions.  _Id._ at 1079-80; _see also_ 1063-64
(discussing the murders and the fact that they were preceded by
"WANTED" posters identifying the physicians).  The Court further
explained that knowing the murders followed the release of their
posters, and knowing that it generated fear among the
reproductive health services community, ACLA released the "DIRTY
DOZEN" and "GUILTY" posters to intimidate those physicians.  _Id._
at 1079.  It was this pattern that the Court found highly
probative of the threatening nature of the ACLA's conduct:

> The true threats analysis turns on the poster pattern.
> Neither the Crist poster nor the Deadly Dozen poster
> contains any language that is overtly threatening. Both
> differ from prior posters in that the prior posters were
> captioned "WANTED" while these are captioned "GUILTY." The
> text also differs somewhat, but differences in caption or
> words are immaterial because the language itself is not what
> is threatening. Rather, it is use of the "wanted"-type
> format in the context of the poster pattern – poster

61

followed by murder – that constitutes the threat. Because of
the pattern, a "wanted"-type poster naming a specific doctor
who provides abortions was perceived by physicians, who are
providers of reproductive health services, as a serious
threat of death or bodily harm. After a "WANTED" poster on
Dr. David Gunn appeared, he was shot and killed. After a
"WANTED" poster on Dr. George Patterson appeared, he was
shot and killed. After a "WANTED" poster on Dr. John Britton
appeared, he was shot and killed. None of these "WANTED"
posters contained threatening language, either. Neither did
they identify who would pull the trigger. But knowing this
pattern, knowing that unlawful action had followed "WANTED"
posters on Gunn, Patterson and Britton, and knowing that
"wanted"-type posters were intimidating and caused fear of
serious harm to those named on them, [defendant] published a
"GUILTY" poster in essentially the same format on Dr. Crist
and a Deadly Dozen "GUILTY" poster in similar format naming
Dr. Hern, Dr. Elizabeth Newhall and Dr. James Newhall
because they perform abortions. Physicians could well
believe that [defendant] would make good on the threat. One
of the other doctors on the Deadly Dozen poster had in fact
been shot before the poster was published. This is not
political hyperbole. Nor is it merely "vituperative,
abusive, and inexact."  In the context of the poster
pattern, the posters were precise in their meaning to those
in the relevant community of reproductive health service
providers. They were a true threat.

Id. at 1085 (citations omitted).  In short, the Court held that

although the posters themselves did not contain an overt threat,

they constituted threats when considered in the proper context.

Id. at 1079, 1085.[44]

---

[44]     The defendants incorrectly assume that the result in
Planned Parenthood was driven by the fact that it involved
murder.  Clearly, it was the threatening nature of the postings,
and not the magnitude of the harm that is pertinent.  Here, the
threatening nature of the postings were made in the context of a
SHAC campaign that included the Brian Cass beating, targets being
accosted outside their homes (like Martha Lobo and Elaine Perna),
windows of homes being smashed on multiple occasions (like
Henning Jonassen's home while he was inside), and later a pipe
bomb explosion.  Where would the defendants draw the line -- a
broken arm?  Clearly, it is the threat of harm, and not the type
of harm, that may be proscribed.

Moreover, although the posters were publicly distributed, the Court found that it did not diminish its threatening nature. Id. at 1086. As the Court explained, the posters specifically identified the doctors and ACLA knew that each doctor would be worried.  Id.  Indeed, the Court noted that the doctors named in the posters were "seriously worried."  Id.

With regard to the Nuremberg Files website, the Court found that it, too, constituted threatening speech unprotected by the First Amendment.  Id. at 1080, 1085.  The Court explained that the website listed the names of physicians who provided abortion services, and had the name in a grey font if that physician was wounded or struck through if he or she was killed.  Id.

As in Planned Parenthood, the First Amendment analysis in this case turns on the pattern of website postings and other communications and the illegal acts that followed discussed supra.  Indeed, the defendants' pattern of identifying targets through the Internet for the purpose of inciting direct action heightens the threatening nature of the defendants' conduct.  See Scott Hammack, The Internet Loophole: Why Threatening Speech On-Line Requires A Modification Of The Court's Approach To True Threats And Incitement, 36 Colum. J.L. & Soc. Probs. 65, 67 (2002).  As one commentator has explained:

> A threat in certain contexts may not cause its recipient to be fearful if its occurrence seems very unlikely.  However, that same threat masquerading as incitement will generate reasonable fear if it is particularly likely to provoke a third party to carry out the threatened act.  The Internet

facilitates these threat/incitement hybrids by making them more likely to cause the act they seek to bring about. In particular, the Internet allows a potentially unlimited and transient audience to communicate across the world with great speed and anonymity, and to do so at a fraction of the costs of other modes of communication.

Id. Here, it was not simply "likely" that the threats masquerading as incitement would provoke others to carry out the threat, it was a sure thing.

Defendant SHAC, nonetheless, argues that this case is distinguishable from Planned Parenthood because (1) the "decision limited itself to situations where the speaker indicates he will take an active role in the inflicting of harm," (2) the defendants' words in this case "were not directed to the victims, but placed on a web page," and (3) "the victims voluntarily went to the web site." SHAC Br. at 56. First, there is nothing in Planned Parenthood to suggest the speaker must indicate he or she would take an active role. To the contrary, the Court explicitly rejected that argument, relying upon a case in which the speaker did not indicate "he would be the one to implement the threat." 290 F.3d at 1077 n.13. Second, that the threats were made on a public website is not material; again, the Court explicitly rejected that argument. See 290 F.3d at 1076 ("Neither do we agree that threatening speech in public is entitled to heightened constitutional protection . . . . threats are unprotected by the First Amendment 'however communicated'"). Third, the suggestion that the statements are not threatening because the victims

"voluntarily" visited the website is absurd; none of the victims "volunteered" to become SHAC targets.

In sum, given the pattern in this case and the defendants' knowledge of it, the jury was clearly within its right to reject the defendants' claim that they were simply providing public information or advocating a point of view.

### B.    Defendants Are Also Liable For Aiding and Abetting Interstate Stalking.

Defendant SHAC, Kjonaas, Gazzola, and Conroy are also liable for aiding and abetting interstate stalking. The fact that the did so through words does not entitle them to the protections of the First Amendment.

In Rice v. Paladin Enterprises, Inc., the defendants published the "Hit Man: A Technical Manual For Independent Contractors" – a 130-page book "of detailed factual instructions on how to murder and become a professional killer." 128 F.3d at 239. The relatives and representatives of a family murdered by James Perry in exchange for a fee sued the defendant because Perry followed the manual in carrying out the killing. Id. at 240-41. The Fourth Circuit held "that the First Amendment did not pose a bar to a finding that [defendant] is civilly liable as an aider and abetter of Perry's triple contract murder." Id. at 242. Although it was a civil case, the Court explicitly noted it was relying on principles of criminal law. See id. at 247-48.

The Court in Rice explained that "while even speech

advocating lawlessness has long enjoyed protections under the
First Amendment, it is equally well established that speech
which, in its effect, is tantamount to legitimately proscribable
nonexpressive conduct may itself be legitimately proscribed,
punished, or regulated incidentally to the constitutional
enforcement of generally applicable statutes." Id. at 243.
Hence, while recognizing that the First Amendment may preclude
liability "on the basis of mere foreseeability or knowledge that
the information could be misused for an impermissible purpose,"
the Court made it clear the First Amendment does "not relieve
from liability those who would, for profit or other motive,
intentionally assist and encourage crime and then shamelessly
seek refuge in the sanctuary of the First Amendment." Id. at
248. Put differently, the Court held that the First Amendment
was not a bar to liability where it can be established that the
speech or expressive conduct was "undertaken with specific, if
not criminal, intent." Id. The Court recognized that whether or
not the speaker acts with the requisite intent is an issue for
the jury to decide based upon the evidence. Id. at 248, 252.[45]

Furthermore, for purposes of aiding and abetting liability,
the fact that the criminal conduct being assisted does not occur
imminently does not insulate it from criminal liability.

_____

[45] In Rice, the defendant stipulated to a specific intent.
Id. at 248. Here, the jury found the intent when it returned the
verdicts of guilty.

See <u>Rice</u>, 128 F.3d at 246 (explaining that <u>Brandenberg</u>'s

imminency test is not the relevant inquiry because it is the

assistance, not the advocacy, that is being criminalized).  As

the Court explained in <u>United States v. Barnett</u>,

> The fact that the aider and abettor's counsel and
> encouragement is not acted upon for long periods of time
> does not break the actual connection between the commission
> of the crime and the advice to commit it.  It is only
> necessary that the [defendant] counseled and advised the
> commission of the crime, and that the counsel and advice
> influenced the perpetration of the crime.  We know of no
> rule of law which fixes a time limit within which the crime
> must be perpetrated.

667 F.2d 835, 841 (9th Cir. 1982).

Here, the defendants successfully assisted others by

detailing to them how to engage in the crime – interstate

stalking.  The evidence at trial established that SHAC USA Inc.,

Kjonaas, Gazzola, and Conroy detailed to sympathizers who to

target, what to do, and then, in further assistance of the actual

stalking, reported on the incidents as part of a design to

further instill fear in those already targeted, as well as warn

others that they, too, could be subjected to it.  Thus, targets

of SHAC who visited the website would see the type of acts being

taken against other targets and, thus, fear for their own safety.

<u>See</u> <u>generally</u> <u>Comment</u>, "<u>Cyberstalking:  Can Communication Via The</u>

<u>Internet Constitute A Credible Threat, And Should An Internet</u>

<u>Service Provider Be Liable If It Does?</u>," 17 Santa Clara Computer

& High Tech. L. J. 115 (Dec. 2000) (available on Westlaw at 17

SCCHITLJ 15) (discussing the concept of cyberstalking – i.e., the

"use of the Internet, e-mail or other electronic communications devices to stalk another person through threatening behavior"). Furthermore, given the knowledge of what had happened, and what continued to happen to SHAC targets, the jury reasonably found that these defendants acted with the specific intent to assist the acts of intimidation, stalking, and violence – i.e., they were not engaging in pure abstract advocacy.[46]

**C.    The Jury Applied The Appropriate Standard For "True Threats."**

SHAC argues that a new trial must be granted because Government witnesses testified about their subjective reaction to the SHAC website postings.  SHAC Br. at 52-53.  This Court, however, properly instructed the jury that a statement or conduct is a true threat if the following two conditions are met: (1) the speaker or actor intended to communicate a serious expression of an intent to commit bodily harm to another person; and (2) a reasonable person would foresee that the statement would be interpreted by those to whom it is communicated as a serious expression on an intent to commit bodily harm.  See Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activities, 290 F.3d 1058, 1080 (9th Cir. 2002)

---

[46]    Defendant Gazzola "denies any knowledge or intent that the information they posted on the websites would be used for any criminal purpose."  Gazzola Br. at 19.  That is, however, an issue for the jury, and the facts in this case sufficiently support the jury's finding that the defendants acted with the requisite knowledge and intent.

(en banc); accord Kosma, 951 F.2d at 557.  In assessing whether a reasonable person would foresee the statement as a threat or intimidation, it is entirely appropriate for the jury to consider whether the victim actually foresaw the statement as a threat. See United States v. Fulmer, 108 F.3d at 1499-1500.  Watts, 394 U.S. at 708 (considering "the reaction of the listeners" in deciding whether statement was threatening); Planned Parenthood, 290 F.3d at 1075 (explaining that the statement should be considered in light of the entire factual context, including "the reaction of the listeners").  Such evidence does not turn the test into a subjective one because ultimately it is the jury that decided the facts using a "reasonable person" standard.

It is interesting that SHAC counsel has, nevertheless, taken it upon himself to judge that "[t]he messages 'we know where you live' -- 'we will never lose' etc. are not 'expressions of a serious threat to harm.'" SHAC Br. at 53.  Unfortunately for the defendants, they do not decide what is threatening.  The jury in this case decided that those statements were threatening when they appeared on a website along with postings like the Top 20 Terror Tactics, (Gov. Ex. 1004), and a list of accomplishments that included "smashed windows and overturned cars" of HLS workers, "HLS worker's home doused in red paint," and "Bank of New York President's yacht sunk," (Gov. Ex. 1013.).[47]

_____

[47]    SHAC's "extensive list of accomplishments to be proud of" included numerous illegal acts that occurred in the United

The fact that members of the New Jersey Animal Rights Alliance, defendant Harper, Pamelyn Ferdin, and Jeffrey Dillbone also testified in a self-serving manner that they did not perceive the statements as threatening, see SHAC Br. at 54-55, is not a basis for rejecting the jury's verdict. First, they all had a motive not to perceive the postings as threatening. Second, the jury clearly rejected their testimony as to the threatening nature of the postings. Accordingly, their testimony only illustrates that the jury heard both sides of the argument and rejected the defense's.

D. **Defendant SHAC's Arguments That The Convictions Constitute A Prior Restraint And Are Contest-Based Lack Merit.**

SHAC also claims that the defendants' conviction under § 43 constitutes a prior restraint on speech. SHAC Br. at 42. It is befuddling how a conviction on March 2, 2006, for conduct that occurred between March 2001 and February 2004, could constitute a prior restraint on speech. SHAC's argument on this point is frivolous.

Likewise, SHAC's argument that § 43 is a content-based restriction on speech lacks any merit. Section 43 applies to

---

Kingdom against SHAC targets. SHAC in the United States used those "accomplishments" in the United Kingdom to encourage their supports and incite them to action in the United States. See Govt. Ex. 1013 (exclaiming that this is a list that "can be outdone and surpassed"; "Get active. Play your part. Make history."). Such evidence undermines the defendants' attempts to create an artificial line between the activities of SHAC-UK and SHAC-US.

criminal conduct directed at an animal enterprise without any regard to the motivation of the actor.  It is no different than statutes that proscribe violence against abortion clinics; such statutes may fall disproportionately on anti-abortion protesters, but that fact does not make it content-based.  <u>E.g.</u>, <u>United States v. Dinwiddie</u>, 76 F.3d 913, 923 (8th Cir. 1996).

For all of these reasons, this Court should reject defendants' efforts to hide behind the First Amendment.

### III. THE COURT PROPERLY CHARGED THE JURY ON THE ELEMENTS OF COUNT ONE – 18 U.S.C. § 43.

Title 18, United States Code, Section 43 reads in pertinent part:

Whoever –

(1) travels in interstate or foreign commerce or uses or causes to be used the mail or any facility in interstate commerce for the purpose of causing physical disruption to the functioning of an animal enterprise; and

(2) intentionally damages or causes the loss of any property (including animals or records) used by the animal enterprise, or conspires to do so;

shall be punished as provided for in subsection (b). Subsection (b) then states that any person who in the course of violating subsection (1) causes economic damage of more than $10,000 shall be imprisoned for not more than 3 years or (2) where the economic damage does not exceed $10,000 shall be imprisoned for not more than 6 months. Thus, in order for the crime to be a felony, the economic damage must exceed $10,000.

Defendant Conroy argues that there must be two types of damage; that first there must be property damage in some amount before the statute can be violated. Once there is property damage of any amount, you then look to economic damage. Not surprisingly, defendant cites no support for this tortured reading of the statute.

Section 43 was amended in 2002. Prior to the amendment, a violation of the statute was a misdemeanor. The amendment made

72

it a felony if the economic damages exceeded $10,000. That is the only change in the statute that was affected by the amendment. See Cong. Rec. Vol. 148 at p. 464 (House Conf. Rpt. No 107-481, May 21, 2002). Prior to the amendment, subsection (1) read exactly as it does now. Subsection (2), however, read differently as follows:

> (2) intentionally causes physical disruption to the functioning of an animal enterprise by intentionally stealing, damaging or causing the loss of any property (including animals or records) used by the animal enterprise, and thereby causes economic damage exceeding $10,000 to that enterprise, or conspires to do so;
>
> shall be fined under this title or imprisoned not than more than one year, or both.

In amending the statute in 2002, Congress took the language of economic damage and moved it to the sentencing section (subsection (b)), thereby categorizing the loss as either (1) loss exceeding $10,000 which was made a felony, or (2) loss not exceeding $10,000 which remained a misdemeanor. Congress did not change the character of the loss, nor did the amendment add a second type of loss that is a threshold to considering economic loss. Defendant posits that "the only explanation for Congress using two different terms in the same statute is that the terms mean different things." Conroy Br. at 3. However, the manner of the amendment illustrates the error of defendant's argument and shows that indeed Congress meant what it said.

Under any reading of the statute, however, this Court

properly charged the jury.  Defendant argues that the jury should

have been instructed to decide first, whether the Government had

proven that the defendants conspired to cause the loss of

property or intentionally damage HLS and then to decide whether

there was economic damage.  Conroy Br. at 5.[48]  A two-tier

approach to damages is not envisioned by the statute and a plain

reading of 18 U.S.C. § 43 does not warrant such a result.  This

Court ruled against defendant's argument at the charge conference

in this case and should do so again.

In interpreting a statute, a Court must begin by looking at

the plain and unambiguous meaning of the language in the statute.

E.g., Smirko v. Ashcroft, 387 F.3d 279, 288 (3d Cir. 2004).  In

applying this canon of statutory construction, however, the Court

does not look at the language in isolation of the rest of the

statute.  See Gozlon-Peretz v. United States, 498 U.S. 395, 407

(1991).  As the Court explained in Gozlon-Peretz, "[i]n

determining the meaning of the statute, [the Court] must look not

only to the particular statutory language, but to the design of

---

[48]  Defendant states:  "the most that can be said of the
proofs is that they established some members of the animal rights
movement were engaged in encouraging a third party boycott which
was intended to affect the business of Huntingdon Life Sciences;
in addition, the website encouraged others to contact the
employees of HLS by telephone and e-mail."  Conroy Br. at 4-5.
That rather understated explanation of the SHAC campaign bears no
resemblance to the facts elicited at trial.  SHAC's campaign of
terror besmirches all of the legitimate secondary boycott
activity which has been legally engaged in over the years by
those seeking justice.

the statute as a whole and to its object and policy." Id. at 407 (internal quotation marks and citation omitted).

Reading a statute's plain language in the context of its overall design and objective avoids an absurd interpretation based upon a literal reading of the language. To that end, "[i]t is the obligation of the court to construe a statute to avoid absurd results, if alternative interpretations are available and consistent with the legislative purpose." United States v. Scheider, 14 F.3d 876, 880 (3d Cir. 1994); accord United States v. Combs, 379 F.3d 564 (9th Cir. 2004) (a court is "not required to interpret a statute in a formalistic manner when such an interpretation would produce a result contrary to the statute's purpose or lead to unreasonable results").

Defendant's untenable reading of § 43(a) would indeed contradict the legislature's intent and the statutory purpose of § 43(a). While there is not extensive legislative history for 18 U.S.C. § 43, the history that does exist refutes defendants' theory. In the House Report on the bill that became § 43 after some amendments, the Judiciary Committee reporting on the bill explained that the bill "would create a federal offense for disrupting an enterprise that uses animals for food or fiber production, agriculture, research or testing." H.R. Rep. 102-498, at 2 (1992), reprinted in 1992 U.S.C.C.A.N. 816, 816 (emphasis added).

This Court has properly construed 18 U.S.C. § 43 and the

instructions provided to the jury relative to the statute were
fair, appropriate and did not confuse the jury. Defendant's
motion should be denied.

As a secondary argument, Conroy claims that "there was no
proof that the defendants had the purpose to cause physical
disruption to Huntingdon Life Sciences not any proof that they
conspired to damage or cause the loss of any property used by
Huntingdon Life Sciences." Conroy Br. at 8. This argument
totally ignores the very purpose of the SHAC campaign he helped
to run – to shut down HLS[49]. If the conspiracy was successful,
the company would have ceased operations thereby wholly
disrupting its business.

This argument also disregards the evidence in this case of
actual damages caused to HLS. For instance, the SHAC website
touted electronic civil disobedience against all sorts of
companies including HLS. Indeed, the SHAC website instructed

---

[49] So, too, defendant Kjonaas argues that HLS suffered no
physical disruption. Kjonaas Br. at 39. First, the defendants
were charged with conspiracy to disrupt the business; there is no
requirement that the conspiracy succeed. The purpose of SHAC was
to shut down HLS which, if successful, would have disrupted its
business in its entirety. Second, HLS' business was disrupted.
It's computer systems were crashed, it's employees dealt with
back faxes and telephone blitzes to the exclusion of their work
and according to the testimony of both Brian Cass (Tr. 2/7/06 at
p. 145), and Richard Michealson (Tr. 2/21/06 at 186-87), the SHAC
campaign caused a major disruption to its business. Third, that
the defendant's argument relies for its support not on judicial
precedent, but on proposed legislation to show the meaning of
existing legislation, Kjonaas Br. at 42, illustrates the
desperate nature of his argument.

people where to go to take part in the electronic civil disobedience. (Govt. Ex. 1034). In one instance of this flooding of the computers of HLS to shut down its website, the defendants and their sympathizers were successful. The damage that ensued was testified to by Donald Wagner, the head of information technology at HLS. Moreover, Richard Michaelson, the Chief Financial Officer at HLS, testified that this single act alone cost $15,000 in damage to the computer system and approximately $400,000 in lost business due to the unavailability of the HLS website. Mr. Michaelson testified that the total loss to HLS due to the SHAC campaign was more than one million dollars. Defendant's wholesale disregard for the damages caused by the actions of the SHAC campaign against HLS illustrates the cavalier attitude taken towards the victim of their illegal activities[50]. The jury saw the intent of the defendants and the damage caused to HLS as was illustrated by its verdict. The verdict is amply supported by the evidence and this Court should deny defendant's request to overturn the will of the jury.

Defendant Conroy, abandoning the law, cites to the

---

[50]   Defendant Kjonaas argues that there were no damages arguing at one point that "the statute provides a non-exclusive list of examples [of damages] which does not in and of itself exclude lost profits, but which does militate against it...." This argument wholly disregards the wording of the statute which specifically includes loss of profits as an element of loss. 18 U.S.C. § 43(d)(3). Not surprisingly, defendant Kjonaas cites to no legal authority – and to no facts elicited at trial – for his argument (Kjonaas Br. at pp.43-46) that there was no damage or loss of property.

Department of Justice's lobbying efforts to create stronger laws in order to argue that no laws relate to him. Conroy Br. at 11. However, various individuals' testimony before congressional bodies in order to address perceived deficiencies in the law lacks the force of statutes and interpretive decisions of courts – the laws upon which criminal jurisprudence is based.

Defendant's true argument is that the Government should be estopped from bringing the instant case because a government official has taken a view of the statute that could be argued to be at odds with the Superseding Indictment in this case.[51] Defendant's argument is simply incorrect. Even when Congress — which is charged with enacting the legislation – makes policy statements about existing legislation, those subsequent statements do not carry the force of law. See Pierce v. Underwood, 487 552, 566 (1981) ("[I]t is the function of the courts and not the Legislature, much less a Committee of one House of the Legislature, to say what an enacted statute means.").

In the instant case, any statements by Department of Justice employees have even less force of law. The statements were not made in support of legislation passed by Congress. Rather, they were statements made at Congressional hearings several years

---

[51]    Defendant has not and, indeed, cannot now argue a reliance upon public authority defense.  See United States v. Cross, 113 F. Supp.2d 1253, 1264-65 (S.D. Ind. 2000).

after the statute was enacted.  Thus, they have no legal efficacy whatsoever.  Accordingly, they lend no credible support to defendant's argument and this Court should deny his motions for a new trial.

**IV. EVIDENCE OF THE ASSAULT OF BRIAN CASS WAS PROPERLY ADMITTED.**

At trial, Brian Cass, the Managing Director of HLS, testified as to the workings of the company and the genesis of the SHAC movement against the company[52]. Cass also testified that he was assaulted outside his home by three men. Defendant Kjonaas argues that the evidence of the assault by "unknown animal rights activists" was improper. In fact the assailants – or at least one of them was known. Mr. Cass testified that David Blinkenslopp was found guilty of assault. Kjonaas admitted to knowing the assailant, as did Harper. Moreover, on the computers at 101 Home Street were files marked Blikenslopp. Thus, not only was that assailant not "unknown," he was known to the defendants.[53]

_____

[52] Defendant SHAC, USA similarly argues that Cass' testimony was improper because the Government did not "link up" the testimony. (SHAC Br. at p. 15). As is set forth herein, this argument lacks merit. For instance, SHAC argues that "no direct evidence was ever adduced that the corporation or any web page related to the Corporation sought to publicize the Cass assault." (Id.) This argument wholly discounts Government Exhibit 1071, a web posting which boasted the attack on Mr. Cass and Government Exhibit 1166 which stated to targets that SHAC would treat them no differently then Brian Cass was treated. This type of misrepresentation of the record is symptomatic of SHAC USA's entire submission.

[53] Defendant refers to the admission of the Cass assault "and the constant reference to it throughout the trial." Kjonaas Br. at 17. Not surprisingly, there are no references to the record for that statement. Indeed, the only references to the assault on Mr. Cass were by the witness himself when describing it; and other witnesses who testified that they were aware of the beating and how it added to their level of fear when threatened by the SHAC website. Additional references to the assault of Mr. Cass and allusions to the beating were made by defendants

In addition, the SHAC website referred to the assault on Mr. Cass at one pont stating:

> Actions such as this [vandalism of a residence and smashing its windows] will continue until Marsh until (sis) they cut all ties with Huntingdon Life Sciences. We will treat you no differently than we would treat Brian Cass, Andrew Gay, or any other HLS scum.

> Marsh employees we know were you work, we know where you et, we know where you sleep.  His HLS really worth it?

(Gov. Ex. 1166).  In Government Exhibit 1071, defendant's boasted:

> Quite literally Brian Cass was attacked outside of his home by masked assailants.  Using axe handles and CS gas, Mr. Cass was beaten simply for his work with HLS.

Moreover, the photograph of Mr. Cass after the beating which, by even the defendant's account "was not particularly gruesome," Kjonaas Br. at 30, was found in two places on the computers at 101 Home Street, the residence of Kjonaas, Gazzola and Conroy.  In addition, a large poster was recovered from 101 Home Street that was a blow-up of the photograph with the blood hand painted in red.  The defendants were aware of the assailant and used the photograph themselves when it suited their needs.  Thus, these events were inextricably intertwined with the charges in the Superseding Indictment and properly admitted.

In <u>United States v. Gibbs</u>, 190 F.3d 188 (3d Cir. 1999), the Court of Appeals for the Third Circuit, in pointing out the

---

when referring to it on the SHAC website in order to instill fear in the victims.

difference between evidence of prior bad acts that must meet the

standards of Rule 404(b) and evidence of bad acts that are

inextricably intertwined with the charged conduct, stated:

> Rule 404(b), which proscribes the admission of evidence
> of other crimes when offered to prove the bad
> character, does not apply to evidence of uncharged
> offenses committed by a defendant when those acts are
> intrinsic to the proof of the charged offense.  As a
> prominent commentator has explained:

>> In cases where the incident offered is a part
>> of the conspiracy alleged in the indictment,
>> the evidence is admissible under Rule 404(b)
>> because it is not an "other" crime.  The
>> evidence is offered as direct evidence of the
>> fact in issue, but as circumstantial evidence
>> requiring an inference as to the character of
>> the accused.  Such proof may be extremely
>> prejudicial to the defendant but the court
>> would have no discretion to exclude it
>> because it is proof of the ultimate issue in
>> the case.

> 22 Charles A. Wright & Kenneth W. Graham, Jr., <u>Federal
> Practice and Procedure</u> § 5239, at 450-51.

<u>Gibbs</u>, 190 F.3d at 217-18.

In <u>United States v. Chin</u>, 83 F.3d 83 (4th Cir. 1996), the

defendant was charged with a number of serious narcotics

trafficking crimes.  In its case in chief, the Government sought

to admit uncharged evidence, by way of videotape and audiotape,

that the defendant talked about killing individuals in the course

of his narcotics trade.  The district court permitted the

evidence in and after conviction, the defendant appealed the

trial court's decision.  The Court of Appeals stated:

> We find that there was no plain error as to Rule 404(b)
> because Rule 404(b)'s exclusion of bad acts did not

pertain to the contested testimony. The majority of circuits have held that Rule 404(b) only applies to limits on the admission of other acts extrinsic to the one charged. Under that rule, acts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence.

The Court went on to state:

Other criminal acts are intrinsic when they are "inextricably intertwined or both bad acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." [United States v.] Lambert, 995 F.2d [1006] at 1007 [(10th Cir.), cert. denied, 114 S.CT. 333 (1993)]. The testimony abut contract murders fits into the intrinsic category of evidence.

Id. at 88. Furthermore, while noting that the evidence was "extremely prejudicial," the Court held that it was properly admitted. Id. Accordingly, when other bad acts are "inextricably intertwined" with the charged conduct, it is properly admissible irrespective of Rule 404(b).

Given these standards, the evidence that the Government adduced at trial was not evidence of other bad acts under Rule 404(b), but rather evidence that was inextricably intertwined with the charged conduct and was intrinsic to the proof of the charged offense. The evidence was introduced because it explained the charged conduct and permitted the Government to put the charged conduct in context in order to permit it to offer a comprehensible story relating to the charged criminal activity. See United States v. Williams, 989 F.2d 1061, 1070 (9th Cir. 1993).

In United States v. Torres, 685 F.2d 921, 924 (5th Cir.

83

1982, the Court upheld the admission of acts that occurred prior

to the charged acts, but which were related, and explained:

> In this case, although the "other acts" occurred at
> different times, they clearly were part of a single
> criminal episode.  The government demonstrated that the
> sample transactions were necessary preliminaries to the
> larger sale that led to the defendants' arrests.  It
> was during those transactions that the plans for the
> purchase of the larger quantity of cocaine were laid.

So too here, the evidence that the Government presented was all

part of the criminal episode that comprised the conspiracy and

was inextricably intertwined with the charged conduct.  It was

not extrinsic to the crime and therefore was not 404(b) evidence.

In any event, Rule 404(b) only precludes evidence of other

crimes, wrongs or other acts if offered for the purpose of

inferring propensity or disposition to commit a crime.  Fed. R.

Evid. 404(b); <u>Government of the Virgin Islands v. Toto</u>, 529 F.2d

278, 283 (3d Cir. 1976).  If the evidence is offered <u>for any

other proper purpose</u> it is admissible subject only to the

ordinary limitations under Rules 402 and 403.  <u>United States v.

Cruz</u>, 326 F.3d 392, 395 (3d Cir. 2003) (recognizing that the

Third Circuit "favor[s] the admission of evidence of other

crimes, wrongs, or acts if such evidence is relevant for any

purpose other than to show a mere propensity or disposition on

the part of the defendant to commit a crime").  The Supreme Court

has listed four guidelines for determining admissibility under

Rule 404(b).  First, the other acts evidence must have a proper

purpose.  Second, the evidence offered must be relevant.  Third,

the probative value of the evidence must outweigh its potential for unfair prejudice.  Fourth, the court must charge the jury to consider the other crimes or acts evidence only for the listed purpose for which it is admitted.  <u>Huddleston v. United States</u>, 485 U.S. 681, 687 (1988).

Defendant Kjonaas argues that under a 404(b) analysis the Government's evidence fails the balancing test.  Defendant is incorrect in this statement.  Indeed, defendant writes:  18 U.S.C. § 2261(A)(2) (sic) requires the Government to prove that the defendant knowingly used the internet to engage in a course of conduct which intentionally placed various victims in reasonable fear of death or serious bodily injury."  (Kjonaas Brf. at p. 22).  Defendant then launches into a "true threats analysis."  However, defendant Kjonaas' analysis wholly disregards the fact that under 18 U.S.C. § 2261A(2) not only must the defendant intend to place a person in fear of death or serious bodily injury, but the person must actually be placed in fear of death or serious bodily injury.  Thus, this is not a threat case where the Government need only prove that a defendant "should have reasonably forseen that the statement uttered would be taken as a threat by those to whom it is made."  <u>United States v. Fulmer</u>, 108 F.3d 1486, 1491 (1st Cir. 1997).  This was a case where the defendant intended to put a third party in fear <u>and</u> the person was actually placed in reasonable fear.  Thus, "the recipient's knowledge of the Cass beating was relevant in proving

that the defendants' conduct constituted a" violation of the statute. Kjonaas Br. at 22. The jury was charged in this manner and found not only the intent on the part of the defendants to place the person in reasonable fear but that the victims were actually placed in reasonable fear. That jury finding should not be disturbed.

However, even under defendant's argument, the evidence of the Cass beating would be admissible. Even assuming that all that had to be proven at trial was that the defendants should have reasonably foreseen that the statements uttered would be taken as a threat by those to whom they were made, the Cass beating was probative. For instance, when the SHAC website published the statement -- we will treat them no different than Brian Cass -- the fact that they knew about the Cass beating made it more probative than not that they could have reasonably foreseen that the statements would be taken as a threat. If they themselves were unaware of the Cass assault when they made that statement, perhaps they could have argued that they could not foresee the statements as harmful. Moreover, without an understanding of the context of the statement "we will treat you no different than we treated Brian Cass" the jury could not have been able to determine whether it was a threat. Thus, no matter how you analyze it, the information relative to the Cass assault was probative and necessary for the jury to hear. Accordingly, the defendants motion in this regard should be dismissed.

## V. EVIDENCE OF THE VARIOUS VICTIMS WAS PROPERLY ADMITTED.

Defendant Kjonaas objects to the admission of testimony by victims Sally Dillenback, Dard Hunter, Marion Harlos and Jeffrey Gillmore. All of these individuals suffered harm at the hands of the defendants' campaign to shut down HLS although none of these victims were even remotely related to work done at HLS. In fact, all of these witnesses worked for Marsh and were targeted because Marsh provided insurance brokerage services to HLS. Not only were these individuals victimized but their families were victimized as well. Indeed, in many instances family members were subjected to the same illegal conduct as the Marsh employees themselves. In the case of Ms. Dillenback, her young son was traumatized and her husband was so fearful for the life of his family members that he purchased a weapon. Mr. Hunter was provided with 24-hour armed security at his home as were many other Marsh employees such as Ms. Dillenback, and Marion Harlos and her family.

Jeffrey Gillmore testified about the smoke bombing at the Marsh Office in Seattle. He was not asked, but testified that during the smokey evacuation of the high-rise building where Marsh had its offices, he was concerned because Marsh had lost so many people in the World Trade Center. In fact, Marsh had lost over 200 people in the World Trade Center – a well publicized fact. Indeed, two Marsh buildings were attacked that day in Seattle minutes apart. The timing of the events on a company

that had suffered so much from those attacks could not have been coincidental. Moreover, after the attacks, it was the SHAC website that applauded the events and the defendants who made appearances on Seattle television and radio to tout the attacks. Indeed, Kjonaas and Conroy (using the alias Frank Hampton) were interviewed on these events and videotapes of the Seattle television news reports were found at 101 Home Street. Gazzola appeared on Seattle radio and granted an interview – using an alias – and took calls from callers. Kjonaas objects to the playing of the tape recording of this radio show as well.

Evidence is relevant if it tends to make the existence of a fact that is a consequence to the determination of the case more probable than not. Fed. R. Evid. 401. In this case, as is set forth above, for the interstate stalking counts the Government had to prove that the defendants intended to place a person in fear of death or serious bodily injury to the person or a member of that person's immediate family and the person must actually be placed in fear of death or serious bodily injury to himself or a member of his or her immediate family. 18 U.S.C. § 2261A(2). Thus, the mental state of the victims is directly in issue in this case. Here, the evidence elicited shed light on the reasonableness of the victims' fear.[54] Accordingly it was

---

[54] There were no objections interposed to the testimony of Dillenback and Hunter. Where a defendant fails to contemporaneously object to the admission of evidence, the decision to admit the evidence is reviewed only for plain error.

properly admitted.

Several cases have reached the same conclusion.  In <u>United States v. Fulmer</u>, 108 F.3d 1486 (1st Cir. 1997), relied on by the defendant, the Court ruled in a plain threat case, where only the reasonably foreseeable intent of the speaker was at issue, that evidence of the recipient of the threats reaction was "relevant to the determination of whether the statement is a true threat." <u>Id</u>. at 1499.  Indeed, the Court found that this was the state of the law in those circuits who had considered the matter.  <u>Id</u>.  In <u>United States v. Malik</u>, 16 F.3d 45, 49 (2d Cir. 1994), the Court held that in assessing whether a person would view something as a threat, "the effect of the alleged threat on the addressee is highly relevant."  In <u>United States v. Robert</u>, 915, F.2d 889, 891 (4th Cir. 1990), the jury heard testimony not only about the recipients's belief that the threat was real, but also the fact that the police and the FBI took the threat seriously.

Furthermore, in <u>United States v. Davis</u>, 876 F.2d 71 (9th

---

<u>See</u> Fed. R. Crim. P. 52(b); <u>United States v. Mornan</u>, 413 F.3d 372, 379 (3d Cir. 2005).  To establish plain error, a defendant has the burden to prove:  "1) an error 2) that is plain [that is, clear and obvious] and 3) that affects substantial rights" – <u>i.e.</u>, that the error "'affected the outcome of the district court proceedings.'"  <u>United States v. Knobloch</u>, 131 F.3d 366, 370 (3d Cir. 1997) (quoting <u>United States v. Olano</u>, 507 U.S. 725 (1993)).  Furthermore, the reviewing Court will correct the error only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  <em>Id.</em> (internal quotation marks and citations omitted).  Accordingly, a Court's power to correct plain error under Fed. R. Crim. P. 52(b) must be used "sparingly."  <u>Jones v. United States</u>, 527 U.S. 373, 389 (1999).

Cir. 1989), the Court held that actions taken in response to a threat are highly relevant as to whether the statements could be read as continuing a threat of injury. Id. at 73. In United States v. Schneider, 910 F.2d 1569, 1570 (7th Cir. 1990), the Court also held that it was relevant that in response to a threat, the recipient "was sufficiently alarmed to request and receive protection from the local sherif." Thus, what Ms. Dillenback and Mr. Hunter did in relation to the actions against them after having had their personal information posted on the SHAC website and having had their homes vandalized was highly relevant to the jury determination of whether they were in reasonable fear of death of serious bodily injury to themselves or members of their families. Mr. Hunter's testimony that he received armed security and that he had law enforcement work with the schools was relevant to how he treated the threatening actions taken against him.[55]

Defendant Kjonaas objects to Ms. Harlos' testimony that she was aware of physical attacks on others. Kjonaas Br. at 34. Kjonaas goes on to argue that there was no evidence of an attack on any individual in the United States. First, Henning Jonnason

---

[55] The names and ages (then 10 and 8) of Mr. Hunter's children were listed on the SHAC website. The names of the schools of other Marsh employees children wee also posted. Thus, Mr. Hunter's concern for his children while they were at school was wholly understandable and his contacting law enforcement to work with the school was a reasonable reaction to the threat posed by the posting in light of the surrounding circumstances.

testified that while he and his wife were home one evening, the
windows of his home were shattered by rocks and he and his wife
had to crawl to safety and call 911.  Second, defendant cites no
law that the assaults had to occur in this country before they
are relevant.  He needs the geographic limit because an HLS
employee, Brian Cass, was physically assaulted in the U.K.
Defendant cannot admit that the evidence of that is relevant
because it damages other aspects of his argument.  However,
attacks on others and how it affected the mental state of victims
is highly relevant to the reasonableness of their fear.  Threats
must be considered in the context in which they were made.
Fulmer, 108 F.3d at 1493; United States v. Orozco-Santillan, 903
F.2d 1262, 1266 (9th Cir. 1990).

   In United States v. Davis, 876 F.2d 71 (9th Cir. 1989), the
defendant threatened to kill a judge and was convicted of mailing
a threatening letter with the intent to extort.  At trial, the
judge who was threatened testified regarding his knowledge of a
prior assassination of a federal judge as well as steps that were
put in pace to protect him.  The defendant claimed that this was
error.  The Court of Appeals disagreed holding:

> Evidence of the recipient's state of mind, as well as
> his actions taken in response to the letter, are highly
> relevant in establishing an essential element of both
> counts of the Indictment – whether the letter could
> reasonably be read as containing a threat of injury.

Id. at 73.  Moreover, the Court held that "the probative value of
the testimony was not substantially outweighed by the danger of

unfair prejudice." Id.   In ths case, unlike the facts in <u>Davis</u>,
the vandalism and physical attacks that Ms. Harlos testified
about occurred to individuals related to this matter and
victimized after their names – like hers – were identified by
SHAC.  Thus, her fear was not based on some unrelated action, but
rather, on what occurred to victims similarly situated to her.
Accordingly, the evidence was properly admitted and defendant's
motion should be denied.

Defendant Kjonaas next objects to a single reference made by
Jeffrey Gilmore that his being evacuated from a smokey, high rise
building in July, 2002 brought back thoughts of the colleagues he
had lost in the World Trade Center.  Defendant claims: "The
prosecutor was trading on the gut reaction of any person in the
tri-state area to references to the World Trade Center bombing."
Kjonaas Br. at 35.  The Government did not probe that statement,
nor did it elicit how many colleagues he lost or any other
circumstances surrounding the events of September 11, 2001 – a
tragedy that occurred only months before the events Mr. Gillmore
was put through.  The Government did not refer to these events in
its opening, its closing, or at any other time during the trial.
In short, the Government did not do anything with the reference
which was created by the events of July 10, 2002.  What swayed
the jury was the illegal activities perpetrated by the
defendants.

Finally, Kjonaas objects to the admission of the radio show

that defendant Gazzola, posing as Angela Jackson, engaged in on her own accord.  This was not a law enforcement covert taping, but rather, a public appearance on a call-in radio show in Seattle which occurred days after the smoke bomb incidents at the Marsh and Guy Carpenter Offices.  In fact, the tape was seized from the residence Ms. Gazzola shared with Kjonaas and Conroy. Gazzola made many statements that were clearly admissible as admissions.  For completeness, the statements of the radio host were included although the Government agreed to redact certain statements.[56]  Gazzola was able to respond to each of the radio show host's comments and indeed used the comments as a platform for her statements.  Thus, without the comment to put the Gazzola's statements in context, they would have no meaning.

Last, the Court instructed the jury on two occasions that the statements by the radio show host were not to be considered by them and indeed, were meant to be provocative rather than true.  Thus, the jury understood that it was Gazzola's comments and not the comments of the radio host that were relevant.

---

[56]  Although the defense was in possession of these tapes for years and the tape was marked as an exhibit some eight months prior to trial, no objection to the content was made until the day the tape was to be formally introduced in evidence.

**VI. THERE WAS SUFFICIENT EVIDENCE TO SUSTAIN THE STALKING CHARGE AGAINST THE CORPORATE DEFENDANT.**

The defendant, SHAC, USA, Inc. was incorporated on October 17, 2002. By its own admission, "Marsh was listed as a target in late 2001 or early 2002." SHAC Br. at 71. Marsh did not cease being a target until <u>after</u> it stopped doing business with HLS. Government Exhibit 5019 is a recording of a conversation dated December 18, 2002, between and among defendants Stepanian, Gazzola and Kjonaas wherein Gazzola announced to Stepanian: "Marsh is out, baby."

During the time that Marsh was a SHAC target, the personal information of Marion Harlos, Rob Harper[57] and Sally Dillenback remained on the SHAC Website and they continued to be harassed. Indeed, even SHAC's memorandum of law, which takes a rather liberal view of the facts, admits that activities at the homes of Mr. Harper, Ms. Dillenback and Ms. Harlos continued "until late 2002." SHAC Br. at 69. Thus, by SHAC's own admission, the activity that formed the basis of the stalking counts continued until after the company was in existence.

SHAC suggests that the injunctions in place limiting the time, place, and manner of protesting, should somehow immunize any and all activity that occurred thereafter. SHAC also argues

_____

[57] The memorandum of law submitted by SHAC states: "Unlike Ms. Dillenback, Mr. Harper's home address was not posted on the website." SHAC Br. at 70 n.23. This statement is simply false. <u>See</u> Govt. Ex. 1133. Ms. Harlos and a host of other Marsh employees' home addresses were also listed on the SHAC Website.

that home demonstrations consistent with Court orders cannot

constitute stalking.  SHAC Br. at 75-76.  However, there was no

evidence at trial that the home demonstrations that occurred

after injunctions were obtained were consistent with the terms of

the injunctions.[58]

Moreover, simply because Marsh went to court and obtained

injunctions does not decriminalize any activity by SHAC and its

sympathizers that put victims in reasonable fear of death or

serious bodily injury.  The injunctions merely permitted

individuals to assemble with certain restrictions.  The fact that

individuals can do so, however, does not _ipso_ _facto_ insulate

their activity from being criminal in nature.  The question is

how did the people act?  What did they do?  What did they say?

For example, defendant Gazzola stood the appropriate amount

of feet from Mr. Harper's house and shouted that they should burn

his house down and asked:

> Where were the police when an HLS worker's car got
> flipped over in his driveway?  Where were the police
> when a Marsh executive had al his windows smashed in
> and his house covered in red paint in Chicago? And
> where were the police when you house was covered in red
> paint a few weeks ago?  They can't protect you. Your
> injunctions can't stop us.  We will always find a way
> around whatever they throw at us.

The injunction did not immunize those words from being found

---

[58]     Indeed, Robert Harper testified that the injunctions
did not help because the very night after Marsh obtained an
injunction on his behalf, someone ran across the front of his
home at 3:00 a.m. screaming: "Rob Harper is a puppy killer."
(Tr. 2/14/06 at p. 213.).

threatening. To the contrary, the protest activity outside people's homes, coupled with the knowledge of what had happened to others (information that was printed on the SHAC Website), and the tenor of the web postings could be seen by the jury as placing the victims in reasonable fear of death or serious bodily injury to themselves or members of their immediate family. Indeed, after Marsh petitioned a Court for an injunction for Ms. Dillenback, which included an affidavit from her about what was happening and how it affected the family, the SHAC website mocked her:

> On Saturday, December 14, activists paid a holiday visit to Sally Dillenback, head of the Marsh Office. She was surprised (finding her) working on her Christmas tree with her family. Sally pretended the presence of two large signs bearing likenesses of mutilated animals did not affect her holiday cheer, but when the activists set off up the street, her husband soon appeared around the corner of the house for no apparent reason, probably checking on the activists' whereabouts. Contrary to Sally's sworn testimony at her deposition, her son did not run for a kitchen knife to hide when he say the activists. Instead he and his . . . sister seemed quite interested in the signs and appeared to be trying to read them from across the street. (Govt. Ex. 1151A).

This web posting was dated December 22, 2002, a date well after SHAC USA, Inc. came into existence. Thus, the jury could have reasonably found that SHAC was involved in the conspiracy to stalk in Count two as well as in aiding and abetting the substantive stalking counts of Counts three through five.

Defendant SHAC's citation to United States v. Thomas, 114 F.3d 403 (3d Cir. 1997), as a "similar conspiracy," SHAC Br. at

71, does not support any argument in this case. The decision in Thomas dealt with a drug importation conspiracy and whether the courier knew that the package he was picking up contained narcotics. In contrast, this case deals with a corporate conspirator who acted through its agents – Kjonaas, Gazzola, and Conroy. To argue that all the corporate defendant did was "keep bad company," SHAC Br. at 73, is wholly spurious. It was the "bad company" that directed the actions of SHAC and acted as its agents. Hence, it is the illegal acts of the "bad company" that were properly imputed to SHAC by the jury. Defendant's motion in this regard should be denied.

## VII. THERE WAS SUFFICIENT EVIDENCE TO SUSTAIN THE CHARGE OF USING A TELECOMMUNICATIONS DEVICE FOR PURPOSES OF HARASSMENT.

Defendant SHAC argues that there was insufficient evidence to support the jury's verdict that it was guilty of Count VI of the Superseding Indictment, which involved harassing activity through the use of a telecommunications device. As set forth above, there was sufficient evidence -- including evidence of acts <u>after</u> the corporate defendant came into being – of SHAC and the defendants importuning people to harass victims through telephone blitzes, e-mail blitzes and black faxes.

Nevertheless, SHAC wishes the Court to dwell, not on the entire panorama of events, but rather on a few isolated incidents. For instance, SHAC only points out the speech by defendant Harper whereby he explained to a group of people at a meeting in Washington State the mechanics of sending a black fax, and the testimony of Jeffrey Dillbone. SHAC Br. at 89. SHAC, however, wholly neglects the testimony from other witnesses about receiving black faxes. It also neglects the postings on the SHAC website calling for black fax Mondays.

Patrick Genovese testified about what occurred at Focal Communications, a company that provided telephone and internet services to HLS until it was driven out by SHAC. The campaign against Focal began with a web posting entitled Murder by Phone Numbers (Govt. Ex. 1197), which listed phone and fax numbers for Focal. The posting stated in part: "although we've all enjoyed

HLS's phone lines as our 'fun line' with many a prank call, but it's time to cut this service off." (<u>Id</u>.).  After this posting, Mr. Genovese testified:

> At the corporate office, our main fax machine was receiving black pages.  These pages would just come in, hundreds at a time, and be fully black, subsequently drying up the ink in the fax machine.

> This main fax number was used by our customers and our prospective customers responding to contracts, by law enforcement agencies forwarding subpoenas to Focal Communications, and being a telecommunications service provider, and was of great concern because it was interrupting our business.  (Tr. 2/21/06 at p. 113).

This activity took place in 2004, well after the corporate defendant came into existence.  Accordingly, there was sufficient evidence in the record – evidence conveniently ignored by defendant – to support the jury's finding of guilt.

Finally, SHAC argues that the statute, 47 U.S.C. § 223(1)(D) "only applies to the person initiating the communication."  SHAC Br. at 91.  This ignores that fact that the defendant was not charged with the substantive act but with conspiracy to commit the crime.  Accordingly, the motion should be denied.

**VIII.  THE INTERNET IS AN INSTRUMENT OF INTERSTATE COMMERCE.**

Defendant SHAC argues at three sections of its memorandum of law, SHAC Br. at 32-33, 67-68, 78-79, that there was no nexus to interstate commerce.  Notwithstanding the fact that HLS, the company that SHAC and the defendants conspired to shut down operated in interstate commerce, as did many of the companies that SHAC targeted, the use of the internet in publishing the SHAC Website constituted the use of an instrumentality in interstate commerce.  Indeed, in <u>United States v. MacEwan</u>, --- F.3d ---, 2006 WL 861184, at *7 (3d Cir. April 5, 2006), the Third Circuit squarely held that "the internet is an instrumentality and channel of interstate commerce."  <u>See also</u> <u>United States v. Tykarsky</u>, --- F.3d ---, 2006 WL 1236824 (3d Cir. May 10, 2006)(internet is channel and instrumentality of interstate commerce).  Accordingly, defendant's motions relative to the lack of an instrumentality of, or activity in interstate commerce, should be denied.

**IX. DEFENDANT SHAC'S REMAINING ARGUMENTS LACK MERIT.**

First, SHAC argues that the Court erroneously admitted certain co-conspirator statements, and specifically references the statements of Kjonaas, Gazzola, and Harper. SHAC Br. at 100-05. Having proven to the jury beyond a reasonable doubt that all of the defendants were involved in a conspiracy, and because the statements all related to the SHAC campaign against HLS, the Government clearly "linked up" the statements to the charged conspiracy. Thus, they were admissible under Rule 801(d)(2)(E).

Second, SHAC argues that this Court erred in barring the defense's proposed expert testimony. The proposed computer expert testimony, however, was clearly impermissible because it sought to opine on the intent of the defendants to the commit the crime. See Fed. R. Evid. 704. The defendants were looking to usurp the jury's role of deciding intent, and this Court properly barred them from doing so. Likewise, this Court properly barred the defendants from admitting the testimony of Dr. Raymond Greek. The proposed testimony focused on the lack of scientific need for animal testing. Regardless of the merit of that opinion, or the lack thereof, it does not excuse the defendants' criminal conduct or entitle them to argue nullification.

Last, SHAC asks this Court to reconsider its motion to be severed. SHAC, however, was charged in a conspiracy with each of the defendants. Moreover, SHAC's agents were co-defendants in this case. There is simply no basis for a severance.

**X.    THE COURT SHOULD DENY KJONAAS'S CLAIM OF INEFFECTIVE
        ASSISTANCE AS PREMATURE.**

As defendant Kjonaas concedes, the Third Circuit "has
expressed a preference that ineffective assistance of counsel
claims be brought as collateral challenges under 28 U.S.C. §2255,
rather than as motions for new trials."  United States v. Chorin,
322 F.3d 274, 282 n. 4 (3d Cir. 2003).   Nevertheless, Kjonaas
claims than in this particular case it is appropriate and
necessary to address his claim now.   Kjonaas, however, ignores
several valid reasons why this Court should adhere to the
preference that such claims be pursued through a collateral
proceeding under 28 U.S.C. § 2255.

First, contrary to Kjonaas's suggestion, the affidavits
presented by the defendant are not sufficient to set forth a
claim of deficient performance by his trial counsel, let alone to
demonstrate any prejudice.   Given defendant's undeniable motive
to lie, this Court cannot simply rely upon his self-serving
assertions that were not subject to cross-examination.   See,
e.g., D'Amario v. United States, 403 F. Supp. 2d 361, 371 (D.N.J.
2005)  ("a barebones assertion by a defendant, albeit made under
oath . . . is insufficient to require a hearing or other action
on his claim that his right to testify in his own defense was
denied him") (internal quotation marks and citations omitted).
Similarly, the Court cannot simply accept the declarations of Ms.
McGinty and Mr. Erba.   Both affidavits claim that the attorneys

were aware that Mr. Schneider was acting unprofessionally during the trial, and they believed that Mr. Schneider's conduct was jeopardizing Kjonaas, yet they stood by and let it happen. That fact, alone, suggests that counsel's affidavits are nothing more than Monday-morning quarterbacking.[59]

Second, it would be more efficient and judicially economical to address Kjonaas's collateral attack on his conviction after any issues on direct appeal are resolved. The defendants are likely to raise several challenges to their convictions. An opinion by the Third Circuit on the issues raised by the defendants would certainly assist this Court in undertaking its analysis of whether counsel was deficient and whether there was any prejudice. Accordingly, it is more efficient to address the merits of this claim after the direct appeals are exhausted.

Third, if this Court decides Kjonaas's claim on the merits, he will be precluded from bringing any future ineffective assistance of counsel claims that he now has or should otherwise know about. Put differently, assuming arguendo that Mr. Schneider was ineffective in some manner that current defense counsel has not raised, Kjonaas would be forever barred from

---

[59]     Indeed, if true, both attorneys may have acted unprofessionally. <u>See</u> N.J. Prof. R. Conduct 8.3 ("A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority").

raising that claim under principles of res judicata.  <u>See</u> <u>United</u>

<u>States v. Brooks</u>, 125 F.3d 484, 496 (7th Cir. 1997) ("an adverse

determination [of ineffective assistance claim] on direct appeal

will be res judicata in any subsequent collateral attack).  Given

Kjonaas's contentions about the length of time it would have

taken to review the discovery in this case and prepare a defense,

it is questionable that a month and a half is sufficient time for

new counsel to review all of that discovery and the entire trial

record and raise all possible claims.  In contrast, if a month

and a half is sufficient for new counsel to adequately

familiarize himself with the discovery in this case as well as

the trial record, then Kjonaas's suggestion that Schneider was

ineffective in his preparation rings hollow.

For all these reasons, it would be more judicially economic

and efficient to resolve all potential collateral attacks after

the direct appeals have been exhausted.  Accordingly, this Court

should deny defendant's ineffective assistance of counsel claim

without prejudice.

**XI.  IN THE ALTERNATIVE, KJONAAS'S CLAIM OF INEFFECTIVE
ASSISTANCE FAILS ON THE MERITS.**

Defendant Kjonaas is claiming that trial counsel was
ineffective and, as a result, it denied him the right to testify.
A defendant claiming ineffective assistance of counsel must show
(1) "that his counsel's performance was deficient" and (2) "that
he was prejudiced by the deficiency." <u>Strickland v. Washington</u>,
466 U.S. 668, 687 (1984).  The first prong requires the defendant
to prove that counsel "made errors so serious that counsel was
not functioning as 'counsel' guaranteed by the Sixth Amendment" -
- <u>i.e.</u>, that counsel's performance fell below an objective
standard of reasonableness.  <u>Id.</u>  The second prong requires the
defendant to prove that but for counsel's error, there is a
reasonable probability that the result of the trial would have
been different" -- <u>i.e.</u>, a "probability sufficient to undermine
confidence in the outcome."  <u>Id.</u> at 694.   In short, the
defendant must demonstrate that "counsel's conduct so undermined
the proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result."  <u>Id.</u> at
686.  Kjonaas has failed to do so.

**A.  Defendant Has Failed To Set Forth Facts To Support A
Claim of Ineffective Assistance Based Upon The Denial
Of The Right To Testify.**

Defendant Kjonaas is not asserting that he did not
understand he had the right to testify.  To the contrary, he
admits that he and Mr. Schneider discussed whether he should

105

testify.  Kjonaas Aff. ¶¶ 20, 21.  Mr. Schneider, likewise,
states that he discussed with Kjonaas whether to testify.
Schneider Aff. ¶ 8. (a copy of Mr. Schneider's affidavit is
annexed hereto).  Ms. McGinty's affidavit also confirms that
Kjonaas was aware he could "testify in his own behalf" as they
discussed the topic "frequently."  McGinty Aff. ¶ 6.  In addition
to these conversations with Mr. Schnedier and Ms. McGinty,
Kjonaas was present in the courtroom when counsel for defendant
Conroy asked the Court to discuss with Conroy the fact that they
had discussed whether he should testify.  Likewise, Kjonaas was
present in the courtroom when defendant Harper exercised his
right to testify.  Hence, Kjonaas unquestionably understood he
had the right to testify.

Kjonaas is also not claiming that Mr. Schneider overrode his
decision to testify.  The affidavit does not contain a
declaration by Kjonaas that he insisted on testifying, that he
communicated that fact to Mr. Schneider, and that Mr. Schneider
refused to let him testify.  The affidavit contains only the
following conclusory statement:  "Mr. Schnedier led me to believe
I could not testify."  Kjonaas Aff. ¶ 25 (emphasis added).

In an affidavit full of dates and specific conversations, it
is telling that there are no particular facts to support this
passive statement.  For example, the affidavit does not state how
or when Kjonaas made it clear to Mr. Schneider that he wanted to
testify.  Likewise, the affidavit does not state how or when Mr.

Schneider told Kjonaas that he could not testify despite

Kjonaas's insistence that he be called to the stand.  Indeed,

nowhere does the affidavit of Kjonaas state that his attorney

told him that he could not testify.  Finally, the affidavit

offers no explanation as to why Kjonaas stood mute when Mr.

Schneider rested on his behalf. In short, the affidavit glosses

over this critical part of Kjonaas's claim.[60]

Moreover, there is a fatal disconnect between what Kjonaas

alleges was deficient performance by Mr. Schneider (e.g., the

failure to review discovery or conduct proper cross-examination

of Government witnesses) and what he is claiming as prejudice

(his decision not to testify).  Kjonaas, for example, claims that

Mr. Schneider was deficient because he did not listen to

approximately 600 audiotapes of intercepted conversations,

Kjonaas Br. at 6, but he neglects to explain what recordings Mr.

Schneider should have, or could have, used at trial.  Kjonaas

also claims that Mr. Schneider was deficient in not filing any

pre-trial motions, Kjonaas Br. at 7, but fails to articulate any

pre-trial motions Mr. Schneider should have filed that had a

_____

[60]    The fact that Ms. McGinty claims that Kjonaas before
the trial intended on testifying is not determinative.  The
decision on whether to testify is a game-day decision that must
necessarily take into account how the actual trial has progressed
and whether the Court has made any rulings that affect the
decision.  Accordingly, the fact that Kjonaas wanted to testify
before the trial started says little about whether he still
wanted to testify after the Government rested.

reasonable probability of affecting the outcome of the trial.[61]
Instead, Kjonaas attempts to avoid satisfying <u>Strickland</u> by
suggesting that he "should not be burdened with the difficult if
not impossible task of perhaps constructing the defense he would
have, or should have had, if his counsel had been prepared and
effective." Kjonaas Br. at 11. But that is exactly what every
defendant must do to demonstrate prejudice under <u>Strickland</u>.
Kjonaas's failure to do so here defeats his claim.

Instead, Kjonaas is asking this Court to reach the
speculative conclusion that he was forced not to testify because,
if he had testified, Mr. Schneider would have been ineffective in
examining him. Further, Kjonaas is asking this Court to reach
that conclusion without having demonstrated that he was <u>actually
prevented</u> by Mr. Schneider from taking the stand. Clearly,
Kjonaas never gave any indication to the Court that he wished to
testify, he never protested when Mr. Schneider rested, and his
own affidavit lacks any facts that show he insisted on testifying
<u>after</u> Mr. Schneider advised him he should not testify.

A defendant cannot make a knowing decision to follow
counsel's advice to not testify, then later protest that he only
made that decision because he speculated that his attorney was
not up to the task of putting him on the stand. At the core of

---

[61]     As discussed <u>infra</u>, Kjonaas conveniently overlooks the
extensive pre-trial motion practice that took place prior to Mr.
Schneider entering the case.

this claim is Monday-morning quarterbacking and second-guessing.
It is not an appropriate basis for relief. Accordingly, because
defendant has failed to set forth sufficient facts to support a
claim of ineffectiveness, this Court should deny his claim on the
merits. See D'Amario v. United States, 403 F. Supp. 2d 361, 371
(D.N.J. 2005) (denying ineffective assistance claim where
defendant "provide[d] no documentation" and there was no
"evidence in the record that" defendant "was actually prevented
from testifying at his trial").

### B. Defendant Has Failed To Demonstrate Deficient Performance Or Actual Prejudice.

In any event, Kjonaas's assertions fail to demonstrate that
Mr. Schneider was deficient or, even accepting that he was, that
Kjonaas was actually prejudiced, such that a new trial is
warranted. In reviewing an attorney's performance, the Court
must be "highly deferential" to the attorney's decision-making to
"eliminate the distorting effects of hindsight, to reconstruct
the circumstances of counsel's alleged conduct, and to evaluate
the conduct from counsel's perspective at the time." Strickland,
466 U.S. at 689. In that regard, there is a "strong presumption
that counsel's conduct falls within the wide range of reasonable
professional assistance." Id. In particular, with regard to the
decision on whether a client should testify, the presumption is
critical because the decision on whether a defendant should
testify is "a 'judgment call' which should not easily be

condemned with the benefit of hindsight." United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002).

Kjonaas's claims of deficient performance fall into three general categories: (1) counsel's pre-trial performance; (2) counsel's performance during the trial; and (3) counsel's advise to Kjonaas regarding his testimony. With regard to each category, Kjonaas has failed to demonstrate that Mr. Schneider's performance fall outside the range of reasonable professional assistance, or that there was any prejudice.

Kjonaas's suggestion that counsel was ineffective because he "failed to file pre-trial motions or responses to the Government's motions" ignores the reality of the situation. Prior to the Schneider's participation in this case, the defendants filed numerous pre-trial motions that were decided by Judge Cooper, including a litany of motions filed by Ms. McGinty, Kjonaas's prior counsel. Those motions covered a wide range of issues, including motions for a bill of particulars, dismissal of the Superseding Indictment, and suppression of the Title III intercepts. When this case was reassigned to this Court, the Court made it clear that it would regard the prior rulings as law of the case. Accordingly, it was entirely reasonable for Mr. Schneider not to frivolously re-file the pretrial motions.[62]

---

[62]    Indeed, from the time he entered this case until the commencement of the trial, no defense counsel filed a pretrial motion.

110

Furthermore, Kjonaas has not even attempted to show what pre-trial motions Mr. Schneider should have filed, but did not. Hence, he cannot possibly establish any prejudice.

It was also entirely reasonable for Mr. Schneider not to file a response to the only Government motion filed during his participation in this case. Mr. Erba filed a comprehensive response to the Government's motion in limine to admit the website postings and to preclude the defense expert witness. That motion was equally important to each defendant, yet their attorneys (like Mr. Schneider) made the reasonable decision that Mr. Erba had adequately responded and, thus, no further response was needed.

Kjonaas also attacks Mr. Schneider's review of the discovery in this case, including the videotapes and audiotapes. Mr. Schneider's affidavit fully explains his strategy and preparation for this case given the relevant discovery and the evidence the Government was going to introduce (including the witnesses). His affidavit evinces an objectively reasonable approach toward defending the case given the particular circumstances.

Nevertheless, even assuming arguendo that Mr. Schneider should have reviewed additional materials, Kjonaas has not demonstrated that there were any additional videotapes, Title III interceptions, or any other material that Mr. Schneider should have sought to admit at trial, let alone that but for his failure to do, there is a reasonable probability that the result of the

trial would have been different. On this point, it is important
to note that Kjonaas's and his co-conspirator's statements on the
video- and audiotapes are hearsay unless used by a party-
opponent. See Fed. R. Evid. 801(d)(2). Hence, the Government
would have objected to the introduction of Kjonaas's prior, out-
of-court statements. Moreover, none of the six co-defendants,
all of whom were similarly situated to Kjonaas, sought to admit
any vide- or audio-tapes.

Mr. Erba suggests that "within the discovery there were
documents which arguably demonstrated that Mr. Kjonaas secured
permits for the various New Jersey demonstrations" and "Mr.
Schneider took no steps to introduce any of these documents."
Erba Aff. ¶ 42. Of all the defendants, the corporation was most
closely aligned with Kjonaas, its former president. If there
were such materials, and they were relevant, Mr. Erba should have
sought to introduce them. Indeed, given the fact that his
client's criminal liability was based upon Kjonaas's conduct as
the company's agent, it would have been ineffective for Mr. Erba
not to have tried if they were truly helpful to the defense. The
fact that Mr. Ebra did not seek to introduce any evidence of this
sort speaks volumes about the merits of this allegation.

More important, evidence of permits to protest is irrelevant
given the fact that a permit to demonstrate lawfully at certain
times does not excuse the unlawful conspiracy proven at trial.
And, in any event, evidence was elicited at trial through cross-

examination that, at times, permits were obtained.

Next, Mr. Schneider's tactical decision to limit his cross-examination of the Government witnesses, was not only reasonable, but was followed by all defense counsel. The majority of the Government witnesses did not directly implicate the defendants in the criminal conduct. Their testimony was pertinent, among other things, to establish what was happening to various victims as a result of an organized effort by SHAC to harass, intimidate, and stalk them. Other evidence, including the Title III intercepts, the audiotapes, the search materials, and the computer expert's opinion was used to establish that these defendants were the ones responsible for that organized, criminal effort. As Schneider has explained: "Because many of the Government witnesses were sympathetic people who told sad stories that seemed to capture the jury's attention, I made the tactical decision with many of them to simply establish that they did not know my client, had never seen my client, and then asked no more. This was a tactical decision that not only I used but all my co-counsel used as well." Schneider Aff. ¶ 7. Under those circumstances, Mr. Schneider's cross-examination strategy was entirely reasonable.[63]

Likewise, Kjonaas has failed to show that Mr. Schneider's

---

[63]     Mr. Erba also contends that Mr. Schneider "would continually ask questions which were poorly formed and which invited Government objection." Erba Aff. ¶ 41. A review of the trial record, however, indicates that Mr. Erba was objected to about the same number of times as Mr. Schneider.

opening statement was ineffective. Similar to the other defense counsel's opening statements, Mr. Schneider focused significantly on what the evidence would not show. Tr. 2/7/06 at 69-77. To be sure, Mr. Schneider offered personal information about Kjonaas and did not later introduce evidence to support it. That, however, is no different than what other defense counsel did, and it is certainly not a basis for concluding he was ineffective. See, e.g., Tr. 2/7/06 at 77-78 (Sirkin opening) ("Lauren is a young lady who grew up in Connecticut, graduated from New York University in a self-degree design program. From the time she Lauren was a young lady in high school, she was concerned about social issues . . . ."); Tr. 2/7/06 at 97 (Throckmorton opening) ("He [Stepanian] is a talent scout for a movie -- excuse me, for a music publisher. As part of that involvement in the music industry he helped organize a trip to New Orleans with trucks . . . ."). [64]

In his opening statement, Mr. Schneider did tell the jury that they would hear Kjonaas consulted with lawyers. Although

---

[64]    Ms. McGinty's affidavit also contains several criticisms of Mr. Schnieder's preparation for the trial and offers her opinion on what effective representation would have entailed. There are always, however, varying ways to defend a criminal case and all of them may be objectively reasonable. Furthermore, Ms. McGinty's opinion in this particular case must be considered in light of the fact that she was removed as Kjonaas's attorney after Judge Cooper concluded that it was not in Kjonaas's best interest for Ms. McGinty to try the case. In the event Ms. McGinty is called as a witness, the Government would seek to unseal Judge Cooper's findings as they would affect Ms. McGinty's credibility.

the statement does suggest he would introduce evidence on the subject, it did not commit Kjonaas to testify because the lawyers could have provided such evidence.

Furthermore, it was reasonable for counsel to change his strategy in light of how the case progressed.[65] During the trial, this Court ruled that if Kjonaas testified he relied on the advice of counsel, or if counsel were called to testify about the advice given, the Government could cross-examine witnesses on the fact that the same counsel advised Kjonaas and others to assert the Fifth Amendment to avoid making incriminating statements.

In addition, the Government did not use an intercepted conversation between Kjonaas and William Strazza in its case-in-chief that showed Kjonaas, Gazzola, and Strazza scheming to avoid a civil injunction.[66] If Kjonaas had testified, the Government could (and would) have used that evidence (and much more) to cross-examine Kjonaas. Both factors made it eminently reasonable for Mr. Schneider to conclude that any benefits from

_____

[65]    Mr. Erba, for example, changed his strategy during the trial. In his opening statement, Mr. Erba told the jury that "[t]he evidence will show that all my client did is provide a web page where people posted information." (Tr. 2/7/06 at p. 64.). In his closing argument, Mr. Erba contradicted himself and argued that the Government had failed to prove his client owned or operated a website.

[66]    Prior to trial, the Court ruled that the conversation was admissible under the crime-fraud exception to the attorney-client privilege.

Kjonaas testifying were outweighed by the harm it would do.
Accordingly, his advice to Kjonaas that he should not testify was
an objectively reasonable strategic decision that should not be
rejected with the benefit of hindsight. See United States v.
Smith 235 F. Supp. 2d 418, 425 (E.D. Pa. 2002) (denying claim of
ineffective assistance where "[P]etitioner has failed to overcome
the presumption that counsel's advice that [Petitioner] not take
the stand was 'sound trial strategy'"); see also Frederic v.
Kyler, 100 Fed. App. 872, 874 (3d Cir. 2004) ("If [Petitioner's]
attorney merely advised him not to testify, that tactical
decision certainly would not have fallen below Strickland's
standard of objective reasonableness").

Defendant cites to United States v. Lore, 26 F. Supp. 2d 729
(D.N.J. 1998) and United States v. DiSalvo, 726 F. Supp. 596
(E.D.Pa. 1989) in support of his motion. These cases differ
drastically from the instant action because in both Lore and
DiSalvo, the defendants clearly wanted to testify and their
lawyers affirmatively stopped them. In Lore, the defendant's
attorney admitted that "there's no question about the fact that
he wanted to testify and I didn't want him to, so in that context
there's no question I coerced him." 26 F. Supp. 2d at 732. In
DiSalvo, the defendant alleged and the Court found that the
defendant's attorney "did not advise DiSalvo of his right to
testify despite DiSalvo's having told him that he wanted to
testify." 726 F. Supp. at 598. In contrast, there is no

dispute here that the defendant knew and understood his right to testify _and_ that his attorney did not stop him or misinform him of his right to testify.

Instead, the defendant claims that he subjectively believed that his attorney was unprepared to put him on the stand and therefore he, the defendant, chose not to testify. An attorney, however, is not ineffective when a client believes him to be so, but rather, when his performance at trial objectively illustrates he is ineffective. As the Court in _Lore_ stated: "The first prong of Strickland requires a defendant to show that his or her attorney's performance was deficient. To satisfy the deficient performance test, the defendant must identify acts or omissions of counsel that were not the result of reasonable professional judgment." 27 F. Supp. 2d at 738. In _Lore_ and _DiSalvo_, the defendants could point to their attorneys' improper conduct in either coercing them not to testify as in _Lore_, or not advising him of his right to testify, as in _Disalvo_, as ineffective conduct.

Kjonaas can point to no such dereliction of duty on the part of his attorney. Indeed, when viewed objectively, Kjonaas can point to no conduct on the part of his attorney which would satisfy the deficiency of performance test in _Strickland_. Kjonaas can only point to after-the-fact subjective belief – not supported by his attorney's performance at trial – that his attorney was not sufficiently prepared to put him on the witness

stand.  A defendant seeking a new trial due to his attorney's
ineffective assistance, must be able to point to objective
indicia of ineffectiveness and not rely wholly on his subjective
belief of ineffectiveness.  To permit such a gambit would allow
defendants two bites at the apple based upon their after-the-fact
assessment of how the trial went.  Accordingly, because Kjonaas
cannot point to objective facts to support his claim of
ineffectiveness on the part of his counsel, the motion should be
denied.

Finally, even assuming that Mr. Schneider was deficient in
telling Kjonaas he should not testify, Kjonaas must still
demonstrate that he was prejudiced by not testifying.  <u>See</u> <u>United</u>
<u>States v. Harris</u>, 408 F.3d 186, 192 (5th Cir. 2005) ("A defendant
who argues that his attorney prevented him from testifying must
still satisfy the two prongs of <u>Strickland</u>.").  Kjonaas blankly
asserts that he was prejudiced because was precluding from
testifying about his legal intent, the purpose of SHAC, and an
explanation for the letters and emails he set to companies to
cease doing business with SHAC.  Kjonaas Br. at 12.  The
pertinent inquiry, however, is whether such testimony, balanced
against cross-examination and the other evidence in this case,
creates a reasonable probability that the result of the trial
would have been different.

Here, most of what Kjonaas claims he would have testified
about was already presented to the jury through the defense's

cross-examination of witnesses, through defense counsel's arguments about the website postings, and through defense witnesses -- *i.e.*, that SHAC only reported on protest activities, that some residential protests occurred prior to SHAC USA reporting it on the website, that the "top 20 terror tactics" were published first by a company affiliated with the animal testing industry, and that there were other organizations protesting against HLS.  Clearly, Kjonaas could have added that he did not intend to engage in an illegal conspiracy, that he was not responsible for any of the illegal activities, and that he did not control the website.  However, the evidence discussed in the statement of facts, overwhelmingly contradicts his story.

Equally important, on cross-examination the Government would have attacked Kjonaas's credibility by showing, <u>inter</u> <u>alia</u>, that on numerous, prior occasions, Kjonaas lied in civil depositions and at a court hearing; those proceedings were all related to SHAC's activities and Kjonaas's association with SHAC.  The Government would have also showed that Kjonaas schemed with Gazzola and SHAC's "general counsel" (Mr. Strazza) to avoid complying with a civil injunction by falsely claiming that SHAC was merely a news organization.  In addition, the Government would have had the opportunity to replay with Kjonaas several prior statements from speeches and intercepted conversations that undermine his story, thus highlighting damaging evidence for the jury a second time.

In sum, the Government is not suggesting that the testimony of a defendant is on par with other evidence. However, in determining what effect a defendant's testimony would have had on the jury, it is unrealistic for the defendant to simply offer his direct testimony without taking into account the damage of cross-examination. In this case, considering the evidence against Kjonaas, what he could have offered by testifying, and what the Government would have shown on cross-examination, it is clear that counsel's advise that he not testify was reasonable, and Kjonaas was not prejudiced for purposes of Strickland. Accordingly, for these additional reasons, this Court should deny his claim of ineffective assistance.

## C. Defendant Must Demonstrate Actual Prejudice.

Defendant attempts to avoid establishing the requisite prejudice under Strickland by claiming that error in this case is a structural error and the only remedy is a new trial. Defendant has not cited any case law to support this contention. To the contrary, ineffective assistance cases cited by defendant all involve a prejudice analysis. See United States v. Harris, 408 F.3d 186, 192 (5th Cir. 2005) ("A defendant who argues that his attorney prevented him from testifying must still satisfy the two prongs of Strickland."). Accordingly, Kjonaas's claim should be denied because he has failed to demonstrate actual prejudice.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendants' motions.

Respectfully submitted,
CHRISTOPHER J. CHRISTIE
United States Attorney

By: **s/ Charles B. McKenna**
Charles B. McKenna
Assistant U.S. Attorney

**s/ Ricardo Solano Jr.**
Ricardo Solano Jr.
Assistant U.S. Attorney

Date: May 22, 2006
Newark, New Jersey